IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

| | |
|---|---|
| S.O.I.TEC SILICON ON INSULATOR TECHNOLOGIES, S.A. and COMMISSARIAT À L'ÉNERGIE ATOMIQUE,<br><br>       Plaintiffs,<br><br>       v.<br><br>MEMC ELECTRONIC MATERIALS, INC.,<br><br>       Defendant. | Civil Action No. 1:08-cv-292-SLR<br><br><br>**REDACTED** |

## DEFENDANT'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR A MORE DEFINITE STATEMENT

August 7, 2008

Patricia S. Rogowski (I.D. #2632)
**CONNOLLY BOVE LODGE & HUTZ LLP**
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141
(302) 658-5614 (Fax)
progowski@cblh.com

*Attorneys for MEMC Electronic Materials, Inc.*

**OF COUNSEL:**
Robert M. Evans, Jr. *(Of the Missouri Bar)*
David W. Harlan *(Of the Missouri Bar)*
Marc W. Vander Tuig *(Of the Missouri Bar)*
Richard L. Brophy *(Of the Missouri Bar)*
**SENNIGER POWERS LLP**
One Metropolitan Square, 16th Floor
St. Louis, MO 63102
(314) 231-5400
(314) 231-4342 (Fax)
revans@senniger.com
dharlan@senniger.com
mvandertuig@senniger.com
rbrophy@senniger.com

## TABLE OF CONTENTS

I.  SOITEC'S ASSERTIONS IN ITS "FACTUAL BACKGROUND" SECTION
    CANNOT CURE ITS DEFECTIVE COMPLAINT ................................................. 1

    A.  Soitec's Lawsuit Against Silicon Genesis Corp. and Reissue Patent
        39,484 ................................................................................................................. 1

    B.  MEMC's SOI Manufacturing Process Does Not Infringe ........................... 3

II. SOITEC'S INSUFFICIENT WILLFUL INFRINGEMENT CLAIM IS NOT
    IMMUNE FROM SCRUTINY UNDER RULE 12(B)(6) ....................................... 4

# TABLE OF AUTHORITIES

## Cases

*Abbott Laboratories v. Sandoz, Inc.*,
  532 F. Supp. 2d 996 (N.D. Ill. 2007) .................................................................. 5

*Bell-Atlantic Corp. v. Twombly*,
  127 S.Ct. 1955 (2007) ......................................................................... 1, 5, 6

*In re Seagate*,
  497 F.3d 1360 (Fed. Cir. 2007) ...................................................................... 4, 5

*Item Development AB v. Sicor Inc.*, No. Civ. 05-336-SLR,
  Civ. 05-337-SLR, 2006 WL 891032 (D. Del.) .................................................. 4

*Soitec v. Silicon Genesis Corp.*, 2003 WL 22839338 (Fed. Cir. 2003) .............................. 2

## Rules

Federal Rule of Civil Procedure 12(b)(6) ............................................................ 4, 5, 6, 7

Federal Rule of Civil Procedure 12(e) ............................................................................. 7

Local Rule 7.1.1 ...................................................................................................... 4

## Statutes

35 U.S.C. § 112 ........................................................................................................ 2

I.    **THE ASSERTIONS OF SOITEC'S "FACTUAL BACKGROUND" CANNOT CURE ITS DEFECTIVE COMPLAINT**

Soitec[1] lists certain allegations in its Opposition brief that it contends support a claim for willful infringement. Soitec's Opposition (D.I. 13), pp. 1-4. Making these allegations in an Opposition brief sidesteps the issue presently before this Court— whether Soitec's *complaint* contains sufficient factual allegations "to raise a right to relief above the speculative level."[2] Soitec opted to omit from its complaint the allegations it makes in its Opposition. And Soitec has not amended its complaint in response to MEMC's motion. As such, the allegations of its Opposition brief can have no bearing on the outcome of MEMC's pending motion. Nonetheless, in this Reply brief, MEMC refutes the substance of Soitec's assertions.

A.    Soitec's Lawsuit Against Silicon Genesis Corp. and Reissue Patent 39,484

In 1999, Soitec sued Silicon Genesis Corporation ("SiGen") for allegedly infringing claims 1-5 and 9 of U.S. Patent No. 5,374,564. *Soitec v. Silicon Genesis Corp.*, No. 99-CV-10826 (D. Mass.). Claims 1-3, 5, and 9 of the '564 patent claimed a

---

[1] Plaintiffs S.O.I.TEC Silicon on Insulator Technologies, S.A. and Commissariat À L'Énergie Atomique are collectively referred to as "Soitec."

[2] Soitec likewise confuses the issue by suggesting that MEMC's motion could have been avoided by calling Soitec and negotiating a "reasonable disclosure arrangement." Soitec's Opposition (D.I. 13), p. 4. The Federal Rules of Civil Procedure mandate that Soitec provide MEMC, *in its complaint*, with a "statement of circumstances, occurrences, and events in support" of its willful infringement claim. *Bell-Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 n.3 (2007). No other "disclosure arrangement" is sufficient under the pleading requirements of the Federal Rules of Civil Procedure or is relevant to the pending motion.

process that required the step of implanting hydrogen ions *or* rare gas ions.[3]  In October

2002, the jury found that claims 1-3, 5, and 9 were invalid for non-enablement under 35

U.S.C. § 112, because the specification only supported hydrogen ion implantation and not

implantation of any other type of "rare gas ions."  *See Soitec v. Silicon Genesis Corp.,*

2003 WL 22839338 at *3 (Fed. Cir. 2003).  Soitec appealed and, on November 6, 2003,

the Federal Circuit affirmed the invalidity of claims 1-3, 5, and 9:

> When a patentee chooses to claim "A or B," as Soitec has, the
> specification must fully enable "B" as well as "A" when the differences
> between "A" and "B" substantially affect the practice of the invention.
> Here, the jury had before it substantial evidence that hydrogen ions are
> significantly different from the rare earth gases in mass, bonding
> capability and diffusion characteristics.  Thus, Soitec's disclosure enabling
> only hydrogen was insufficient.  A reasonable jury could have found that
> the specification failed to teach one skilled in the art how to make and use
> the process using "rare earth gases."

*Id.* at *4.

On May 30, 2003, while its appeal was still pending, Soitec filed a re-issue patent

application in an attempt to salvage the invalidated claims of the '564 patent.  Soitec first

amended the claims to require implantation of hydrogen ions "or a combination of

hydrogen gas ions and rare gas ions."  Ex. 2.  The Patent Office rejected these claims for

lack of enablement, based on the Federal Circuit's findings:

> [T]he jury considered the issue of enablement of the claim feature of
> implanting, not only rare gases alone, but also hydrogen in combination
> with a rare gas. The claims were finally held not enabled and invalid. ***The
> instant claims drawn to the implantation of helium alone*** (i.e. claims 27-
> 32), ***hydrogen in combination with any rare gas*** (i.e. claims 1-3, 5-26,
> and 32-50), ***or anything other than hydrogen, be it in a single stage or***

---

[3] Claim 4 depended from claim 1 and required that the ions being implanted be hydrogen
ions and that the heat treatment stage exceed 500°C.  Although these requirements were
not satisfied by SiGen's NanoCleave process, some early research and development
activities conducted by SiGen in developing its Genesis process were found to have
surpassed this temperature threshold.  *See Soitec,* 2003 WL 22839338 at *2-3.

> ***successive stages of implantation, are not enabled and are invalid, as per the ruling of the Fed. Cir.*** The final decision by the Fed. Cir. is binding upon the USPTO.

Ex. 3, p. 5 (emphasis added).

In response, Soitec amended its patent claims to cover only the implantation of hydrogen. Ex. 4. In allowing these narrowed claims, the Patent Office reemphasized that the claims were limited to implantation of only hydrogen:

> The Applicant cannot use the doctrine of claim differentiation to recapture subject matter which has been held by the Federal Circuit to be not enabled and invalid. The Examiner notes that prosecution history estoppel (file wrapper estoppel), collateral estoppel and res judicata all function to make clear that the Applicant's claims are limited to hydrogen ions.

Ex. 5, p. 9. These narrowed claims, limited to the mono-implantation of hydrogen, were issued as United States Patent No. RE 39,484, and are now asserted as infringed in this lawsuit.

### B.    MEMC's SOI Manufacturing Process Does Not Infringe

Soitec boldly asserts that "the manufacturing process that MEMC uses to make SOI has been adjudicated by a court of law to infringe patent claims...." Soitec's Opposition (D.I. 13), p. 2. This fallacious conclusion is based on two incorrect premises.

First, Soitec asserts that "the PTO approved claims which are substantively identical to the original claims with respect to the applicability to the NanoCleave Process." This sweeping statement contradicts the prosecution history record. As shown above, Soitec was forced to surrender significant claim scope during the prosecution of the reissue application. Because the invalid '564 patent claims were much broader than the RE 39,484 patent claims, the SiGen lawsuit provides Soitec no support in this case.

Second, Soitec erroneously assumes that SiGen's manufacturing process at issue in the 1999 SiGen lawsuit is identical to MEMC's manufacturing process. But as Soitec

surely knows, manufacturing processes evolve as they mature. Moreover, trademarks (such as NanoCleave®) or technology licenses are not reliable indicators of the details of a manufacturing process.

REDACTED

The records of the SiGen litigation and the Reissue proceedings show that MEMC's     REDACTED     is not within the scope of the claims of Soitec's patent. Neither the '564 patent claims, which were invalidated in 2002, nor the substantially narrowed claims of the RE 39,484 patent, which issued in 2007, presented any infringement risk to MEMC, much less an "objectively high" infringement risk. *In re Seagate,* 497 F.3d 1360 (Fed. Cir. 2007).

## II.     SOITEC'S INSUFFICIENT WILLFUL INFRINGEMENT CLAIM IS NOT IMMUNE FROM SCRUTINY UNDER RULE 12(b)(6)

Soitec contends that insufficient allegations of willful infringement are not subject to scrutiny through a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). Soitec's Opposition (D.I. 13), p. 6 ("Federal Rule of Civil Procedure 12(b)(6) is simply inapplicable").[4] Soitec cites no cases to support this assertion. Courts, in fact, have subjected willful infringement allegations to scrutiny under a motion to dismiss under Rule 12(b)(6). *See, e.g., Item Development AB v. Sicor Inc.*, No. Civ. 05-336-SLR, Civ. 05-337-SLR, 2006 WL 891032 (D. Del.) (granting in part defendant's Rule 12(b)(6) motion to dismiss plaintiff's willfulness allegations); *Abbott Laboratories v. Sandoz, Inc.*, 532 F. Supp. 2d 996 (N.D. Ill. 2007) (granting defendant's Rule 12(b)(6) motion for

---

[4] It is on this basis that Soitec alleges MEMC failed to comply with Local Rule 7.1.1, which Soitec concedes does not apply to motions to dismiss, such as MEMC's motion presently before the Court.

4

failing to satisfy the heightened standards for willful infringement required by *In re Seagate*).

Soitec further asserts that its complaint withstands MEMC's motion because it "tracks Form 16" of the Federal Rules of Civil Procedure. D.I. 13, p. 5. Under the current Rules, effective December 1, 2007, Form 18 (not Form 16) is the form that sets forth a sample complaint for patent infringement. Notably, Form 18 does not include any allegation of willful infringement. As such, it is an inadequate yardstick for measuring the sufficiency of Soitec's willful infringement allegations. If the level of detail provided in Form 18 was sufficient to state a claim for willful infringement, then no willful infringement allegation could ever be dismissed under Rule 12(b)(6). Soitec provides no support for this illogical result.

Soitec also attempts to justify its inadequate willful infringement allegations based on a counterclaim filed by MEMC in 2006. This counterclaim pre-dated both *In re Seagate* and *Bell-Atlantic v. Twombly*. Therefore, this counterclaim has no bearing on the issue presently before the Court—whether Soitec's willful infringement allegations in its 2008 complaint pass muster under the heightened "objectively reckless" standard of *Seagate* and the *Twombly* pleading standard.

Soitec provides two main reasons why the Court should not require Soitec to plead its willful infringement allegations with more specificity, notwithstanding the undisputed change in the law marked by *Seagate* and *Twombly*. First, Soitec argues that its bare allegation of willful infringement "imports the applicable standard of proof set forth in *Seagate*." D.I. 13, p. 7. And Soitec suggests that amending its complaint to include a verbal formula would be of little benefit. D.I. 13, p. 8. Such an amendment

would not cure Soitec's defective complaint. *Twombly* expressly rejected formulaic recitations of the elements of a cause of action. *Bell-Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964-65 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do").

Second, Soitec urges the Court not to require it to plead additional details based on Soitec's perceived uncertainty as to the level of factual detail required. Soitec asks, "How much is enough?" D.I. 13 at 8. And wrings its hands over the potential for "satellite" disputes that could "bog down" patent cases at the pleading stage. Soitec's concerns are overstated. The Supreme Court has provided ample guidance:

> Rule 8(a)(2) still requires a "showing," rather than a blanket assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only "fair notice" of the nature of the claim, but also "grounds" on which the claim rests. See 5 Wright & Miller § 1202, at 94, 95 (Rule 8(a) "contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented" and does not authorize a pleader's "bare averment that he wants relief and is entitled to it" ).

*Id.* at 1965. And the Supreme Court has already determined that the minimal time and effort expended in testing the sufficiency of questionable claims at the pleading stage is a worthwhile investment: "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court.'" *Id.* at 1966 (citations omitted).

Because Soitec's complaint provides *no* factual support for its willful infringement allegations, it clearly falls short. Therefore, MEMC respectfully requests

6

that the Court dismiss Soitec's claims for willful patent infringement pursuant to Fed. R.

Civ. P. 12(b)(6), or in the alternative, order Soitec to file a more definite statement under

Fed. R. Civ. P. 12(e), detailing the specific factual basis for Soitec's willful patent

infringement claims.

Respectfully submitted,

Dated:  August 7, 2008                       CONNOLLY BOVE LODGE & HUTZ LLP

By: _Patricia A Rogowski_
    Patricia S. Rogowski (I.D. #2632)
    The Nemours Building
    1007 North Orange Street
    P.O. Box 2207
    Wilmington, DE 19899
    (302) 658-9141
    (302) 658-5614 (Fax)
    progowski@cblh.com

Of Counsel:

SENNIGER POWERS LLP
Robert M. Evans, Jr.
David W. Harlan
Marc W. Vander Tuig
Richard L. Brophy
One Metropolitan Square
16th Floor
St. Louis, MO 63102
(314) 231-5400
(314) 231-4342 (Fax)
revans@senniger.com
dharlan@senniger.com
mvandertuig@senniger.com
rbrophy@senniger.com

*Attorneys for MEMC Electronic Materials, Inc.*

7

# Exhibit 2

I hereby certify that this correspondence is being deposited
with the United States Postal Service, with sufficient
postage, as first class mail in an envelope addressed to:
Mail Stop Reissue, Commissioner for Patents
P.O. Box 1450, Alexandria, Virginia 22313-1450
on November 8, 2004

_____
Date of Deposit

Jasper W. Dockrey, Reg. No. 33,868
_____
Name of applicant, assignee or
Registered Representative

_____
Signature
November 8, 2004
_____
Date of Signature

REISSUE
Case No. 9905/8

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Application of:<br>  BRUEL, Michel | )<br>)<br>) |
| Application Serial No. 10/449,786<br>Filing Date: May 30, 2003 | )<br>)<br>)<br>) |
| Reissue of U.S. Patent No. 5,374,564<br>Issue Date: December 20, 1994 | )<br>)<br>) |
| For:  A METHOD OF PRODUCING<br>A THIN LAYER OF SEMICONDUCTOR<br>MATERIAL | )<br>)<br>) |

Examiner:
  Erik Kielin

Group Art Unit:
  2813

## AMENDMENT AND
## REQUEST FOR RECONSIDERATION UNDER 37 C.F.R. § 1.111

Mail Stop Reissue
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

Dear Sir:

    In response to the Office Action dated June 7, 2004, please reconsider the rejection in view of the amendment and remarks presented herein.

11/10/2004 SSITHIB1 00000053 10449786
I3 FC:1205                108.00 OP

Appl. No. 10/449,786
Amendment. Dated November 7, 2004
Reply to Office Action of June 7, 2004

Amendments to the claims (changes from the original patented claims shown by underlining and square brackets) are reflected in the listing of claims beginning on page 3 of this paper.  Claim 39 is amended in line 16 (deletion of typographical error).

The applicant's remarks begin on page 15 of this paper.

**Amendments to the Claims:**

     This listing of claims will replace all prior versions, and listings of claims, in the application:

**Listing of Claims:**

1. (Previously presented)  Process for the preparation of thin semiconductor material films, wherein the process comprises subjecting a semiconductor material wafer having a planar face and whose plane[,] is substantially parallel to a principal crystallographic plane, to the three following stages:

     a first stage of implantation by ion bombardment of the face of said wafer by means of ions creating in the volume of said wafer at a depth close to the average penetration depth of said ions, a layer of gaseous microbubbles defining in the volume of said wafer a lower region constituting a majority of the substrate and an upper region constituting the thin film, the ions being chosen from among hydrogen gas ions or a combination of hydrogen gas ions and rare gas ions and, wherein the temperature of the wafer during implantation [being] is kept below the temperature at which the gas produced by the implanted ions can escape from the semiconductor by diffusion,

     a second stage of intimately contacting the planar face of said wafer with a stiffener constituted by at least one rigid material layer,

     a third stage of thermally treating the assembly of said wafer and said stiffener at a temperature above that at which the ion bombardment takes place and adequate to create by a crystalline rearrangement effect in the wafer and a pressure effect in the microbubbles, a separation between the thin film and the majority of the substrate, the stiffener and the planar face of the wafer being kept in intimate contact during said stage.


2. (Original patent claim)  Process for the preparation of thin films according to claim 1, wherein the stage of implanting ions in the semiconductor material takes place through one or more layers of materials having a nature and thickness such that they can be traversed by the ions.

Appl. No. 10/449,786
Amendment. Dated November 7, 2004
Reply to Office Action of June 7, 2004

3. (Previously presented)  Process for the [production] <u>preparation</u> of thin films according to claim 1, wherein the semiconductor comprises a group IV material.

4. (Previously presented)  Process for the [production] <u>preparation</u> of thin <u>semiconductor material</u> films [according to claim 1], wherein the <u>process comprises subjecting a</u> semiconductor [is] <u>material wafer of</u> silicon [,] <u>having a planar face and whose plane is</u> <u>substantially parallel to a principal crystallographic plane, to the three following stages:</u>

    <u>a first stage of implantation by ion bombardment of the face of said wafer by means of</u> <u>ions creating in the volume of said wafer at a depth close to the average penetration depth of</u> <u>said ions, a layer of gaseous microbubbles defining in the volume of said wafer a lower</u> <u>region constituting a majority of the substrate and an upper region constituting the thin film,</u> <u>wherein</u> the implanted ion is a hydrogen gas ion[,] <u>and</u> the wafer temperature during implantation is between 20 and 450°C., [and]

    <u>a second stage of intimately contacting the planar face of said wafer with a stiffener</u> <u>constituted by at least one rigid material layer, and</u>

    <u>a third stage of thermally treating the assembly of said wafer and said stiffener at a</u> <u>temperature above that at which the ion bombardment takes place and adequate to create by a</u> <u>crystalline rearrangement effect in the wafer and a pressure effect in the microbubbles, a</u> <u>separation between the thin film and the majority of the substrate, the stiffener and the planar</u> <u>face of the wafer being kept in intimate contact during said stage,</u>

    <u>wherein</u> the temperature of the third stage heat treatment exceeds 500°C.

5. (Previously presented)  Process for the [production] <u>preparation</u> of thin films according to claim 2, wherein implantation takes place through an encapsulating thermal silicon oxide layer and the stiffener is a silicon wafer covered by at least one silicon oxide layer.

Appl. No. 10/449,786
Amendment. Dated November 7, 2004
Reply to Office Action of June 7, 2004

6. (Previously presented)  Process for the [production] preparation of thin films according to claim 1, wherein the second stage of intimately contacting the planar face of said wafer with a stiffener takes place by applying an electrostatic pressure.

7. (Previously presented)  Process for the [production] preparation of thin films according to claim 1, wherein the stiffener is deposited by one or more methods from within the group consisting of evaporation, sputtering, and chemical vapor deposition with or without plasma assistance or photon assistance.

8. (Previously presented)  Process for the [production] preparation of thin films according to claim 1, wherein the stiffener is bonded to said wafer by means of an adhesive substance.

9. (Previously presented)  Process for the [production] preparation of thin films according to claim 1, wherein the stiffener is made to adhere to the wafer by a treatment favoring interatomic bonds.

10. (Previously presented)  Process for the preparation of thin films according to claim 1 further comprising cleaving the thin film from the substrate.

11. (Previously presented)  Process for the preparation of thin films according to claim 1, wherein the rare gas ions comprise helium.

12. (Previously presented)  Process for the preparation of thin films according to claim 1, wherein the rare gas ions comprise neon.

13. (Previously presented)  Process for the preparation of thin films according to claim 1, wherein the rare gas ions comprise krypton.

Appl. No. 10/449,786
Amendment. Dated November 7, 2004
Reply to Office Action of June 7, 2004

14. (Previously presented) Process for the preparation of thin films according to claim 1, wherein the rare gas ions comprise xenon.

15. (Previously presented) Process for the preparation of thin films according to claim 1, wherein the thin films are formed as continuous films of semiconductor material.

16. (Previously presented) Process for the preparation of thin semiconductor material films, wherein the process comprises subjecting a semiconductor material wafer having a planar face and whose plane is substantially parallel to a principal crystallographic plane, to the three following stages:

a first stage of implantation by hydrogen ion bombardment of the face of said wafer by means of ions creating in the volume of said wafer at a depth close to the average penetration depth of said ions, a layer of gaseous microbubbles defining in the volume of said wafer a lower region constituting a majority of the substrate and an upper region constituting the thin film, wherein the temperature of the wafer during implantation is kept below the temperature at which the gas produced by the implanted ions can escape from the semiconductor by diffusion,

a second stage of intimately contacting the planar face of said wafer with a stiffener constituted by at least one rigid material layer,

a third stage of thermally treating the assembly of said wafer and said stiffener at a temperature above that at which the ion bombardment takes place and adequate to create by a crystalline rearrangement effect in the wafer and a pressure effect in the microbubbles, a separation between the thin film and the majority of the substrate, the stiffener and the planar face of the wafer being kept in intimate contact during said stage.

17. (Previously presented) Process for the preparation of thin films according to claim 16 further comprising cleaving the thin film from the substrate.

Appl. No. 10/449,786
Amendment. Dated November 7, 2004
Reply to Office Action of June 7, 2004

18. (Previously presented) Process for the preparation of thin films according to claim 16, wherein the semiconductor material wafer comprises silicon.

19. (Previously presented) Process for the preparation of thin films according to claim 16, wherein implantation takes place through an encapsulating thermal silicon oxide layer.

20. (Previously presented) Process for the preparation of thin films according to claim 16, wherein the stiffener comprises a silicon wafer covered by at least one silicon oxide layer.

21. (Previously presented) Process for the preparation of thin films according to claim 16, wherein the semiconductor material comprises a group IV semiconductor, silicon carbide, or a silicon-germanium alloy.

22. (Previously presented) Process for the preparation of thin films according to claim 16, wherein the first stage of implantation by hydrogen ion bombardment comprises implantation of hydrogen ions in combination with rare gas ions.

23. (Previously presented) Process for the preparation of thin semiconductor material films, wherein the process comprises subjecting a silicon semiconductor material wafer having a planar face and whose plane, is substantially parallel to a principal crystallographic plane, to the three following stages:

a first stage of implantation by hydrogen ion bombardment of the face of said wafer by means of ions creating in the volume of said wafer at a depth close to the average penetration depth of said ions, a layer of gaseous microbubbles defining in the volume of said wafer a lower region constituting a majority of the substrate and an upper region constituting the thin film, the temperature of the wafer during implantation being kept below the

Appl. No. 10/449,786
Amendment. Dated November 7, 2004
Reply to Office Action of June 7, 2004

temperature at which the gas produced by the implanted ions can escape from the semiconductor by diffusion;

a second stage of intimately contacting the planar face of said wafer with a stiffener constituted by at least one rigid material layer;

a third stage of thermally treating the assembly of said wafer and said stiffener at a temperature above that at which the ion bombardment takes place and adequate to create by a crystalline rearrangement effect in the wafer and a pressure effect in the microbubbles, a separation between the thin film and the majority of the substrate, the stiffener and the planar face of the wafer being kept in intimate contact during said stage; and

cleaving the thin film from the substrate.

24. (Previously presented) Process for the preparation of thin films according to claim 23, wherein implantation takes place through an encapsulating thermal silicon oxide layer.

25. (Previously presented) Process for the preparation of thin films according to claim 23, wherein the stiffener comprises a silicon wafer covered by at least one silicon oxide layer.

26. (Previously presented) Process for the preparation of thin films according to claim 23, wherein the semiconductor material wafer comprises silicon carbide or a silicon-germanium alloy.

27. (Previously presented) Process for the preparation of thin semiconductor material films, wherein the process comprises subjecting a semiconductor material wafer having a planar face and whose plane is substantially parallel to a principal crystallographic plane, to the three following stages:

a first stage of implantation by ion bombardment of the face of said wafer by means of ions creating in the volume of said wafer at a depth close to the average penetration depth of said ions, a layer of gaseous microbubbles defining in the volume of said wafer a lower

Appl. No. 10/449,786
Amendment. Dated November 7, 2004
Reply to Office Action of June 7, 2004

region constituting a majority of the substrate and an upper region constituting the thin film, wherein the ions are selected from the group consisting of hydrogen gas ions and helium gas ions, and wherein the temperature of the wafer during implantation is kept below the temperature at which the gas produced by the implanted ions can escape from the semiconductor by diffusion,

a second stage of intimately contacting the planar face of said wafer with a stiffener constituted by at least one rigid material layer,

a third stage of thermally treating the assembly of said wafer and said stiffener at a temperature above that at which the ion bombardment takes place and adequate to create by a crystalline rearrangement effect in the wafer and a pressure effect in the microbubbles, a separation between the thin film and the majority of the substrate, the stiffener and the planar face of the wafer being kept in intimate contact during said stage.

28. (Previously presented)  Process for the preparation of thin films according to claim 27 further comprising cleaving the thin film from the substrate.

29. (Previously presented)  Process for the preparation of thin films according to claim 27, wherein the semiconductor material wafer comprises silicon.

30. (Previously presented)  Process for the preparation of thin films according to claim 27, wherein implantation takes place through an encapsulating thermal silicon oxide layer.

31. (Previously presented)  Process for the preparation of thin films according to claim 27, wherein the stiffener comprises a silicon wafer covered by at least one silicon oxide layer.

32. (Previously presented)  Process for the preparation of thin films according to claim 27, wherein the semiconductor material wafer comprises a group IV semiconductor, silicon carbide, or a silicon-germanium alloy.

Appl. No. 10/449,786
Amendment. Dated November 7, 2004
Reply to Office Action of June 7, 2004

33. (Previously presented) Process for the preparation of thin semiconductor material films, wherein the process comprises subjecting a semiconductor material wafer having a planar face and whose plane is substantially parallel to a principal crystallographic plane, to the three following stages:

a first stage of implantation by hydrogen and helium ion bombardment of the face of said wafer by means of ions creating in the volume of said wafer at a depth close to the average penetration depth of said ions, a layer of gaseous microbubbles defining in the volume of said wafer a lower region constituting a majority of the substrate and an upper region constituting the thin film, wherein the temperature of the wafer during implantation is kept below the temperature at which the gas produced by the implanted ions can escape from the semiconductor by diffusion,

a second stage of intimately contacting the planar face of said wafer with a stiffener constituted by at least one rigid material layer,

a third stage of thermally treating the assembly of said wafer and said stiffener at a temperature above that at which the ion bombardment takes place and adequate to create by a crystalline rearrangement effect in the wafer and a pressure effect in the microbubbles, a separation between the thin film and the majority of the substrate, the stiffener and the planar face of the wafer being kept in intimate contact during said stage.

34. (Previously presented) Process for the preparation of thin films according to claim 33 further comprising cleaving the thin film from the substrate.

35. (Previously presented) Process for the preparation of thin films according to claim 33, wherein the semiconductor material wafer comprises silicon.

36. (Previously presented) Process for the preparation of thin films according to claim 33, wherein implantation takes place through an encapsulating thermal silicon oxide layer.

Appl. No. 10/449,786
Amendment. Dated November 7, 2004
Reply to Office Action of June 7, 2004

37. (Previously presented)  Process for the preparation of thin films according to claim 33, wherein the stiffener is a silicon wafer covered by at least one silicon oxide layer.

38. (Previously presented)  Process for the preparation of thin films according to claim 33, wherein the semiconductor material wafer comprises a group IV semiconductor, silicon carbide, or a silicon-germanium alloy.

39. (amended)  Process for the preparation of thin semiconductor material films, wherein the process comprises subjecting a semiconductor material wafer having a planar face and whose plane is substantially parallel to a principal crystallographic plane, to the three following stages:

a first stage of implantation by ion bombardment of the face of said wafer by means of hydrogen ions creating, by electronic braking in the wafer, in the volume of said wafer at a depth close to the average penetration depth of said ions, a layer of gaseous hydrogen microbubbles defining in the volume of said wafer a lower region constituting a majority of the substrate and an upper region constituting the thin film, wherein the temperature of the wafer during implantation is kept below the temperature at which the gas produced by the implanted ions can escape from the semiconductor by diffusion;

a second stage of intimately contacting the planar face of said wafer with a stiffener constituted by at least one rigid material layer,

a third stage of thermally treating the assembly of said wafer and said stiffener at a temperature above that at which the ion bombardment takes place and adequate to create by a crystalline rearrangement effect in the wafer and a coalescence of hydrogen microbubbles and a pressure effect in the hydrogen microbubbles, a separation between the thin film and the majority of the substrate, the stiffener and the planar face of the wafer being kept in intimate contact during said stage.

Appl. No. 10/449,786
Amendment. Dated November 7, 2004
Reply to Office Action of June 7, 2004

40. (Previously presented)  Process for the preparation of thin films according to claim 39, wherein the first stage of implantation by hydrogen ion bombardment includes implantation of hydrogen ions in combination with rare gas ions.

41. (Previously presented)  Process for the preparation of thin semiconductor material films, wherein the process comprises subjecting a semiconductor material wafer having a planar face and whose plane is substantially parallel to a principal crystallographic plane, to the three following stages:

a first stage of implantation by ion bombardment of the face of said wafer by means of ions creating in the volume of said wafer at a depth close to the average penetration depth of said ions, a layer of gaseous microbubbles defining in the volume of said wafer a lower region constituting a majority of the substrate and an upper region constituting the thin film, the ions including a combination of hydrogen gas ions and rare gas ions, wherein the implantation is carried out by a succession of implantations, and wherein the temperature of the wafer during implantation is kept below the temperature at which the gas produced by the implanted ions can escape from the semiconductor by diffusion,

a second stage of intimately contacting the planar face of said wafer with a stiffener constituted by at least one rigid material layer,

a third stage of thermally treating the assembly of said wafer and said stiffener at a temperature above that at which the ion bombardment takes place and adequate to create by a crystalline rearrangement effect in the wafer and a pressure effect in the microbubbles, a separation between the thin film and the majority of the substrate, the stiffener and the planar face of the wafer being kept in intimate contact during said stage.

42. (Previously presented)  Process for the preparation of thin films according to claim 41, wherein the succession of implantations comprises successive implantations with different ions.

Appl. No. 10/449,786
Amendment. Dated November 7, 2004
Reply to Office Action of June 7, 2004

43. (Previously presented)  Process for the preparation of thin films according to claim 41, wherein the succession of implantations comprises successive implantations with different implant doses.

44. (Previously presented)  Process for the preparation of thin films according to claim 41, wherein the succession of implantations comprises successive implantations with different implant energies.

45. (New)  Process for the preparation of thin films according to claim 16, wherein the first stage of implantation by hydrogen ion bombardment comprises implantation of hydrogen ions in combination with helium ions.

46. (New)  Process for the preparation of thin films according to claim 16, wherein the first stage of implantation by hydrogen ion bombardment comprises implantation of hydrogen ions in combination with argon ions.

47. (New)  Process for the preparation of thin films according to claim 16, wherein the first stage of implantation by hydrogen ion bombardment comprises implantation of hydrogen ions in combination with neon ions.

48. (New)  Process for the preparation of thin films according to claim 16, wherein the first stage of implantation by hydrogen ion bombardment comprises implantation of hydrogen ions in combination with krypton ions.

49. (New)  Process for the preparation of thin films according to claim 16, wherein the first stage of implantation by hydrogen ion bombardment comprises implantation of hydrogen ions in combination with xenon ions.

Appl. No. 10/449,786
Amendment. Dated November 7, 2004
Reply to Office Action of June 7, 2004

50. (New)  Process for the preparation of thin films according to claim 1, wherein the rare gas ions comprise argon.

Appl. No. 10/449,786
Amendment. Dated November 7, 2004
Reply to Office Action of June 7, 2004

## REMARKS

Claims 1-50 are pending in the application. Claim 39 has been amended to correct a typographical error and claims 45-50 are newly added in order that the applicant can more fully claim the subject matter of his invention. The amendment does not introduce new matter or broaden the claim scope beyond that of the original patent claims.

The applicant appreciates the courtesies extended to his representative, Jasper W. Dockrey, and to the licensee's representative, Allan Fanucci, during an interview with Examiner Erik Kielin on October 5, 2004. The remarks appearing herein, with the exception of the remarks pertaining to the new claims, are substantively the same as those that were presented and discussed at the interview.

Claim 39 has been amended to correct an inadvertent typographical error appearing at line 16. In particular, the word "the" has been removed after the word "coalescence." This amendment is not believed to alter the scope of claim 39 in any way whatsoever.

### Patentability over the Prior Art

It is noted with appreciation that the Examiner has considered the references submitted with Applicants' Information Disclosure Statements (References A1-113, B1-36, C1-2, D1-2, E1-2, F1-7, and G1-2), and has found claims 1-44 now presented to be patentable over the prior art.

### Rejection of Applicant's Reissue Declaration

The applicant's declaration has been rejected for an alleged failure to recognize the preliminary amendment filed by the application and for an alleged failure to identify at least one error relied upon by the applicant to support the applicant's reissue application. The applicant's pending claims have also been rejected in view of the alleged defects in the applicant's Reissue Declaration.

The Reissue Declaration is alleged to be defective because it does not state that the person making the declaration "has reviewed and understands the contents of the specification, including the claims, **as amended by any amendment specifically referred to**

15

**in the oath or declaration."** (Emphasis by Examiner). The rejection is traversed. The Reissue Declaration refers to "original claims 1-9 and new claims 10-29", which is a reference to the amendment adding claims 10-29. The Reissue Declaration further recites "... I have reviewed and understand the contents of the above-identified U.S. patent, including the claims referred to above." The Reissue Declaration thus alleges that the inventor has reviewed and understands the contents of the specification, including the claims, as amended by the amendment adding claims 10-29.

Apparently, the Examiner would prefer a more explicit reference to the precise words provided in the MPEP. Accordingly, a new Reissue Declaration is being obtained and will be submitted in due course.

The reissue declaration is also alleged to be defective because it does not identify an error being corrected, because "failure to include the following claims in the original patent" (by itself) is not an acceptable statement. While the Reissue Declaration refers to claims 10-29 in essentially the same manner, it does so as an introduction to the following paragraphs, and then says much more, providing 5 paragraphs of explanation of the subject matter claimed in claims 10-29 and, therefore, not claimed in the original patent. Also, the amendments made to claim 1 were required due to the District Court's decision, and these amendments necessitated the presentation of the new claims. It is therefore submitted that the declaration adequately identifies the errors being corrected in adding claims 10-29.

The applicable law applying to reissue patent applications supports the applicant's assertion set forth above. In the applicant's reissue application and preliminary amendment, the applicant introduced new claims directed to various aspects of the applicant's invention not previously claimed in the applicant's patent. The applicant also introduced several dependent claims that recite particular features of the applicant's invention as set forth in the independent claims. The applicant asserts that the reissue statutes, as interpreted by the Court of Appeals for the Federal Circuit, provide for the addition of claims to subject matter not previously claimed in the original patent. *C.R. Bard Inc. v. M3 Systems, Inc.*, 157 F3d 1340 (Fed. Cir. 1998). Further, the Board of Patent Appeals and Interferences has expressly held

Appl. No. 10/449,786
Amendment Dated November 7, 2004
Reply to Office Action of June 7, 2004

that adding dependent claims is sufficient to meet the error requirement for a reissue application. *Ex parte Parks*, 30 USPQ2d 1234, 1237 (BPAI 1994) (*citing Hewlett Packard v. Bausch & Lomb*, 882 F2d 1556 (Fed. Cir. 1989)). Accordingly, the applicant is entitled to add claims to previously unclaimed subject matter and to base his reissue application on an error arising through a failure to include claims to the presently claimed subject matter.

## First Rejection Under 35 U.S.C. § 251

Claims 1-44 are rejected under 35 USC 251 as based on an allegedly defective Reissue Declaration. As explained above, it is submitted that the Reissue Declaration is not defective. The rejection should be withdrawn.

## Second Rejection Under 35 U.S.C. § 251

Claims 1-3, 5-15, 17, 22, 23-26, 28, 33-38, 40, and 41-44 have been rejected for allegedly broadening the scope of the claimed subject matter in a reissue application filed more than two years after the issue date. This rejection is believed to be erroneous as explained in the applicant's following remarks.

Claims 1-3, 5-15, 22, 33-38, 40, and 41-44 are alleged to broaden the scope of the original patent claims by reciting implantation with a combination of hydrogen with a rare gas. Under the test outlined by the CCPA, recognized by the CAFC, and recited in MPEP § 1412.03, a claim is broadened with respect to an original claim if it includes within its scope subject matter that would not infringe the original claim. *In re Jerry M. Freeman*, 30 F.3d. 1459, 1464 (Fed. Cir. 1994). The applicant respectfully asserts that there are no conceivable processes within the scope of the pending claims that would not be within the scope of original claim 1.

Original claim 1 recited a process comprising "ions being chosen from among hydrogen or rare gas ions." As set forth in the applicant's declaration, amended claim 1 differs from original claim 1 by reciting a process comprising "ions being chosen from among hydrogen gas ions or a combination of hydrogen gas ions and rare gas ions." This is an additional recitation that was not originally present in claim 1, because hydrogen gas ions and rare gas ions were originally recited the alternative. The transition "wherein the process

Appl. No. 10/449,786
Amendment. Dated November 7, 2004
Reply to Office Action of June 7, 2004

comprises" (Col. 6, l. 32) opens original claim 1 and amended claim 1 to inclusion of additional elements. MPEP § 2111.03. For example, a process including bombardment with hydrogen gas ions would infringe original Claim 1. A process including bombardment with rare gas ions would infringe original Claim 1. Original Claim 1 did not preclude bombardment with both hydrogen gas ions and rare gas ions, so a process including bombardment with both hydrogen gas ions and rare gas ions would doubly infringe original Claim 1, rather than being outside the scope of Claim 1. Analysis of whether an amendment broadens a claim should be done by considering the entire claim, not just individual phrases that, in another context, might be deemed to be broadening.

The applicant respectfully disagrees with the argument at page 4 of the instant Office Action that original claim 1 exclusively requires either hydrogen gas ions *or* rare gas ions and not both. This assertion contravenes the judicially recognized meaning and effect of the open transition "comprising." Original claim 1 recited a process comprising hydrogen ions *or* comprising rare gas ions. Accordingly, the use of either hydrogen gas ions or rare gas ions does not foreclose the use of additional ions, or combinations of ions. For example, a process including the use of hydrogen gas ions and any other substance, such as rare gas ions, would still infringe original claim 1. Further, the specification supports the use of both hydrogen and rare gas ions in combination. (See Col. 4, ll. 38-44). Accordingly, claims 1, 33, and 41 and their dependent claims do not broaden the scope of the original patent claims. Further, dependent claims 17, 22, and 40 do not broaden the scope of the original patent claims.

Claims 10, 17, 23-26, 28, and 34 are alleged to broaden the scope of the original patent by reciting the step of "cleaving the thin film." First, the applicant notes that each of the rejected claims recites a process that includes a separation between the thin film and the majority of the substrate. Under the interpretation of "separation" rendered by the district court and affirmed by the Court of Appeals for the Federal Circuit, the term "separation" means a gap or intervening space. *See, Soitec, S.A. and Commissariat A L'Energie Atomique v. Silicon Genesis Corp.*, Judgment, No. 99-CV-10826, Fed. Cir., November 26, 2003, pg. 5. A separation occurs when microbubbles coalesce and a gap forms in the substrate. In

accordance with the process of the present invention, a separation must occur during a process that ultimately achieves a cleaving of the substrate.

The rejected claims recite a process in which a thin film is separated, and then cleaved from the substrate. The rejection is based on several erroneous assertions by the Examiner. The Examiner is correct, however, in asserting that "each of claims 10, 17, 23, 28, and 34 require 'cleaving the thin film' in addition to 'separation of the thin film.' " (Office Action, page 4.). Since each of process claims 10, 17, 23, 28, and 34 require *an additional step* besides "separation of the thin film," they are *ipso facto* narrower than the claims that do not recite "cleaving the thin film." Adding a process step to a process claim *narrows* the claim, rather than broadens it.

The Examiner erroneously states "The 'separation between the thin film and the majority of the substrate' is an intermediate product ...." (Office Action, page 4). Actually, the "separation between the thin film and the majority of the substrate" is a *gap or intervening space* created by the claimed process.

The Examiner erroneously states that the (original) patent claims claim the intermediate "separated" product, but not the final "cleaved" product. (Office Action, page 4). Recalling that *all of the original patent claims and the claims being added by reissue are process claims*, the original patent claims *do not* claim the intermediate "separated" product, but rather a process for preparation of a thin film.

Process claims are infringed by carrying out the patented process. If someone carried out the originally patented process, so as to infringe the originally patented claims, and then carried out a cleaving step, so as to infringe the claims being added by the present reissue application, carrying out the additional "cleaving" step would not relieve the infringer from having infringed the original patent claims. So the Examiner's conclusion that the claims being added by reissue would be infringed, but the original claims would not, is *incorrect*. In any process carried out in accordance with the claims, a separation must take place before a thin film can be cleaved from the substrate. Accordingly, any process carried out in accordance with the pending claims that results in a cleaved thin film must infringe claim 1

Appl. No. 10/449,786
Amendment. Dated November 7, 2004
Reply to Office Action of June 7, 2004

of the original patent because the process must include a separation between the thin film and the substrate in addition to the remaining claimed process steps. Rather than presenting a broadening claim, applicant's pending claims merely recite an additional process embodiment of the applicant's invention.

Claim 41-44 are alleged to broaden the scope of the original patent by reciting that the implantation is carried out by a succession of implantation steps. The original patent claims recite "implantation by ion bombardment," but these claims do not limit the way in which the ion bombardment stage is carried out. Further, the specification describes that the term "implantation stage" contemplates a succession of ion implantation steps. (See Col. 2, ll. 56-59). Moreover, the recitation in claim 1 is introduced by the indefinite article "a." The Federal Circuit has specifically held that the word "a" or "an" in a patent claim means "one or more" in open-ended claims containing the transitional phrase "comprising." *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000). Accordingly, the scope of the original patent claims includes one or more ion bombardment steps; thus, claims 41-44 do not broaden the scope of the original patent.

## Rejection Under 35 U.S.C. § 112

Claims 1-3, 5-15, 22, 27-32, 33-38, 40, and 41-44 have been rejected because the specification allegedly fails to support practice of the invention with helium or with rare gas ions in combination with hydrogen. A declaration by Dr. Kevin Jones accompanies this response. Dr. Jones is the Chairman of the Department of Materials Science and Engineering at the University of Florida, Gainesville, Florida. As set forth in Dr. Jones' declaration and in his *Curriculum Vitae* appended to his declaration, Dr. Jones has authored and co-authored numerous technical publications, book chapters, and other documents dealing with various aspects of the ion implantation and annealing of semiconductor materials. This rejection is believed overcome in view of the accompanying Rule 132 declaration of Dr. Kevin Jones together with the following remarks.

The applicant asserts that the Examiner has the initial burden to establish a reasonable basis to question the enablement provided for the claimed invention. *In re Wright*, 999 F.2d

Appl. No. 10/449,786
Amendment. Dated November 7, 2004
Reply to Office Action of June 7, 2004

1557, 1562, 27 USPQ2d 1510, 1513 (Fed. Cir. 1993) (examiner must provide a reasonable explanation as to why the scope of protection provided by a claim is not adequately enabled by the disclosure). The Examiner has alleged that the applicant's specification lacks support for the claimed use of helium or other rare gas ions in combination with hydrogen and, therefore, does not meet the enablement requirement. The applicant asserts that the Examiner has failed to meet the burden of establishing a reasonable basis, since the specification contains a teaching of the manner and process of making and using the invention in terms which correspond in scope to the subject matter sought to be patented. Accordingly, the specification must be taken as being in compliance with 35 U.S.C. § 112, first paragraph, unless there is a reason to doubt the objective truth of the description that is relied upon for enabling support. (See MPEP 2164).

The applicant notes that the Examiner has stated that final decisions of the Court of Appeals for the Federal Circuit are binding on the Patent Office. As explained during the interview, the pending claims in the present application are different from those that were reviewed by the courts in *Soitec, S.A. and Commissariat A L'Energie Atomique v. Silicon Genesis Corp.* Accordingly, the applicant asserts that the decision of those courts regarding enablement of original patent claims 1, 2-3, 5 and 9 is not binding as to the claims pending in the present application. Since the Examiner has not given a valid reason as to why the allegedly missing subject matter is necessary to provide enablement, a reasonable basis has not been established. (See MPEP 2164.06(a)).

The Examiner's failure to establish a reasonable basis notwithstanding, the applicant respectfully asserts that the patent specification enables one skilled in the art to practice the full scope of the invention as defined by the pending claims. The test of enablement is whether one reasonably skilled in the art could make or use the invention from the disclosures in the patent coupled with information known in the art and without undue experimentation. *United States v. Telectronics, Inc.*, 857 F.2d 778, 785, 8 USPQ2d 1217, 1223 (Fed. Cir. 1988). Further, as long as the specification discloses at least one method for making and using the claimed invention that bears a reasonable correlation to the entire scope

Appl. No. 10/449,786
Amendment. Dated November 7, 2004
Reply to Office Action of June 7, 2004

of the claims, then the enablement requirement of 35 U.S.C. § 112 is satisfied. *In re Fisher*, 427 F.2d 833, 839, 166 USPQ 18, 24 (CCPA 1970). The failure to disclose other methods by which the claimed invention may be made does not render a claim invalid under 35 U.S.C. § 112. *Spectra-Physics, Inc. v. Coherent, Inc.*, 827 F.2d 1524, 1533 (Fed. Cir. 1987).

The applicant asserts that the specification of the '564 patent teaches the use of both helium alone and hydrogen in combination with a rare gas. While a preferred embodiment employing hydrogen gas is described in detail, the teaching of the invention is not limited to the use of hydrogen. For example, the '564 patent clearly sets forth that the preferred embodiment carried out with hydrogen can also be performed with combinations of rare gas.

> "In the performance of the process according to the invention, the ions used for implantation by bombardment are usually $H^+$ ions, but this choice must not be looked upon as limitative. Thus, the principle of the method is applicable with molecular hydrogen ions or with ions of rare gases such as helium, neon, krypton and xenon, used either singly or in combination." (Col. 4, lines 38-44).

Given the description of specific process parameters to be used for hydrogen implantation, and given the extensive literature on rare gas implantation of semiconductors and metals, the applicant asserts that one skilled in the art could have made the necessary adjustments based on routine experimentation to practice the invention using any one or all of the recited rare gas ions as of the '564 patent filing date.

Within the realm of semiconductor process science, a proper perspective must be used when considering whether a patent specification is enabling. The enablement requirement under 35 U.S.C. § 112, first paragraph, is directed to those skilled in the art, and not to members of the general public. *W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1556 (Fed. Cir. 1983). The knowledge of those skilled in the art is included in concert with the disclosure provided in the patent. The Examiner must consider the level of skill in the art when reviewing the applicant's specification and claims. *See In re Wands*, 858 F.2d 731, 737, 8 USPQ2d 1400, 1404 (Fed. Cir. 1988). This is because the amount of guidance or direction needed to enable practice of the invention with rare gas ions is inversely related to

Appl. No. 10/449,786
Amendment, Dated November 7, 2004
Reply to Office Action of June 7, 2004

the amount of knowledge in the art as well as the predictability of the art. *See, In re Angstadt*, 537 F.2d 498, 502 (CCPA 1976); *In re Fisher*, 427 F.2d 833, 839, (CCPA 1970). The more that is known in the prior art about the implantation and behavior of rare gas ions in semiconductor materials, the more predictable the art is and, correspondingly, less information needs to be explicitly stated in the specification. Even a considerable amount of experimentation is permissible if it is merely routine, or if the specification provides a reasonable amount of guidance with respect to the direction in which the experimentation should proceed. *In re Wands, Id.* The fact that experimentation may be complex does not necessarily make it undue if the art typically engages in such experimentation. *In re Certain Limited Charge Cell Culture Microcarriers*, 221 USPQ 1165, 1174, (Int' Trade Comm'n 1983).

Underlying the level of skill possessed by persons practicing in the art is the particular field of science to which the invention applies. Even in an unpredictable art, however, the disclosure of a test of every species covered by a claim is not required. *In re Angstadt, Id.* The applicant submits that those skilled in semiconductor fabrication were well aware of the differences that could be expected from the implantation of rare gases in a semiconductor substrate as compared with hydrogen.

Using the teaching of the '564 patent, the applicant asserts that those skilled in the art could have practiced the claimed subject matter in view of the substantial development in the field of ion implantation and solid state diffusion as evidenced by the accompanying declaration of Dr. Kevin Jones and the numerous references cited in the declaration. For example, the pending independent claims each recite that the ions create "a layer of gaseous microbubbles." As set forth in the declaration of Dr. Kevin Jones, those skilled in the art were well aware of process techniques for using rare gas ions to form gaseous microbubbles in semiconductor materials as of the filing date of the '564 patent. (Jones Declaration, para. 10-14). Dr. Jones also describes how those skilled in the art could have established implant requirements based on the known diffusion and solid solubility characteristics of the rare gases in semiconductor materials. (Jones Declaration, para.15-17).

23

After contacting the face of the wafer with a stiffener, the wafer is thermally treated to coalesce the micobubbles and create a pressure effect leading to a separation between the thin film and the substrate. Dr. Jones describes that those skilled in the art could have established the necessary thermal treatment conditions from known diffusion parameters. (Jones Declaration, para. 18). Finally, Dr. Jones explains how those skilled in the art could have carried out routine experiments to determine the process parameters for practicing the invention using helium alone or hydrogen in combination with a rare gas. (Jones Declaration, para. 19-21).

The substantial degree of skill possessed by those active in the field of ion implantation in semiconductor materials is such that the skilled artisan would have readily comprehended how to make and use the applicant's claimed invention as of the patent filing date. Given the extensive disclosure of the claimed process and the existence of numerous references describing the implantation of rare gases, the applicant asserts that one of skill in the art of thin film fabrication as of the application filing date leading to the '564 patent would have known how to make and use the invention recited in the pending claims without undue experimentation.

## Litigation

In the applicant's Information Disclosure Statement filed February 10, 2004, the applicant submitted an Order dated January 7, 2004 in which the Court of Appeals for the Federal Circuit denied the plaintiffs' petition for a panel rehearing and for a rehearing *en banc*. The applicant confirms the information that applicant's attorney gave the Examiner in the telephone interview of June 3, 2004, and set forth in the Examiner Interview Summary dated June 7, 2004, namely that neither applicant nor plaintiffs (nor defendants) in the case *Soitec, S.A. and Commissariat A L'Energie Atomique v. Silicon Genesis Corp.* have filed a petition for writ of *certiorari* with the U.S. Supreme Court. The Court of Appeals Decision of November 26, 2003 is therefore final, and the litigation is no longer pending. The applicant further states that there are no other prior or concurrent litigations, interferences, reexaminations or other reissue applications involving the '564 patent.

24

Appl. No. 10/449,786
Amendment. Dated November 7, 2004
Reply to Office Action of June 7, 2004

**New Claims**

Claims 45-49 have been added that depend from claim 16 and claim 50 has been added that depends from claim 1. These claims recite implantation with hydrogen in combination with individual species within the group of rare gas ions. Support for the new claims can be found in the quoted text from the specification set forth above. Claims 45-49 recite implantation of hydrogen in combination with helium (claim 45), argon (claim 46), neon (claim 47), krypton (claim 48) and xenon (claim 49). Claim 50 depends from claim 1 and recites implantation with a combination of hydrogen and argon. While argon is not explicitly listed as a rare gas in the '564 patent specification, argon is known as a rare gas, and was known as rare gas ion as of the filing date of the '564 patent. The applicant asserts that these claims are not broader in scope than the original patent claims for the same reasons as given above with respect to the second rejection under 35 U.S.C. § 251.

The applicant asserts that the new claims are fully supported by the '564 patent specification. The specification describes the implantation of individual rare gas ions in combination with hydrogen. (Col. 4, lines 38-44). Further, the applicant asserts that those skilled in the art were familiar with ion implantation of each recited rare gas ion long before the filing date of the '564 patent. For example, Cullis et al. describe implant characteristics of neon, argon, and krypton in silicon. (Jones Declaration, para. 16). Wittmaack et al. describe the implant characteristics of argon and xenon in silicon, and Evans and Roth describe the implantation of helium in metals. (Jones Declaration, para. 8). Moreover, Dr. Jones sets forth routine experimental steps that one skilled in the art could have carried out to practice the claimed invention. (Jones Declaration, para. 19).

Claim 45 recites implantation of hydrogen in combination with helium, which is the most similar to hydrogen in atomic size. Given the similar solid solubility, diffusion characteristics, and mobility of helium in a crystalline semiconductor, those skilled in the art would have found the process parameters for helium to be similar to hydrogen. (Jones Declaration, para. 10). Indeed, the process originally claimed in the '564 patent has been carried out with helium in combination with hydrogen. (*See* Expert Report of Chris Van De

Appl. No. 10/449,786
Amendment. Dated November 7, 2004
Reply to Office Action of June 7, 2004

Walle, Ph.D. para. 19, *citing* Agarwal et al., Appl. Phys., Lett., 72, 1086 (1998), and Weldon et al. Appl. Phys. Lett., 73, 3721 (1998)). Dr. Marcus Weldon, one of the expert witnesses testifying for the defendant in the above-referenced litigation stated that "implanting helium in combination with hydrogen is a successful compromise (Expert Report Of Marcus Weldon, Ph.D., para. 19).

The remaining new claims 46-50 are also believed to be fully supported by the '564 patent specification. Dr. Jones describes that rare gas ions in combination with hyrdrogen will not impair the behavior of hydrogen in silicon, and may even permit hydrogen to more readily form the bubbles necessary to carry out the claimed process. (Jones Declaration, para. 20).

Accordingly, the applicant asserts that those skilled in the art, using the '564 patent specification, could have practiced the inventive process with each of the ions recited in claims 45-50 in combination with hydrogen.

## Conclusion

The applicant believes to have fully responded to all grounds of rejection set forth in the Office Action of June 7, 2004. Accordingly, the pending claims are believed to be in condition for allowance and such allowance is now earnestly requested.

Respectfully submitted,

Jasper W. Dockrey
Registration No. 33,868
Attorney for Applicant

BRINKS HOFER GILSON & LIONE
P.O. BOX 10395
CHICAGO, ILLINOIS 60610
312/321-4200

# Exhibit 3



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/449,786 | 05/30/2003 | Michel Bruel | 9905/8 | 6531 |

757          7590          01/28/2005

BRINKS HOFER GILSON & LIONE
P.O. BOX 10395
CHICAGO, IL 60610

| EXAMINER |
|---|
| KIELIN, ERIK J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2813 | |

DATE MAILED: 01/28/2005

Please find below and/or attached an Office communication concerning this application or proceeding.

PTO 90C (Rev 10/03)

| | Application No. | Applicant(s) |
|---|---|---|
| ***Office Action Summary*** | 10/449,786 | BRUEL, MICHEL |
| | Examiner | Art Unit |
| | Erik Kielin | 2813 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTH(S) FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If the period for reply specified above is less than thirty (30) days, a reply within the statutory minimum of thirty (30) days will be considered timely.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
  Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>10 November 2004</u>.

2a)☐ This action is **FINAL**.    2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>1-50</u> is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) <u>1-50</u> is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☐ The drawing(s) filed on _____ is/are: a)☐ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All  b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☐ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☒ Information Disclosure Statement(s) (PTO-1449 or PTO/SB/08)
Paper No(s)/Mail Date <u>11/10/04, 12/20/04</u>.

4)☐ Interview Summary (PTO-413)
Paper No(s)/Mail Date. _____ .

5)☐ Notice of Informal Patent Application (PTO-152)

6)☐ Other: _____.

U.S. Patent and Trademark Office

PTOL-326 (Rev. 1-04)         **Office Action Summary**        Part of Paper No./Mail Date 20041208

Application/Control Number: 10/449,786                                    Page 2
Art Unit: 2813

## DETAILED ACTION

This action responds to the submissions filed by Applicant on 10 November 2004.

This action further considers the Protest filed 7 December 2004. The Protest certifies on

page 8 that Applicant's Representative, Jasper Dockrey, has been served a copy of the Protest on

7 December 2004, by first class mail, in accordance with 37 CFR 1.291.


### *Oath/Declaration*

1.    The reissue oath/declaration filed with this application is defective (see 37 CFR 1.175

and MPEP § 1414) because of the following:

The oath or declaration fails to comply with 37 CFR 1.63 in that it does not state that the

person making the oath or declaration has reviewed and understands the contents of the

specification, including the claims, **as amended by any amendment specifically referred to in**

**the oath or declaration.** Inasmuch as the claims have been amended, the absence of the

statement in the instant Declaration acknowledging the amendment must be present.

2.    The reissue oath/declaration filed with this application is defective because it fails to

identify at least one error which is relied upon to support the reissue application. See 37 CFR

1.175(a)(1) and **MPEP § 1414 --especially section II.** Note that the statement, "failure to

include the following claims in the original patent..." is not an acceptable statement of error.

Without specifically stating what the error is, the present statement is a mere allegation of error.

In this regard, MPEP § 1414 (II) (C) states in pertinent part, "Any error in the claims must be

identified by reference to the specific claim(s) **and the specific claim language wherein lies the**

**error.**" (Emphasis added.) For example, Applicant pointed out in the instant oath that the "jury

Application/Control Number: 10/449,786                                    Page 3
Art Unit: 2813

decided that the specification of the original patent did not enable the practice of claims 1-3, 5,

and 9 with rare gas ions," a decision affirmed by the Court of Appeals of the Federal Circuit.

Accordingly, one example of a statement of error might include that claims 1-3, 5, and 9 are

partly inoperative because of the presence of the of the claim language "rare gas ions."

3.      Applicant is reminded that inasmuch as the new claims 45-50 are drawn to the correction

of the error that Applicant claimed less than all Applicant was entitled to claim, the addition of

new claims requires Applicant to submit a supplemental Oath or Declaration indicating that these

errors (i.e. new claims) arose without any deceptive intent. See 37 CFR 175(b)(1).

4.      Claims 1-50 are rejected as being based upon a **defective reissue declaration** under 35

U.S.C. 251 as set forth above.  See 37 CFR 1.175.

        The nature of the defect(s) in the declaration is set forth in the discussion above in this

Office action.


### *Claim Rejections - Res Judicata*

5.      Claims 1-3 and 5-50 are rejected under the doctrine of *res judicata.*

        The issue of enablement of implantation of rare gases, either alone or in combination

with hydrogen, in the context of the claims, has already been adjudicated. Applicant is barred

from revisiting the particular issue of enablement under the doctrine of *res judicata.*  Reasoning

follows.

        In the matter of enablement of claims 1-3, 5 and 9 of US Patent 5,374,564 to Michel

Bruel, the United States Court of Appeals for the Federal Circuit (Fed. Cir., hereafter) has ruled,

> "5. The **jury returned a verdict that claims 1-3, 5, and 9 were
> invalid for non-enablement under 35 U.S.C. § 112, ¶ 1.** Enablement is

a legal determination of whether a patent enables one skilled in the art to make and use the claimed invention. BJ Servs, Co., 338 F.3d at 1371 (citations omitted). 'Although enablement is a question of law, because of the factual nature of the inquiry in this case, it is amenable to resolution by the jury. And because a jury decided the issue here based on factual determinations, we look to whether a reasonable jury could have made the underlying factual findings necessary to provide substantial evidence in support of its conclusion.' Id. at 1371-72 (citations omitted)."

"Claim 1 recites that the bombardment of the donor silicon wafer occurs with 'hydrogen or rare earth gases.' The jury apparently found that the specification failed to explain how 'rare earth gases' could be used in the claimed process. The specification details precise critical temperatures for hydrogen implantation as well as other important information relating to the use of hydrogen ions in the process. Considering the unpredictability of the art, the lack of direction and guidance in the specification and the absence of working examples, **the jury's finding is well supported**. Soitec argues that certain articles describe the use of rare earth gases in the claimed process, and thus provide evidence of enablement. The articles cited, however, were published in 1997, while the patent was filed on September 15, 1992. **The publications do not address the state of the art in 1992, and are irrelevant to whether the specification was enabling at the time the patent was filed**. See Enzo Biochem, Inc. v. Calgene, Inc., 188 F.3d 1362, 1371 (Fed. Cir. 1999) ('Whether claims are sufficiently enabled by a disclosure in a specification is determined as of the date that the patent application was first filed.')."

" '[A] patent specification must enable the full scope of a claimed invention.' AK Steel Corp, v. Soilac, 344 F.3d 1234, 1241 (Fed. Cir. 2003) (citation omitted). When a patentee chooses to claim 'A or B,' as Soitec has, the specification must fully enable 'B' as well as 'A' when the differences between 'A' and 'B' substantially affect the practice of the invention. Here, the jury had before it substantial evidence that hydrogen ions are significantly different from the rare-earth gases in mass, bonding capability and diffusion characteristics. Thus, Soitec's disclosure **enabling only hydrogen** was insufficient. A reasonable jury could have found that **the specification failed to teach one skilled in the art how to make and use the process using 'rare earth gases.'** " (Soitec, S.A. v. Silicon Genesis Corp., 81 Fed. Appx. 734, (Fed. Cir. 2003), at page 738-739). (Bold emphasis added. Underlined emphasis in original.)

Application/Control Number: 10/449,786                                         Page 5
Art Unit: 2813

    In particular, the jury had before it evidence presented by Applicant during the course of the litigation, drawn to the implantation of helium --a rare gas-- alone, and hydrogen in combination with helium. Specifically, Applicant argued,

> "Dr. Cheung's article, published in 1997, reported oil his successful use of Soitec's 'Smart-Cut' process to make SOI wafers with **helium (a rare gas)** as the implant species for Stage One of the Bruel process. (See A12297-300, ('A New Way to Make SOI Wafers')). The article even contained a picture of the thin film he obtained using helium implantation." (Emphasis added.) (See Exhibit 1, page 3, column 2, paragraph 1).

Applicant also argued,

> "[Dr. Weldon] published an article in 1997 that also reported success in practicing the Bruel process using helium. (A13677-78 (Efficient Production of Silicon-on-Insulator films by Co-Implantation of He$^-$ with H$^+$)). The article specifically stated: 'we have used a 7.5 x 10$^{15}$ cm$^{-2}$ H **implant** followed by a 1 x 10$^{16}$ cm$^{-2}$ **He implant** <u>to successfully produce thin films</u> by wafer bonding.' " (Bold emphasis added; underlined emphasis in original.) (Pages 21-22 of Exhibit 2, Brief of Plaintiffs-Appellants Soitec. S.A. and Commissariat A L'Energie Atomique, Jan. 28, 2003.)

    Accordingly, the jury considered the issue of enablement of the claim feature of implanting, not only rare gases alone, but also hydrogen **in combination with** a rare gas. The claims were finally held not enabled and invalid. The instant claims drawn to the implantation of helium alone (i.e. claims 27-32), hydrogen in combination with any rare gas (i.e. claims 1-3, 5-26, and 32-50), or anything other than hydrogen, be it in a single stage or successive stages of implantation, are not enabled and are invalid, as per the ruling of the Fed. Cir. The final decision by the Fed. Cir. is binding upon the USPTO.

    While it is acknowledged that there existed no claims in the original '564 patent drawn to performing the method with "hydrogen ions **in combination with** rare gas ions" (emphasis

added), at the time of the trial, the reasoning applied by the Fed. Cir., as recited above, would still have applied to any and all claims making use of rare gas ion implantation, because the Fed. Cir. affirmed the Massachusetts jury's finding that Applicant's evidence was irrelevant by post-dating the time of the invention.

While Examiner acknowledges Applicant's submission of evidence pre-dating the time of the '564 patent, presumably to support enablement of implantation of rare gases alone or in combination with hydrogen, Examiner respectfully submits that use of rare gases in the original or any reissued claimed has already been ruled non-enabled by the Fed. Cir. for the reasons indicated above.

Finally, Examiner respectfully submits that a reissue application is not the proper forum in which to submit different evidence regarding rare gases implantation that could have been submitted and considered during litigation. In this regard, the Supreme Court in Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found., 402 U.S. 313, 169 USPQ 513 (1971) set forth the rule that once a patent has been declared invalid via judicial inquiry, a collateral estoppel barrier is created against further litigation involving the patent, unless the patentee-plaintiff can demonstrate "that he did not have" a full and fair chance to litigate the validity of his patent in "the earlier case." See also Ex parte Varga, 189 USPQ 209 (Bd. App. 1973). As stated in Kaiser Industries Corp. v. Jones & Laughlin Steel Corp., 515 F.2d 964, 987, 185 USPQ 343, 362 (3rd Cir. 1975):

> "In fashioning the rule of Blonder-Tongue, Justice White for a unanimous Court made it clear that a determination of patent invalidity, after a thorough and equitable judicial inquiry, creates a collateral estoppel barrier to further litigation to enforce that patent."

Application/Control Number: 10/449,786                                    Page 7
Art Unit: 2813

In this case, were Applicant to be given another opportunity to submit evidence directed to the

implantation of rare gases, both alone and in combination with hydrogen, that **predates** the date

of invention of the '564 patent --which Applicant has done in this reissue application-- such

evidence would necessarily be directed to the enablement of the original claims of the '564

patent, regardless of how the claims of the reissue application are presently recited. Were the

present claims to found enabled for implantation of helium alone, or helium or other rare gas in

combination with hydrogen, in the context of the claims, such finding would nullify the decision

previously affirmed by the Fed. Cir. *Res judicata* and collateral estoppel were established to

prevent decision nullification.


### *Claim Rejections - 35 USC § 112*

6.      The following is a quotation of the first paragraph of 35 U.S.C. 112:

> The specification shall contain a written description of the invention, and of the manner and process of making
> and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it
> pertains, or with which it is most nearly connected, to make and use the same and shall set forth the best mode
> contemplated by the inventor of carrying out his invention.

7.      Claims 1-3, 5-15, 22, 27-32, 33-38, 40, 41-50 are rejected under 35 U.S.C. 112, first

paragraph, as failing to comply with the enablement requirement. The claims contain subject

matter which was not described in the specification in such a way as to enable one skilled in the

art to which it pertains, or with which it is most nearly connected, to make and/or use the

invention. The reasoning applied here is that applied above in the rejection of the claims under

the doctrine of *res judicata*, and is incorporated herein in its entirety.


8.      The following is a quotation of the second paragraph of 35 U.S.C. 112:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

9.      Claims 22, 40, and 42 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention.

Independent claim 16 recites the limitation, "a first stage of implantation by hydrogen ion bombardment…" By contrast, claim 22, which depends from claim 16, recites the limitation, "wherein the first stage of implantation by hydrogen ion bombardment comprises implantation of hydrogen ions in combination with rare gas ions." Claim 22 is considered indefinite because it is unclear, **as presently written**, how "hydrogen ion bombardment" can become hydrogen ion plus rare gas ion bombardment. This limitation **replaces** implantation of a single species (i.e. hydrogen ions) with a combination of species (i.e. hydrogen ions plus rare gas ions). For clarity, claim 22 might be worded, "wherein the first stage of implantation by hydrogen ion bombardment **further comprises** implantation with rare gas ions."

Similarly, independent claim 39 recites the limitation, "a first stage of implantation by ion bombardment of the face of the wafer by means of hydrogen ions." By contrast dependent claim 40 recites the limitation, "wherein the first stage of implantation by hydrogen ion bombardment comprises implantation of hydrogen ions in combination with rare gas ions." As with claim 22, claim 40 is considered indefinite because it is unclear, **as presently written**, how "by means of hydrogen ions" can become by means of hydrogen ion in combination with rare gas ions. This limitation **replaces** implantation of a single species (i.e. hydrogen ions) with a combination of species (i.e. hydrogen ions plus rare gas ions). For clarity, claim 40 might be

worded, "wherein the first stage of implantation by hydrogen ion bombardment **further comprises** implantation with rare gas ions."

Claim 40 recites the limitation "the first stage of implantation by hydrogen ion bombardment" in lines 2-3. There is insufficient antecedent basis for this limitation in the claim.

Regarding claim 42, independent claim 41 recites the limitation, "a first stage of ion bombardment of the face of said wafer by means of ions... the ions including a combination of hydrogen gas ions and rare gas ions, wherein the implantation is carried out by a succession of implantations..." By contrast, claim 42 recites the limitation, "wherein the succession of implantations comprises successive implantations with **different** ions." (Emphasis added.) As presently written, claim 42 is indefinite as to the identity of the "different ions." Since independent claim 41 indicates that the implanted species is "a combination of hydrogen gas ions and rare gas ions," it is unclear if the "different ions" refer to (1) additional ions that are not hydrogen or rare gas, or to (2) one of "hydrogen gas ions" or "rare gas ions" in the combination.

### Claim Rejections - 35 USC § 251

10.    The following is a quotation of 35 U.S.C. 251 which forms the basis for the broadening rejections set forth in this Office action:

> No reissued patent shall be granted enlarging the scope of the claims of the original patent unless applied for within two years from the grant of the original patent.

11.    Claims 1-3 and 5-50 are rejected under 35 U.S.C. 251 as being broadened in a reissue application filed outside the two year statutory period.

A claim is broader in scope than the original claims (1) if it contains within its scope any conceivable product or process which would not have infringed the original patent, or alternatively, (2) if it contains within its scope any conceivable invention which would not have infringed the patent, but will now infringe the reissue claim. A claim is broadened if it is broader in any one respect even though it may be narrower in other respects. (See MPEP 1412.03.)

Because the claims 1-3, 5 and 9 of the '564 patent were ruled invalid by decision of the Fed. Cir. for failure to enable the feature of implantation of rare gas ions at the time of the invention, the claims 1-3, 5, and 9 have no scope. Furthermore, claims 6-8 of the '564 patent must also be invalid for depending from claim 1 and thereby including the non-enabled feature of implantation using rare gas ions or otherwise failing to limit the claimed invention to one that finds clear enablement from the specification, as has original claim 4. Since an invalid claim cannot be infringed, no process exists that could infringe the original, '564 patent claims 1-3 and 5-9. According to the test (1) above, then, the instant claims 1-3 and 5-50, as presently written, are broadened in scope, since no process within the scope of claims 1-3 and 5-50 can be conceived of which could possibly infringe the invalid original claims.

This leaves claim 4 as the only valid claim. Accordingly, any claim that is broader in scope than claim 4 of the '564 patent is broadening. Claim 4 recites, *inter alia*, temperatures for implantation in the range of 20 °C to 450 °C, and later thermal treatment at a temperature exceeding 500 °C. According to test (2) above, then, the claims 1-3 and 5-50, as presently written, are broadened in scope because they include within their scope a conceivable process (e.g. one in which the temperature for implantation is 0 °C, and the temperature for the third stage heat treatment is 400 °C, for example) which would not infringe claim 4 of the '564 patent,

but would infringe the reissue claims because none of the reissue claims recite the implantation

temperature and are, therefore, not limited to some specific temperature range.

Claims 27-32, as presently written, are broadened in scope because each claim includes

the limitation of implantation of helium (He) ions alone --without hydrogen ions-- which would

not infringe claims 1-9 of '564 patent, since the claims of '564 patent was found not enabled and

invalid for implantation of all rare gases, of which helium is a member.

### *Litigation*

12.     Applicant is reminded of the continuing obligation under 37 CFR 1.178(b), to timely

apprise the Office of any prior or concurrent proceeding in which US Patent No. 5,374,564 is or

was involved. These proceedings would include interferences, reissues, reexaminations, and

litigation.

Applicant is further reminded of the continuing obligation under 37 CFR 1.56, to timely

apprise the Office of any information which is material to patentability of the claims under

consideration in this reissue application.

These obligations rest with each individual associated with the filing and prosecution of

this application for reissue. See also MPEP §§ 1404, 1442.01 and 1442.04.

### *Response to Arguments*

13.     Applicant's arguments filed 10 November 2004 have been fully considered but they are

not fully persuasive.

Application/Control Number: 10/449,786                                           Page 12
Art Unit: 2813

Applicant's arguments regarding the impending submission of a supplemental declaration

are noted. Until Applicant actually submits the supplemental declaration, the objection to the

oath and the rejection of the claims will be maintained.

Applicant's arguments regarding the enablement under 35 USC 112(1), while noted, are

moot as having already been adjudicated. The claims have been ruled as not enabled for rare

gases by final decision of the Fed. Cir. for reasons indicated herein above. The decision of the

court is final and is binding on the Office.

Applicant's arguments regarding the rejection of the claims under 35 USC 251 are moot

in view of new grounds of rejection under 35 USC 251.


### Conclusion

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Erik Kielin whose telephone number is 571-272-1693. The

examiner can normally be reached on 9:00 - 19:30.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Carl Whitehead, Jr. can be reached on 571-272-1702. The fax phone number for the

organization where this application or proceeding is assigned is 703-872-9306.

Application/Control Number: 10/449,786                                    Page 13
Art Unit: 2813

Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system. Status information for published applications

may be obtained from either Private PAIR or Public PAIR. Status information for unpublished

applications is available through Private PAIR only. For more information about the PAIR

system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR

system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

Erik Kielin
Primary Examiner
January 13, 2005

Exhibit 4

I hereby certify that this correspondence is being deposited with
the United States Postal Service, with sufficient postage, as first
class mail in an envelope addressed to:
Mail Stop Reissue, Commissioner for Patents
P.O. Box 1450, Alexandria, Virginia 22313-1450
on August 19, 2005
Date of Deposit

Jasper W. Dockrey, Reg. No. 33,868
Name of applicant, assignee or
Registered Representative

_Jasper W. Dockrey_
Signature
August 19, 2005
Date of Signature

REISSUE
Case No. 9905/8

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:                    )
  BRUEL, Michel                       )
                                )    Examiner:
Application Serial No. 10/449,786        )      Laura M. Schillinger
Filing Date: May 30, 2003               )
                                )
Reissue of U.S. Patent No. 5,374,564    )
Issue Date: December 20, 1994           )    Group Art Unit:
                                )      2813
For:  A METHOD OF PRODUCING            )
A THIN LAYER OF SEMICONDUCTOR           )
MATERIAL                                )

## SUPPLEMENTAL AMENDMENT UNDER 37 C.F.R. § 1.111

Mail Stop Reissue
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

Dear Sir:

      In response to the telephone interview conducted with Examiner Keilin on July 13,

2005, please amend the application as follows.

      Amendments to the claims (changes from the original patented claims shown by

underlining and square brackets) are reflected in the listing of claims beginning on page 2 of

this paper.

      The applicant's remarks begin on page 14 of this paper.

**Amendments to the Claims:**

This listing of claims will replace all prior versions, and listings of claims, in the application:

**Listing of Claims:**

1. (Twice Amended) Process for the preparation of thin semiconductor material films, wherein the process comprises subjecting a semiconductor material wafer having a planar face and whose plane[,] is substantially parallel to a principal crystallographic plane, to the three following stages:

a first stage of implantation by ion bombardment of the face of said wafer by means of ions creating in the volume of said wafer at a depth close to the average penetration depth of said ions, a layer of gaseous microbubbles defining in the volume of said wafer a lower region constituting a majority of the substrate and an upper region constituting the thin semiconductor material film, the ions being [chosen from among] hydrogen gas ions [or rare gas ions] and, wherein the temperature of the wafer during implantation [being] is kept below the temperature at which the gas produced by the implanted ions can escape from the semiconductor by diffusion,

a second stage of intimately contacting the planar face of said wafer with a stiffener constituted by at least one rigid material layer,

a third stage of thermally treating the assembly of said wafer and said stiffener at a temperature above that at which the ion bombardment takes place and adequate to create by a crystalline rearrangement effect in the wafer, a coalescence of hydrogen microbubbles and a pressure effect in the hydrogen microbubbles, a separation between the thin semiconductor material film and the majority of the substrate, the stiffener and the planar face of the wafer being kept in intimate contact during said stage.

2. (amended) Process for the preparation of thin semiconductor material films according to claim 1, wherein the stage of implanting ions in the semiconductor material takes place through one or more layers of materials having a nature and thickness such that they can be traversed by the ions.

Appl. No. 10/449,786
Amendment Dated August 19, 2005
Reply to Examiner Interview of July 13, 2005

3. (Twice amended)  Process for the [production] preparation of thin semiconductor material films according to claim 1, wherein the semiconductor comprises a group IV material.

4. (Three times amended)  Process for the [production] preparation of thin semiconductor material films [according to claim 1], wherein the process comprises subjecting a semiconductor [is] material wafer of silicon[,] having a planar face and whose plane is substantially parallel to a principal crystallographic plane, to the three following stages:

a first stage of implantation by ion bombardment of the face of said wafer by means of ions creating in the volume of said wafer at a depth close to the average penetration depth of said ions, a layer of gaseous microbubbles defining in the volume of said wafer a lower region constituting a majority of the substrate and an upper region constituting the thin semiconductor material film, wherein the implanted [ion is a] ions are hydrogen gas [ion] ions[,] and the wafer temperature during implantation is kept below the temperature at which the gas produced by the implanted ions can escape from the semiconductor by diffusion and between 20° and 450°C., [and]

a second stage of intimately contacting the planar face of said wafer with a stiffener constituted by at least one rigid material layer, and

a third stage of thermally treating the assembly of said wafer and said stiffener at a temperature above that at which the ion bombardment takes place and adequate to create by a crystalline rearrangement effect in the wafer and a pressure effect in the microbubbles, a separation between the thin semiconductor material film and the majority of the substrate, the stiffener and the planar face of the wafer being kept in intimate contact during said stage, wherein the temperature of the third heat treatment stage exceeds 500°C.

5. (Twice amended)  Process for the [production] preparation of thin semiconductor material films according to claim 2, wherein implantation takes place through an encapsulating thermal silicon oxide layer and the stiffener is a silicon wafer covered by at least one silicon oxide layer.

Appl. No. 10/449,786
Amendment Dated August 19, 2005
Reply to Examiner Interview of July 13, 2005

6.  (Twice amended)  Process for the [production] preparation of thin semiconductor material films according to claim 1, wherein the second stage of intimately contacting the planar face of said wafer with a stiffener takes place by applying an electrostatic pressure.

7.  (Twice amended)  Process for the [production] preparation of thin semiconductor material films according to claim 1, wherein the stiffener is deposited by one or more methods from within the group consisting of evaporation, sputtering, and chemical vapor deposition with or without plasma assistance or photon assistance.

8.  (Twice amended)  Process for the [production] preparation of thin semiconductor material films according to claim 1, wherein the stiffener is bonded to said wafer by means of an adhesive substance.

9.  (Twice amended)  Process for the [production] preparation of thin semiconductor material films according to claim 1, wherein the stiffener is made to adhere to the wafer by a treatment favoring interatomic bonds.

10.  (New)  Process for the preparation of thin semiconductor material films according to claim 1 further comprising cleaving the thin semiconductor material film from the substrate.

11.  (New)  Process for the preparation of thin semiconductor material films according to claim 1, wherein the thin semiconductor material films are formed as a continuous film of semiconductor material.

12.  (New)  Process for the preparation of thin semiconductor material films according to claim 1, wherein the semiconductor material wafer comprises silicon.

13.  (New)  Process for the preparation of thin semiconductor material films according to claim 1, wherein the semiconductor material wafer comprises germanium.

14.  (New)  Process for the preparation of thin semiconductor material films according to claim 1, wherein the semiconductor material wafer comprises a silicon-germanium alloy.

Appl. No. 10/449,786
Amendment Dated August 19, 2005
Reply to Examiner Interview of July 13, 2005

15. (New) Process for the preparation of thin semiconductor material films according to claim 1, wherein the semiconductor material wafer comprises silicon carbide.

16. (New) Process for the preparation of thin semiconductor material films according to claim 1, wherein the stiffener comprises a silicon wafer covered by at least one silicon oxide layer.

17. (New) Process for the preparation of thin semiconductor material films, wherein the process comprises subjecting a semiconductor material wafer having a planar face and whose plane is substantially parallel to a principal crystallographic plane, to the three following stages:

a first stage of implantation by hydrogen ion bombardment of the face of said wafer by means of hydrogen ions creating in the volume of said wafer at a depth close to the average penetration depth of said ions, a layer of gaseous microbubbles defining in the volume of said wafer a lower region constituting a majority of the substrate and an upper region constituting the thin semiconductor material film, wherein the temperature of the wafer during implantation is kept below the temperature at which the gas produced by the implanted ions can escape from the semiconductor by diffusion,

a second stage of intimately contacting the planar face of said wafer with a stiffener constituted by at least one rigid material layer,

a third stage of thermally treating the assembly of said wafer and said stiffener at a temperature above that at which the ion bombardment takes place and adequate to create by a crystalline rearrangement effect in the wafer, a coalescence of hydrogen microbubbles and a pressure effect in the hydrogen microbubbles, a separation between the thin semiconductor material film and the majority of the substrate, the stiffener and the planar face of the wafer being kept in intimate contact during said stage.

18. (New) Process for the preparation of thin semiconductor material films according to claim 17, wherein the stage of implanting ions in the semiconductor material takes place

through one or more layers of materials having a nature and thickness such that they can be traversed by the ions.

19. (New)  Process for the preparation of thin semiconductor material films according to claim 17, wherein the semiconductor material comprises a group IV semiconductor.

20. (New)  Process for the preparation of thin semiconductor material films according to claim 17, wherein the semiconductor material wafer comprises silicon.

21. (New)  Process for the preparation of thin semiconductor material films according to claim 17, wherein the semiconductor material wafer comprises germanium.

22. (New)  Process for the preparation of thin semiconductor material films according to claim 17, wherein the semiconductor material wafer comprises a silicon-germanium alloy.

23. (New)  Process for the preparation of thin semiconductor material films according to claim 17, wherein the semiconductor material wafer comprises silicon carbide.

24. (New)  Process for the preparation of thin semiconductor material films according to claim 17, wherein implantation takes place through an encapsulating thermal silicon oxide layer.

25. (New)  Process for the preparation of thin semiconductor material films according to claim 17, wherein the stiffener comprises a silicon wafer covered by at least one silicon oxide layer.

26. (New)  Process for the preparation of thin semiconductor material films according to claim 17, wherein the second stage of intimately contacting the planar face of said wafer with a stiffener takes place by applying an electrostatic pressure.

27. (New)  Process for the preparation of thin semiconductor material films according to claim 17, wherein the stiffener is deposited by one or more methods from within the group

Appl. No. 10/449,786
Amendment Dated August 19, 2005
Reply to Examiner Interview of July 13, 2005

consisting of evaporation, sputtering, and chemical vapor deposition with or without plasma assistance or photon assistance.

28. (New)  Process for the preparation of thin semiconductor material films according to claim 17, wherein the stiffener is bonded to said wafer by means of an adhesive substance.

29. (New)  Process for the preparation of thin semiconductor material films according to claim 17, wherein the stiffener is made to adhere to the wafer by a treatment favoring interatomic bonds.

30. (New)  Process for the preparation of thin semiconductor material films according to claim 17, which further comprises cleaving the thin semiconductor material film from the substrate.

31. (New)  Process for the preparation of thin films according to claim 17, wherein the thin semiconductor material films are formed as a continuous film of semiconductor material.

32. (New)  Process for the preparation of thin semiconductor material films, wherein the process comprises subjecting a semiconductor material wafer having a planar face and whose plane is substantially parallel to a principal crystallographic plane, to the three following stages:

a first stage of implantation by ion bombardment of the face of said wafer by means of ions creating in the volume of said wafer at a depth close to the average penetration depth of said ions, a layer of gaseous microbubbles defining in the volume of said wafer a lower region constituting a majority of the substrate and an upper region constituting the thin semiconductor material film, the ions consisting of hydrogen gas ions and, wherein the temperature of the wafer during implantation is kept below the temperature at which the gas produced by the implanted ions can escape from the semiconductor by diffusion,

a second stage of intimately contacting the planar face of said wafer with a stiffener constituted by at least one rigid material layer,

Appl. No. 10/449,786
Amendment Dated August 19, 2005
Reply to Examiner Interview of July 13, 2005

a third stage of thermally treating the assembly of said wafer and said stiffener at a temperature above that at which the ion bombardment takes place and adequate to create by a crystalline rearrangement effect in the wafer, a coalescence of hydrogen microbubbles and a pressure effect in the hydrogen microbubbles, a separation between the thin semiconductor material film and the majority of the substrate, the stiffener and the planar face of the wafer being kept in intimate contact during said stage.

33. (New) Process for the preparation of thin semiconductor material films according to claim 32, wherein the stage of implanting ions in the semiconductor material takes place through one or more layers of materials having a nature and thickness such that they can be traversed by the ions.

34. (New) Process for the preparation of thin semiconductor material films according to claim 32, wherein the semiconductor material comprises a group IV semiconductor.

35. (New) Process for the preparation of thin semiconductor material films according to claim 32, wherein the semiconductor material wafer comprises silicon.

36. (New) Process for the preparation of thin semiconductor material films according to claim 32, wherein the semiconductor material wafer comprises germanium.

37. (New) Process for the preparation of thin semiconductor material films according to claim 32, wherein the semiconductor material wafer comprises a silicon-germanium alloy.

38. (New) Process for the preparation of thin semiconductor material films according to claim 32, wherein the semiconductor material wafer comprises silicon carbide.

39. (New) Process for the preparation of thin semiconductor material films according to claim 32, wherein implantation takes place through an encapsulating thermal silicon oxide layer.

Appl. No. 10/449,786
Amendment Dated August 19, 2005
Reply to Examiner Interview of July 13, 2005

40. (New) Process for the preparation of thin semiconductor material films according to claim 32, wherein the stiffener comprises a silicon wafer covered by at least one silicon oxide layer.

41. (New) Process for the preparation of thin semiconductor material films according to claim 32, wherein the second stage of intimately contacting the planar face of said wafer with a stiffener takes place by applying an electrostatic pressure.

42. (New) Process for the preparation of thin semiconductor material films according to claim 32, wherein the stiffener is deposited by one or more methods from within the group consisting of evaporation, sputtering, and chemical vapor deposition with or without plasma assistance or photon assistance.

43. (New) Process for the preparation of thin semiconductor material films according to claim 32, wherein the stiffener is bonded to said wafer by means of an adhesive substance.

44. (New) Process for the preparation of thin semiconductor material films according to claim 32, wherein the stiffener is made to adhere to the wafer by a treatment favoring interatomic bonds.

45. (New) Process for the preparation of thin semiconductor material films according to claim 32, which further comprises cleaving the thin semiconductor material film from the substrate.

46. (New) Process for the preparation of thin films according to claim 32, wherein the thin semiconductor material film is formed as a continuous film of semiconductor material.

47. (New) Process for the preparation of thin semiconductor material films, wherein the process comprises subjecting a semiconductor material wafer having a planar face and whose plane is substantially parallel to a principal crystallographic plane, to the three following stages:

Appl. No. 10/449,786
Amendment Dated August 19, 2005
Reply to Examiner Interview of July 13, 2005

a first stage of implantation by hydrogen ion bombardment of the face of said wafer so as to create in the volume of said wafer at a depth close to the average penetration depth of said ions, a layer of gaseous hydrogen microbubbles defining in the volume of said wafer a lower region constituting a majority of the substrate and an upper region constituting the thin semiconductor material film, wherein the temperature of the wafer during implantation is kept below the temperature at which the gas produced by the implanted ions can escape from the semiconductor by diffusion;

a second stage of intimately contacting the planar face of said wafer with a stiffener constituted by at least one rigid material layer, and

a third stage of thermally treating the assembly of said wafer and said stiffener at a temperature above that at which the ion bombardment takes place and adequate to create by a crystalline rearrangement effect in the wafer and a pressure effect in the microbubbles, a separation between the thin semiconductor material film and the majority of the substrate, the stiffener and the planar face of the wafer being kept in intimate contact during said stage.

48. (New) Process for the preparation of thin semiconductor material films according to claim 47, wherein the stage of implanting ions in the semiconductor material takes place through one or more layers of materials having a nature and thickness such that they can be traversed by the ions.

49. (New) Process for the preparation of thin semiconductor material films according to claim 47, wherein the semiconductor material comprises a group IV semiconductor.

50. (New) Process for the preparation of thin semiconductor material films according to claim 47, wherein the semiconductor material wafer comprises silicon.

51. (New) Process for the preparation of thin semiconductor material films according to claim 47, wherein the semiconductor material wafer comprises germanium.

52. (New) Process for the preparation of thin semiconductor material films according to claim 47, wherein the semiconductor material wafer comprises a silicon-germanium alloy.

Appl. No. 10/449,786
Amendment Dated August 19, 2005
Reply to Examiner Interview of July 13, 2005

53. (New) Process for the preparation of thin semiconductor material films according to claim 47, wherein the semiconductor material wafer comprises silicon carbide.

54. (New) Process for the preparation of thin semiconductor material films according to claim 47, wherein implantation takes place through an encapsulating thermal silicon oxide layer.

55. (New) Process for the preparation of thin semiconductor material films according to claim 47, wherein the stiffener comprises a silicon wafer covered by at least one silicon oxide layer.

56. (New) Process for the preparation of thin semiconductor material films according to claim 47, wherein the second stage of intimately contacting the planar face of said wafer with a stiffener takes place by applying an electrostatic pressure.

57. (New) Process for the preparation of thin semiconductor material films according to claim 47, wherein the stiffener is deposited by one or more methods from within the group consisting of evaporation, sputtering, and chemical vapor deposition with or without plasma assistance or photon assistance.

58. (New) Process for the preparation of thin semiconductor material films according to claim 47, wherein the stiffener is bonded to said wafer by means of an adhesive substance.

59. (New) Process for the preparation of thin semiconductor material films according to claim 47, wherein the stiffener is made to adhere to the wafer by a treatment favoring interatomic bonds.

60. (New) Process for the preparation of thin semiconductor material films according to claim 47, which further comprises cleaving the thin semiconductor material film from the substrate.

Appl. No. 10/449,786
Amendment Dated August 19, 2005
Reply to Examiner Interview of July 13, 2005

61. (New) Process for the preparation of thin films according to claim 47, wherein the thin semiconductor material film is formed as a continuous film of semiconductor material.

62. (New) Process for the preparation of thin semiconductor material films, wherein the process comprises subjecting a semiconductor material wafer having a planar face and whose plane is substantially parallel to a principal crystallographic plane, to the three following stages:

a first stage of implantation by ion bombardment of the face of said wafer by means of hydrogen ions creating, by electronic braking in the wafer, in the volume of said wafer at a depth close to the average penetration depth of said ions, a layer of gaseous hydrogen microbubbles defining in the volume of said wafer a lower region constituting a majority of the substrate and an upper region constituting the thin semiconductor material film, wherein the temperature of the wafer during implantation is kept below the temperature at which the gas produced by the implanted ions can escape from the semiconductor by diffusion;

a second stage of intimately contacting the planar face of said wafer with a stiffener constituted by at least one rigid material layer,

a third stage of thermally treating the assembly of said wafer and said stiffener at a temperature above that at which the ion bombardment takes place and adequate to create by a crystalline rearrangement effect in the wafer and a coalescence of hydrogen microbubbles and a pressure effect in the hydrogen microbubbles, a separation between the thin semiconductor material film and the majority of the substrate, the stiffener and the planar face of the wafer being kept in intimate contact during said stage.

63. (New) Process for the preparation of thin semiconductor material films according to claim 62, which further comprises cleaving the thin semiconductor material film from the substrate.

64. (New) Process for the preparation of thin semiconductor material films according to claim 62, wherein the semiconductor material comprises silicon.

Appl. No. 10/449,786
Amendment Dated August 19, 2005
Reply to Examiner Interview of July 13, 2005

65. (New) Process for the preparation of thin semiconductor material films according to claim 64, wherein the thickness of the thin semiconductor material film increases with increasing hydrogen implantation energy.

66. (New) Process for the preparation of thin semiconductor material films according to claim 65, wherein implantation takes place through a layer of thermal silicon oxide layer.

67. (New) Process for the preparation of thin semiconductor material films according to claim 62, wherein the semiconductor material wafer comprises a monocrystalline silicon wafer.

68. (New) Process for the preparation of thin semiconductor material films according to claim 62, wherein the planar face of the monocrystalline silicon wafer is substantially parallel to a 1,0,0 crystallographic plane of the monocrystalline silicon wafer.

69. (New) Process for the preparation of thin semiconductor material films according to claim 68, wherein the hydrogen microbubbles are distributed in vicinity of the 1,0,0 crystallographic plane.

70. (New) Process for the preparation of thin semiconductor material films according to claim 69, which further comprises cleaving the thin semiconductor material film from the substrate along the 1,0,0 crystallographic plane.

Appl. No. 10/449,786
Amendment Dated August 19, 2005
Reply to Examiner Interview of July 13, 2005

## REMARKS

Claims 1-70 are pending in the application.  Claim 4 has been amended.  The amendment does not introduce new matter or broaden the claim scope beyond that of the original patent claims.  Entry of this supplemental amendment is requested under Rules 1.111(a)(2)(i)(B) and 1.111(a)(2)(i)(C).

During a telephone interview conducted with Examiner Kielin on July 13, 2005, the Examiner pointed out that the applicant's recitation of claim 4 submitted with the previous response failed to accurately indicate changes from original patent claim 4.  A Substance of Interview accompanies this response.  Accordingly, the applicant has restated claim 4 to correct inadvertent omissions as follows:

in line 10, the word "and" following "ions" has been underlined;

in lines 10 and 11, the phrase "kept below the temperature at which the gas produced by the implanted ions can escape from the semiconductor by diffusion and" has been added;

in line 13, the word "intimately" has been underlined;

in line 15, the word "thermally" has been underlined; and

in line 21, the phrase "third stage heat treatment" has been changed to "third heat treatment stage" in order to conform to the language of originally issued claim 4 of U.S. patent 5,374,564.

As noted above, in addition to the corrections requested by the Examiner, the applicant has further amended claim 4 to include the recitation of original claim 1 that the

temperature of the wafer during implantation is "kept below the temperature at which the gas produced by the implanted ions can escape from the semiconductor by diffusion."

The applicant asserts that claim 4 now properly shows all changes from the original patent claim. The applicant believes to have fully responded to all of the claim issues raised in the Examiner Interview of July 13, 2005. Accordingly, the pending claims are in condition for allowance and such allowance is now earnestly requested.

Respectfully submitted,

Jasper W. Dockrey
Registration No. 33,868
Attorney for Applicant

BRINKS HOFER GILSON & LIONE
P.O. BOX 10395
CHICAGO, ILLINOIS 60610
312/321-4200

- 15 -

# Exhibit 5

| | Application No. | Applicant(s) |
|---|---|---|
| ***Notice of Allowability*** | 10/449,786 | BRUEL, MICHEL |
| | Examiner | Art Unit |
| | Laura M. Schillinger | 2813 |

***-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--***

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *2/3/06*.

2. ☒ The allowed claim(s) is/are *1-70*.

3. ☒ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
   a) ☒ All   b) ☐ Some*   c) ☐ None   of the:
   　1. ☒ Certified copies of the priority documents have been received.
   　2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
   　3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).
   * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.

4. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.
   (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached
   　1) ☐ hereto or 2) ☐ to Paper No./Mail Date _____ .
   (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of
   　Paper No./Mail Date _____ .
   **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☒ Notice of References Cited (PTO-892)
2. ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3. ☒ Information Disclosure Statements (PTO-1449 or PTO/SB/08),
   Paper No./Mail Date *2-13-04  5-30-03*
4. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

5. ☐ Notice of Informal Patent Application (PTO-152)
6. ☐ Interview Summary (PTO-413),
   Paper No./Mail Date _____ .
7. ☐ Examiner's Amendment/Comment
8. ☒ Examiner's Statement of Reasons for Allowance
9. ☒ Other *See Continuation Sheet*.

Continuation Sheet (PTOL-37)

Application No. 10/449,786

Continuation of Attachment(s) 9. Other: Response to third party protests.

Application/Control Number: 10/449,786                                    Page 2
Art Unit: 2813

## DETAILED ACTION

### *Supplemental Reissue Declaration*

The Supplemental Reissue Declaration dated 5/19/05 is acceptable.

### *Response to Protest filed pursuant to 37 CFR 1.291 dated July 8, 2005 (Protest 2)*

I. The Protestor asserts that claim 10, is deficient under the written description requirement of 35 USC 112. In summary, the alleged deficiency with claim 10 is the term "cleaving". The Protestor states, "Nowhere does the specification of the '564 Patent describe any cleaving technique other than thermal cleaving" (See page 2 of 7, Protest 2). The Protestor goes on to assert, " Based on the complete failure of the '564 Patent to provide written description of anything other than thermal cleaving, it is respectfully asserted that claim 10, drawn generically to all cleaving techniques, is not supported by the specification." (pages 2-3, Protest 2. The Protestor further refers to prosecution of European Patent No. 0 533551, claim 1 which was amended to recite cleaving during a subsequent heat treatment, stating "this amendment clearly indicates limitation of the corresponding European Application to thermal cleaving, rather than any other type of cleaving process." (See Page 3 of 7)

The arguments asserted by the Protestor are not persuasive because cleaving is taught in four locations within the '564 patent. However, there is no teaching of "thermal cleaving" anywhere to be found within the '564 patent. The additional locations where the '564 patent discusses cleaving include Col.3, lines: 45-46, Col.5, lines: 20-30 and Col.4, lines: 65-69.

Cleaving is further demonstrated in the Fig.4 (See also Col.4, lines: 65-69). The Examiner has

determined that there is adequate written description for the term "cleaving" based upon the

specification of the '564 patent. The '564 patent recites in Col.3, lines: 45-46, "Therefore the

semiconductor film can remain flat and intact throughout the heat treatment phase and up to the

final <u>cleaving</u>." Furthermore, the description of Figure 4, provided by the '564 patent states,

"FIG. 4 The assembly of the semiconductor wafer and the stiffener shown in FIG.3 at the end of

the heat treatment phase, when <u>cleaving</u> has taken place between the film and the substrate

mass." The Protestor does not make clear what support from the specification there is for the

term "thermal cleaving"; such a phrase fails to exist within the '564 reference. Therefore an

argument to require an amendment including "thermal cleaving" is found unpersuasive. Based

upon the various citations provided by the Examiner and the figures, it is determined that claim

10 meets the requirements of 35 USC 112, first paragraph. Lastly, the Examiner notes that

amendments made in a foreign filings before the EPO fail to have any bearing before the

USPTO.

II.      The Protestor asserts that claim 10 is not enabled because undue experimentation would

be necessary. The Protestor states, "Applicant's own later-filed patents clearly evidence the need

for undue experimentation in order to perform other than thermal cleaving." The Protestor

further states that, US Patent No. 6,020,252 (the '252 Patent) names Applicant as a co-inventor,

and specifically contrasts mechanical cleaving with thermal cleaving". The Protestor further

points out that the '252 reference is filed five years after the filing date of the '564 patent and

alleges that this is the result of experimentation (page 4 of 7, Protest 2).

Application/Control Number: 10/449,786                         Page 4
Art Unit: 2813

In determining whether undue experimentation may be needed, the Examiner turns to the

MPEP 2164.01(a) which outlines the Undue Experimentation Factors that all must be considered

by the Examiner when making 112 rejection. Section 2164.01 (a) states, " There are many

factors to be considered when determining whether there is sufficient

evidence to support a determination that a disclosure does not satisfy the enablement

requirement and whether any necessary experimentation is 'undue.' These factors

include, but are not limited to:

(A)    The breadth of the claims;

(B)    The nature of the invention;

(C)    The state of the prior art;

(D)    The level of one of ordinary skill;

(E)    The level of predictability in the art;

(F)    The amount of direction provided by the inventor;

(G)    The existence of working examples; and

(H)    The quantity of experimentation needed to make or use the invention based on

the content of the disclosure."

See In re Wands, 858 F.2d 731, 737, 8 USPQ2d 1400, 1404 (Fed. Cir. 1988).

The MPEP further guides, "It is improper to conclude that a disclosure is not enabling based on

an analysis of only one of the above factors while ignoring one or more of the others. The

examiner's analysis must consider all the evidence related to each of these factors, and any

conclusion of nonenablement must be based on the evidence as a whole. 858 F.2d at

Application/Control Number: 10/449,786                                    Page 5
Art Unit: 2813

737, 740, 8 USPQ2d at 1404, 1407."

The determination that "undue experimentation" would have been needed to make and
use the claimed invention is not a single, simple factual determination. Rather, it is a
conclusion reached by weighing all the above noted factual considerations. In re Wands,
858 F.2d at 737, 8 USPQ2d at 1404. These factual considerations are discussed more
fully in MPEP § 2164.08 (scope or breadth of the claims), § 2164.05(a) (nature of the
invention and state of the prior art), § 2164.05(b) (level of one of ordinary skill), §
2164.03 (level of predictability in the art and amount of direction provided by the
inventor), § 2164.02 (the existence of working examples) and § 2164.06 (quantity of
experimentation needed to make or use the invention based on the content of the
disclosure)."

The Examiner has determined, based upon all of the above factors, that the Protestor's
argument is unpersuasive. The Examiner has determined that the Protestor's arguments do not
adequately address the state of the prior art, the level of one of ordinary skill in the art. Nor,
could the Examiner find any evidence to support a large quantity of experimentation needed in
order to carry out cleaving for the '564 reference as required in an undue experimentation
analysis. The Examiner finds no evidence that a five-year delay in filing a separate patent
application with a separate inventive entity was the result of a large quantity of
experimentation to determine how to cleave.

Application/Control Number: 10/449,786                                    Page 6
Art Unit: 2813

In contrast, Examiner has found evidence which shows that cleaving was considered to

be a conventional technique to one of ordinary skill in the semiconductor manufacturing art at

the time of the '564 patent, (see US 5036023- Col.3, lines: 45-52) which states, "[t]he

inventative method also comprises a variety of conventional steps, exemplarily including ...

dicing or cleaving of a semiconductor wafer....Such processing steps are *conventional and*

*require no detailed discussion*" (emphasis added).    Therefore, it is determined by the Examiner

that between the description provided in the '564 patent and the conventional nature of cleaving

within the art of semiconductor manufacturing, the breadth of claim 10 is enabled.


III.   The Protestor argues that, "[a]t least two pieces of evidence strongly indicated that there

was no intent to claim the subject matter of claim 10. First, the original '564 Patent fails to

disclose any cleaving technique other than thermal cleaving. Second the '564 Patent did not

include claims drawn to any type of cleaving process, even thermal cleaving." (page 5 of 7,

Protest 2).


According to 35 U.S.C 251 "[w]henever any patent is through error or without any

deceptive intention...by reason of the patentee claiming more or less than he had a right to claim

the patent" is allowed to file a reissue.  In this case, as discussed above, the Examiner has

determined that the term "cleaving" is sufficiently enabled and therefore, the Applicant had a

right to claim "cleaving", yet did not do so.  Therefore in accordance with 35 U.S.C. 251, the

Applicant is entitled to correct this deficiency by reissue.

Application/Control Number: 10/449,786                                          Page 7
Art Unit: 2813

IV. The Protestor argues that the '564 patent is "ineligible for broadening". The Protestor argues

further that claim 10 is broadened and "other reissue claims are unpatentable on the same

grounds". (page 6 of 7 Protest 2).


As stated in the MPEP 1412.03 "[a] broadened reissue claim is a claim which enlarges

the scope of the claims of the patent i.e., a claim which is greater in scope than each and every

claim of the original patent." The Examiner acknowledges that the instant application is not

eligible for broadening reissue, however the current claims are not broadening within the

meaning of 35 U.S.C. 251.   However, in this case, the Applicant has amended the claims to

pertain to only hydrogen and the claims no longer include rare gas ions (which was held to be

invalid by the Federal Circuit Court of Appeals). Therefore, the Applicant has *narrowed* the

scope of all claims and no broadening has occurred.


### *Response to Protest filed pursuant to 37 CFR 1.291 dated Sept. 1, 2005 (Protest 3)*


**1. The Protestor argues that the Applicant failed to state an error as required under 35**

**U.S.C. 251.**


The Protestor argues that "section 251 has two parts (1) error in the patent and (2) error in

conduct" (page 3, Protest 3) The Protestor submits that "statements of the Applicant-that the

jury decided that the specification of the original patent did not enable claims 1-3, 5 and 9 with

rare gas ions or that claim 1 was overly broad because it included subject matter determined in

the lawsuit to be not enabled- does not provide an error in the scope of the claims" (page 3,

Protest 3).

The MPEP in section 1402 [R-3], explains the grounds for filing a reissue application.

It states, "[a] reissue application is filed to correct an error in the patent which was made without

any deceptive intention, where, as a result of the error, the patent is deemed wholly or partly

inoperative or invalid.  An error in the patent arises out of an error in conduct which was

made in the preparation and/or prosecution of the application which became the patent.

There must be at least one error in the patent to provide grounds for reissue of the patent.

If there is no error in the patent, the patent will not be reissued."

In this case, the Federal Circuit upheld a finding of invalidity on the basis that the "rare gas ions"

claimed in the '564 patent were non-enabled. This allows the Applicant to file a reissue

application to correct such errors in the patent which was made without any deceptive intention,

where, as a result of the error, the patent is deemed wholly or partly inoperative or invalid  in

accordance to 35 U.S.C. 251.  The Examiner interprets the include of "rare gas ions" in the

claim to constitute 1) the error in the patent and the inclusion of this claimed material and failure

to adequately provide enough specificity within the specification as 2) the error in conduct made

in the preparation and prosecution of the application which became the patent.  Therefore, the

oath does comply with the requirements of 35 U.S.C. 251.  The Examiner further notes that

"protests raising fraud or other inequitable conduct issues will be entered in the application file,

Application/Control Number: 10/449,786                                    Page 9

Art Unit: 2813

generally without comment on those issues.  37 CFR 1.291(*>e<)." (such issues are raised on

pages 5-8, 11 in Protest 3).


2. **The Protestor asserts that "the Applicant is attempting to broaden the claims beyond**

**hydrogen in the guise of claim differentiation."**  The Protestor states that "the patentee could

later argue that some claims cover more then hydrogen as the composition of the implantation

gas." (page 9, Protest 3).  The Protestor argues that the claim language should be limited with the

transitional phrase "consisting" in efforts to prevent the Applicant from asserting that the claims

could include elements or ingredients other than hydrogen. (page 10, Protest 3).


The Examiner finds the arguments asserted by the protest unpersuasive.  The Applicant

cannot use the doctrine of claim differentiation to recapture subject matter which has been held

by the Federal Circuit to be not enabled and invalid.  The Examiner notes that prosecution

history estoppel (file wrapper estoppel) , collateral estoppel and res judicata all function to make

clear **that the Applicant's claims are limited to hydrogen ions.**.  Due to these doctrines and the

current application's well established record,  the Examiner does not believe that any further

amendments are necessary on behalf of the Applicant to further clarify this resolved issue.


The Protestor asserts that the claims 1-16, 17-31, 47-61 and 62-70 should be objected to

under 37 C.F.R. 1.75 as being substantial duplicates of claims 32-46 because the language or

scope of claims 1-16, 17-31, 47-61 and 62-70 is substantially the same as that of claims 32-46.

Application/Control Number: 10/449,786                                    Page 10

Art Unit: 2813

(page 12, protest 3). The Protestor further argues that "electronic braking" (recited in claim 62)

is an inherent feature of all the other independent claims.

According to the MPEP section 706.03(k), "Inasmuch as a patent is supposed to be

limited to only one invention or, at most, several closely related indivisible inventions, limiting

an application to a single claim, or a single claim to each of the related inventions might appear

to be logical as well as convenient. However, court decisions have confirmed applicant's right to

restate (i.e., by plural claiming) the invention in a reasonable number of ways. Indeed, a mere

difference in scope between claims has been held to be enough."

In this case, the Examiner has determined that the claims constitute a restating or plural

claiming within a reasonable number of ways such as: "the ions being hydrogen gas ions",

including "hydrogen microbubbles" (claim 1); "wherein the implanted ions are hydrogen gas

ions", "wafer temperature during implantation is kept below the temperature at which the gas

produced by the implanted ions can escape from the semiconductor by diffusion" (claim 4)

etc...- (similar differences are recited in the remaining claims). Such differences of language are

acceptable because they restate the invention in a reasonable number of ways without having the

language qualify as "duplicate". Therefore, the claims are not objectionable and are considered

proper.

**3. The Protestor states that "Protester fully agrees with the arguments in the Protest filed**

**July 8, 2005 that claim 10 (or any other claim reciting "further comprising cleaving") is not**

Application/Control Number: 10/449,786                                    Page 11
Art Unit: 2813

supported by adequate written description and is not enabled" (page 13, Protest 3). The

Protestor refers then to trial testimony excerpts to further support an assertion that the Applicant

only invented "thermal cleaving." (pages 15-16, Protest 3)


The Examiner does not agree with the enablement arguments made in the Protest dated

July 5, 2005 as explained above.  The Examiner would refer to her previous arguments

addressing this subject in-depth and will restate that thermal cleaving is not found in the '564

patent.  The only reference to cleaving made in the '564 patent is "cleaving" and one of ordinary

skill in the art would understand how to go about "cleaving" a semiconductor wafer.


4.    The Protestor asserts that claims 1-5, 7-8, 10-12, 16-20, 24-25, 27, 29-35, 39-40, 42, 44-

50, 54-55, 57, and 59-66 should be rejected as being anticipated under 35 U.S.C. 102 (e)

over US Patent No. 5,256,581 (the Motorola patent). (page 16, Protest 3).


The Protestor asserts that the first stage, that is the hydrogen implantation step is taught

by the Motorola patent (Page 19, Protest 3).  The Protestor asserts that the "step two is the same

as stage 2 of the '564 patent " (page 20, Protest 3).  In the alternative step two of the Motorola

patent is the same as combined states of 2 and 3 in the '564 patent (page 20, Protest 3).  Lastly,

the Protestor asserts that "step three is etching the silicon wafer to the boundary of the n-type

layer" (page 22, Protest 3).

Application/Control Number: 10/449,786                                      Page 12
Art Unit: 2813

In accordance with MPEP 2111, "during patent examination, the pending claims must be given their broadest reasonable interpretation consistent with the specification." In re Hyatt, 211 F.3d 1367, 1372, 54 USPQ2d 1664, 1667 (Fed. Cir. 2000). See also In re Morris, 127 F.3d 1048, 1054-55, 44 USPQ2d 1023, 1027-28 (Fed. Cir. 1997) (The court held that the PTO is not required, in the course of prosecution, to interpret claims in applications in the same manner as a court would interpret claims in an infringement suit.) Therefore, the Examiner does not take into account the court's determined claim scope provided in the Markman Hearing, rather the broadest reasonable interpretation consistent with the specification will be applied to determine claim scope.

The Examiner has concluded that claims 1-5, 7-8, 10-12, 16-20, 24-25, 27, 29-35, 39-40, 42, 44-50, 54-55, 57, and 59-66 are not anticipated under 35 U.S.C. 102 (e) over US Patent No. 5,256,581 (the Motorola patent). The Examiner does not deem it necessary to address all the arguments by the Protestor with regard to steps one through three because the "microbubble" limitation is not anticipated by the Motorola patent and thereby renders such other arguments moot. In summary, the Motorola patent is disqualified as a 102 (e) reference because it fails to explicitly nor implicitly teach the formation of "microbubbles". The term "microbubbles" nor any other synonym appears in the Motorola patent.

Further, the Motorola fails to implicitly teach the formation of "microbubbles" because it fails to teach the conditions for forming microbubbles as disclosed in the '564 reference. The '564 patent specification teaches forming microbubbles as follows, "For doses of approximately

$10^{16}$ cm $^{-2}$, the implanted hydrogen atoms start to form bubbles, which are distributed in the

vicinity of a plane parallel to the surface. The plane of the surface corresponds to a principal

crystallographic plane and the same applies with respect to the plane of the microbubbles, which

is consequently a cleaving plane. For an implanted does of $> 10^{16}$ cm $^{-2}$, (e.g. $5 \cdot 10^{16}$ cm$^2$), it is

possible to thermally trigger the coalescence between the bubbles inducing a cleaving into two

parts of the silicon" (Col.5, lines: 24-29).   Therefore, the formation of microbubbles requires a

certain amount of implanted hydrogen in order to form microbubbles.  The Protestor admits that

the Motorola patent fails teach such conditions "Even though the Motorola patent does not

explicitly disclose the conditions for hydrogen ion implantation, this feature is well known to

persons skilled in the art at the time of filing the Motorola patent  on August 28, 1991" (See

footnote 3, page 19, Protest 3).  An assertion that it would be well known to one of ordinary skill

in the art does not qualify the reference for anticipation under 35 USC 102 (e).


5.      **The Protestor asserts that claims 6, 9, 13-15, 21, 23, 26, 28, 36-38, 41, 43, 51-53, 56, 58**

**and 67-70 of the Reissue Application would have been obvious over the Motorola patent in**

**view of the various art cited (pages 25-26, Protest 3).**


        Upon careful review of all references provided by the Protestor, the Examiner has

concluded that all references fail to render it obvious to modify the Motorola patent to further

include "microbubbles" and a subsequent "third stage of thermally treating the assembly of the

wafer and said stiffener at a temperature above that at which the ion (hydrogen) bombardment

takes place and adequate to create by a crystalline rearrangement effect in the wafer, a

coalescence of (hydrogen) microbubbles and a pressure effect in the (hydrogen) microbubbles, a

separation between the thin semiconductor film and majority of the substrate". Due to such

deficiencies, the Protestors arguments are deemed to be moot.


6. The Protestor asserts that claims 1-70 of the reissue application would have been

obvious over the Motorola patent, in view of GB 2211991 (GB '991), further in view of the

other patents cited.


The Protestor states that "GB '991 discloses stages one through three of the '564 patent. In

particular, GB '991 discloses hydrogen ion implantation (page2, line 4), and that 'if the silicon is

then subjected to a post-implantation anneal, there is a tendency both for the bubbles to migrate

through the silicon and for the inert gas to diffuse through the silicon and escape from the surface

of the silicon so leaving voids in the silicon' (page 1, lines: 28-32). The Protestor further asserts,

"persons of ordinary skill in this art would have been motivated to combine the Motorola patent

with GB '991 as the Motorola patent clearly discloses that it would be advantageous to carry out

the bonding step prior to further processing for separating the hydrogen implanted thin film of

silicon from the underlying silicon substrate 'with precisely controlled thickness' (*See* column 3,

lines 21 to 60)." (page 28, Protest 3).


The Examiner does concede that the GB '991 reference teaches the formation of

'microbubbles" and further teaches the ability of such bubbles to coalesce to form a continuous

defect which will allow the upper region of the silicon to become detached." (page 4, lines: 5-

11). Therefore the Examiner will look to see if one of ordinary skill in the art would have

thought it obvious to modify the Motorola patent to include the microbubble formation and

coalescing disclosed by GB '991.

When applying 35 U.S.C. 103, the following tenets of patent law must be adhered to:

(A)    The claimed invention must be considered as a whole;

(B)    The references must be considered as a whole and must suggest the

desirability and thus the obviousness of making the combination;

(C)    The references must be viewed without the benefit of impermissible

hindsight vision afforded by the claimed invention; and

(D)    Reasonable expectation of success is the standard with which obviousness

is determined.  Hodosh v. Block Drug Co., Inc., 786 F.2d 1136, 1143 n.5, 229 USPQ 182, 187

n.5 (Fed. Cir. 1986).

Further, a prior art reference must be considered in its entirety, i.e., as a whole,

including portions that would lead away from the claimed invention. W.L. Gore & Associates,

Inc. v. Garlock, Inc., 721 F.2d 1540, 220 USPQ 303 (Fed. Cir. 1983), cert. denied, 469

U.S. 851 (1984) (Claims were directed to a process of producing a porous article by

expanding shaped, unsintered, highly crystalline poly(tetrafluoroethylene) (PTFE) by

stretching said PTFE at a 10% per second rate to more than five times the original length.

The prior art teachings with regard to unsintered PTFE indicated the material does not

respond to conventional plastics processing, and the material should be stretched slowly.

Application/Control Number: 10/449,786                                        Page 16

Art Unit: 2813

A reference teaching rapid stretching of conventional plastic polypropylene with reduced

crystallinity combined with a reference teaching stretching unsintered PTFE would not

suggest rapid stretching of highly crystalline PTFE, in light of the disclosures in the art that

teach away from the invention, i.e., that the conventional polypropylene should have

reduced crystallinity before stretching, and that PTFE should be stretched slowly.).

Upon review of the Motorola reference, the motivation to combine as pointed out by the

protestor in Column 3, lines: 21-60 focuses on bonding the handle wafer 21 to the active wafer

19 in order to give the hydrogen layer 18 additional strength for further processing (mechanical

grinding, scraping etc...) (see Fig.3 and Col.3, lines: 20-30). This motivation is deficient

because in combination with the GB '991 reference, the need for support during mechanical

grinding would not exist. That is, the removal based upon scraping, mechanical grinding etc...

would not be required because the microbubbles would coalesce and detach the silicon layer.

Therefore, the need for additional strength would not exist.

Moreover, the Protestor's motivation does not address why one of ordinary skill in the art

at the time the invention was made would modify the Motorola reference to include

"microbubbles" as taught by GB '991. Rather this merely restates the use of the handle wafer to

back-side etch the excess silicon layer from the hydrogen implanted material. Therefore, the

protestor's proposed motivation does not address the proper deficiency..

Application/Control Number: 10/449,786                                    Page 17
Art Unit: 2813

The Examiner has reviewed the Motorola reference to determine if any evidence existed to

motivate one of ordinary skill in the art to modify the Motorola reference to further include the

formation of microbubbles in accordance with the Applicant's claim language. The Examiner

could find no such evidence. The Examiner then turned to the GB '991 reference to determine

whether it provided any evidence or suggestion to modify the teachings of the Motorola patent.

The Examiner found that the GB '991 reference actually teaches away from Applicant's claimed

invention. Specifically, page 4, lines: 5-11 states, "[I]t should be noted that there is an upper

limit to the ion dose of the hydrogen or helium arising from the need to prevent the bubbles

and/or voids from being so densely packed that they may coalesce to from a continuous defect

which will allow the upper region of silicon to become detached." The GB '991 reference is

actually teaching to *prevent* the bubbles from being densely packed such that they coalesce. This

constitutes a clear "teaching away". Therefore the Examiner has concluded that it would not

have been obvious to one of ordinary skill in art at the time the invention was made to modify

the Motorola patent in view of the GB '991 reference because there is no motivation to do so.


### Allowable Subject Matter

Claims 1-70 are allowed.

### Conclusion

Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Laura M. Schillinger whose telephone number is (571) 272-1697.

The examiner can normally be reached on M-T, R-F 7:00-5:00.

Application/Control Number: 10/449,786                                   Page 18

Art Unit: 2813

    If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Carl W. Whitehead, Jr. can be reached on (571) 272-1702. The fax phone number

for the organization where this application or proceeding is assigned is 571-273-8300.

    Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system. Status information for published applications

may be obtained from either Private PAIR or Public PAIR. Status information for unpublished

applications is available through Private PAIR only. For more information about the PAIR

system, see http://pair-direct.uspto.gov. Should you have questions on access to the Private PAIR

system, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free).

Laura M Schillinger
Primary Examiner
Art Unit 2813

04/11/06

Westlaw.

Not Reported in F.Supp.2d                                                              Page 1
Not Reported in F.Supp.2d, 2006 WL 891032 (D.Del.)
**2006 WL 891032 (D.Del.)**

Ⅽ Item Development AB v. Sicor Inc.
D.Del.,2006.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
ITEM DEVELOPMENT AB, Astellas U.S. LLC, and
Astellas Pharma US, Inc., Plaintiffs,
v.
SICOR INC. and Sicor Pharmaceuticals, Inc.,
Defendants.
KING PHARMACEUTICALS RESEARCH AND
DEVELOPMENT INC., Astellas U.S. LLC, and
Astellas Pharma US, Inc., Plaintiffs,
v.
SICOR INC. and Sicor Pharmaceuticals, Inc.,
Defendants.
**No. Civ. 05-336-SLR, Civ. 05-337-SLR.**

March 31, 2006.

Paul M. Lukoff, Prickett, Jones & Elliott, P.A.,
Richard K. Herrmann, Morris, James, Hitchens &
Williams, Wilmington, DE, for Plaintiffs.
Karen Elizabeth Keller, Doungamon Fon Muttamara-
Walker, Young, Conaway, Stargatt & Taylor,
Wilmington, DE, for Defendants.

MEMORANDUM ORDER

ROBINSON, J.
**\*1** At Wilmington this 31st day of March, 2006,
having considered defendants' motions to dismiss
count III of the complaint, as well as the papers
submitted in connection therewith;

IT IS ORDERED that defendants' motions to dismiss
count III of the complaint (Civ. No. 05-336-SLR, D.I.
5; Civ. No. 05-337-SLR, D.I. 5) [FN1][FN2] is granted in
part and denied in part for the reasons that follow:

> FN1. The D.I. numbers in this memorandum
> order refer to Civ. No. 05-336-SLR, unless
> otherwise noted.

> FN2. The motions filed by defendants in
> Civ. No. 05-336-SLR ("the '336 case") and
> Civ. No. 05-337-SLR ("the '337 case") are
> identical, except for the parties' names and

other case-specific information which is
inconsequential to the resolution of these
motions. The responsive arguments made by
the plaintiffs in the '337 case "mirror" those
made by the plaintiffs in the '336 case. (Civ.
No. 05-337-SLR, D.I.1, n. 1) Since the
issues are identical and the arguments
thereon are nearly identical, the court will
address the issues and arguments regarding
the motions in both cases in this single
memorandum order.

1. Standard of Review. In analyzing a motion to
dismiss pursuant to Rule 12(b)(6), the court must
accept as true all material allegations of the
complaint and it must construe the complaint in favor
of the plaintiff. See*Trump Hotels & Casino Resorts,
Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478, 483 (3d
Cir.1998)."A complaint should be dismissed only if,
after accepting as true all of the facts alleged in the
complaint, and drawing all reasonable inferences in
the plaintiff's favor, no relief could be granted under
any set of facts consistent with the allegations of the
complaint."*Id.* Claims may be dismissed pursuant to
a Rule 12(b)(6) motion only if the plaintiff cannot
demonstrate any set of facts that would entitle it to
relief. See*Conley v. Gibson,* 355 U.S. 41, 45-46, 78
S.Ct. 99, 2 L.Ed.2d 80 (1957). The moving party has
the burden of persuasion. See*Kehr Packages, Inc. v.
Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991).

2. With respect to their claim of infringement,
plaintiffs assert that defendant Sicor Pharmaceuticals
filed an ANDA and paragraph IV certification with
the FDA to obtain approval for the manufacture, use
and sale of Adenosine Injection, USP. (D.I. 1 at ¶ 23,
25) Plaintiffs in the '336 case assert that the use of
Adenosine Injection, USP, according to its approved
labeling, would "result in infringement of one or
more claims of [its] '296 patent [U.S. Patent No.
5,731,296]." (D.I. 1 at ¶ 24) (Plaintiffs in the '337
case allege that the same acts would result in
infringement with respect to U.S. Patent No.
5,070,877 ("the '877 patent").) Plaintiffs further
allege that defendant Sicor Inc. has encouraged and
induced Sicor Pharmaceuticals to file an ANDA and
prepare to sell Adenosine Injection, USP pursuant to
the ANDA. (D.I. 1 at ¶ 27) Count I of plaintiffs'

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 891032 (D.Del.)
**2006 WL 891032 (D.Del.)**

complaint in the '336 case, entitled "Patent Infringement," restates the allegation that Sicor Pharmaceuticals infringes the '296 patent under 35 U.S.C. § 271(e)(2)(A) by submitting an ANDA to the FDA, as well as the allegation that Sicor Inc. induced Sicor Pharmaceuticals to file the ANDA application, prepare to sell Adenosine Injection, USP, and eventually sell it once approved by the FDA. (D.I. 1 at ¶¶ 29-30) (The same argument is offered by plaintiffs in the '337 case with respect to the '877 patent.) Count III of the complaint of plaintiffs in the '336 case, entitled "Willful Infringement," asserts in paragraph 40 [FN3] that the alleged infringement by defendants has been willful. (D.I. 1 at ¶¶ 38-41) (Plaintiffs in the '337 case make the same assertion in paragraph 41 of their complaint.)

> FN3."On information and belief, Defendants' infringement has been willful."D.I. 1 at ¶ 40.

*2 3. Defendants move to dismiss count III of plaintiffs' complaint as failing to state a claim on which relief can be granted, pursuant to Fed.R.Civ.P. 12( b)( 6). (D.I.5) Defendants assert that plaintiffs' claim in count III of their complaint, alleging **willful infringement**, has no support in the facts since a patentee in an **infringement** action under 35 U.S.C. § 271(e)(2) may not prove that an accused **infringer's** conduct amounts to **willful infringement**. (Id.)

4. Plaintiffs argue that defendants' arguments with respect to § 271(e)(2) are incorrect and ignore the facts of this case. (D.I. 14 at 2-6) Furthermore, plaintiffs request that the court not strike those portions of count III which are not directed to willful infringement. (Id. at 6-7)

5. The Federal Circuit initially addressed the issue of willfulness in ANDA and paper NDA cases in *Yamanouchi Pharm. Co., Ltd. v. Danbury Pharmacal, Inc.,* 231 F.3d 1339 (Fed.Cir.2000). In *Yamanouchi,* the court noted that "[a]n ANDA [or paper NDA] filing by its very nature is a 'highly artificial act of infringement,' therefore, the trial court need not have elevated the ANDA certification into a finding of willful infringement."231 F.3d at 1347. Nevertheless, the court held that the case was exceptional and awarded attorney's fees to the plaintiff, based on defendant's "misconduct in filing a wholly unjustified ANDA certification and

misconduct during the litigation that followed...."Id.

6. The Federal Circuit addressed this issue again in *Glaxo Group Ltd. v. Apotex, Inc.,* 376 F.3d 1339 (Fed.Cir.2004), holding that "the mere fact that a company has filed an ANDA application or certification cannot support a finding of willful infringement for purposes of awarding attorney's fees pursuant to 35 U.S.C. § 271(e)(4)."376 F.3d at 1350-51. The court noted that in *Yamanouchi,* it had "determined that a baseless and 'wholly unjustified' paragraph IV certification in an ANDA filing, when combined with litigation misconduct, warranted an exceptional case finding."Id. at 1350.The court continued, "in *Yamanouchi,* we did not agree that the generic company had engaged in willful infringement, but rather determined that an award of attorney's fees was permitted because the generic had filed numerous baseless filings supporting its fruitless and meritless arguments, both in its case at trial and in its ANDA certification."Id.

7. In the case at bar, plaintiffs have not offered any support for a finding of willful infringement. The only allegations of infringement by plaintiffs are that Sicor Pharmaceuticals filed an ANDA and paragraph IV certification for Adenosine Injection, USP, and that Sicor Inc. assisted, induced or encouraged Sicor Pharmaceuticals in those and related acts. Because the filings of Sicor Pharmaceuticals cannot support a claim of willful infringement, plaintiffs' complaint fails to state a claim on that basis. Paragraph 40 of count III of the complaint in the '336 case, and paragraph 41 of count III of the complaint in the '337 case, shall be dismissed. Plaintiffs assert that, even if the court strikes the allegations of willful infringement in count III, the allegations concerning exceptional case and attorney's fees should remain. The court agrees. As the Federal Circuit explained in *Glaxo,* a finding that an ANDA/paper NDA case is "exceptional" can be based on meritless filings combined with litigation misconduct, although a finding of willful infringement cannot.Glaxo, 376 F.3d at 1350-51. Plaintiffs shall have the opportunity to establish facts which support a claim for an exceptional case for which the court may award attorney's fees. Thus, the remaining paragraphs of count III (¶ ¶ 38, 39, 41 in the '336 case; ¶¶ 39, 40, 42 in the '337 case), including those relating to an exceptional case and attorney's fees, shall not be dismissed.

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 891032 (D.Del.)
**2006 WL 891032 (D.Del.)**

D.Del.,2006.
Item Development AB v. Sicor Inc.
Not Reported in F.Supp.2d, 2006 WL 891032
(D.Del.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

81 Fed.Appx. 734                                                                                              Page 1
81 Fed.Appx. 734, 2003 WL 22839338 (C.A.Fed.)
**(Cite as: 81 Fed.Appx. 734, 2003 WL 22839338 (C.A.Fed.))**

**H**Soitec, S.A. v. **SiliconGenesis** Corp.
C.A.Fed.,2003.
This case was not selected for publication in the
Federal Reporter.NOTE: Pursuant to Fed.Cir.R. 47.6,
this order is not citable as precedent. It is public
record.Please use FIND to look at the applicable
circuit court rule before citing this opinion. Federal
Circuit Rule 47.6. (FIND CTAF Rule 47.6.)
United States Court of Appeals,Federal Circuit.
SOITEC, S.A. and Commissariat A L'Energie
Atomique, Plaintiffs-Appellants,
v.
**SILICONGENESIS** CORPORATION, Defendant-
Cross Appellant.
**No. 03-1080, 03-1140.**

Nov. 26, 2003.
Rehearing and Rehearing En Banc Denied Jan. 7,
2004.

In action alleging infringement of patent for process
for production of thin semiconductor material films,
the United States District Court for the District of
Massachusetts found that claims were infringed, but
that five claims were invalid and that remaining
claim was not willfully infringed. Patentee appealed,
and alleged infringer cross-appealed. The Court of
Appeals held that: (1) alleged infringer was subject to
personal jurisdiction in Massachusetts; (2) claim
requiring "separation" between thin film and majority
of substrate was not indefinite; and (3) determination
that claim reciting that bombardment of donor silicon
wafer occurred with "hydrogen or rare earth gases"
was invalid for non-enablement was supported by
evidence.

Affirmed.

West Headnotes

**[1] Patents 291 ⌐⌐288(4)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k288 Jurisdiction
                291k288(4) k. Regular and Established

Place of Business. Most Cited Cases
Alleged    infringer    transacted    business    in
Massachusetts, and thus was subject to personal
jurisdiction in Massachusetts in patent infringement
action, where alleged infringer merged with
Massachusetts-based        company,        purchased
subsystems and other equipment directly for its
Massachusetts facility, and used facility to design and
build equipment used to create system that allegedly
infringed patent. M.G.L.A. c. 223A, § 3.

**[2] Patents 291 ⌐⌐101(2)**

291 Patents
    291IV Applications and Proceedings Thereon
        291k101 Claims
            291k101(2) k. Construction in General.
Most Cited Cases
In patent claim for process for production of thin
semiconductor material films, term "separation"
referred to "intervening space or gap" between thin
film and majority of substrate, but did not require
perfect cleavage between top of film and bottom
substrate.

**[3] Patents 291 ⌐⌐260**

291 Patents
    291XII Infringement
        291XII(A) What Constitutes Infringement
            291k260 k. Extent of Use. Most Cited
Cases
There is no fair use or research and development
exception for infringement of normal commercial
processes.

**[4] Patents 291 ⌐⌐101(6)**

291 Patents
    291IV Applications and Proceedings Thereon
        291k101 Claims
            291k101(6) k. Ambiguity, Uncertainty or
Indefiniteness. Most Cited Cases
Claim in patent for process for production of thin
semiconductor material films requiring "separation"
between thin film and majority of substrate was not
indefinite, despite contention that one skilled in art

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

81 Fed.Appx. 734                                                                                      Page 2
81 Fed.Appx. 734, 2003 WL 22839338 (C.A.Fed.)
**(Cite as: 81 Fed.Appx. 734, 2003 WL 22839338 (C.A.Fed.))**

would be unable to ascertain when "separation" occurred, where, considering context of claim and teachings of specification, one skilled in art would have been able to determine that separation had to occur during third stage of heat treatment of wafer only after ion implantation and attachment of stiffener, and be caused by crystalline rearrangement effect in wafer and pressure effect in microbubbles. 35 U.S.C.A. § 112, ¶ 2.

**[5] Patents 291 ☜312(6)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k312 Evidence
                291k312(3) Weight and Sufficiency
                    291k312(6) k. Particular Matters, Sufficiency as To. Most Cited Cases
Jury's determination that claim in patent for process for production of thin semiconductor material films reciting that bombardment of donor silicon wafer occurred with "hydrogen or rare earth gases" was invalid for non-enablement was supported by evidence, where claim described only how hydrogen could be used in claimed process, hydrogen ions were significantly different from rare earth gases in mass, bonding capability and diffusion characteristics, and there were no publications explaining use of rare earth gases at time patent was filed. 35 U.S.C.A. § 112, ¶ 1.

**[6] Patents 291 ☜312(8)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
            291k312 Evidence
                291k312(3) Weight and Sufficiency
                    291k312(8) k. Participation, Intent, and Contributory Infringement. Most Cited Cases
Jury's determination that competitor's infringement of patent for process for production of thin semiconductor material films was not willful was supported by evidence that competitor's activities were geared toward designing around patent's claims, and that competitor secured opinions that provided interpretation of claims and understanding of accused process that at least arguably avoided infringement.

**Patents 291 ☜328(2)**

291 Patents
    291XIII Decisions on the Validity, Construction, and Infringement of Particular Patents
        291k328 Patents Enumerated
            291k328(2) k. Original Utility. Most Cited Cases
5,374,564. Invalid in Part.

*735 Before MAYER, Chief Judge, CLEVENGER and SCHALL, Circuit Judges.

PER CURIAM.
**1 Soitec, SA and Commissariat à l'Energie Atomique (collectively "Soitec") brought this patent infringement suit against Silicon Genesis Corporation ("SiGen") for infringing U.S. Patent No. 5,374,564 ("the '564 patent"). After a *Markman* hearing, the United States District Court for the District of Massachusetts entered partial summary judgment that claims 1-3, 5 and 9 of the '564 patent were infringed. At trial the jury returned a verdict that claim 4 was likewise infringed. The jury found, however, that claims 1-3, 5 and 9 were invalid for failing the enablement requirement of 35 U.S.C. § 112, ¶ 1. The jury further found that claim 4 was not willfully infringed. *Soitec v. Silicon Genesis Corp.,* No. 99-CV-10826 (D.Mass. Oct. 21, 2002). Soitec appeals the jury verdict that claims 1-3, 5 and 9 are invalid for non-enablement and that claim 4 was not willfully infringed. SiGen cross-appeals the district court's claim construction, or, alternatively, the court's holding that the claims as construed are not invalid for indefiniteness under 35 U.S.C. § 112, ¶ 2. SiGen also appeals the jury verdict of infringement of claim 4. We *affirm.*

1. SiGen argues in its cross-appeal that the district court improperly asserted personal jurisdiction. A district court may exercise personal jurisdiction over a non-consenting party if the party is amenable to service of process under the appropriate state long-arm statute, and the party's activities within the forum state satisfy the minimum contacts requirement of the due process clause. *Hildebrand v. Steck Mfg. Co.,* 279 F.3d 1351, 1354 (Fed.Cir.2002)*736 (citing *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

SiGen disputes that the reach of the Massachusetts long-arm statue is coextensive with the bounds of due

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

81 Fed.Appx. 734                                                                                                           Page 3
81 Fed.Appx. 734, 2003 WL 22839338 (C.A.Fed.)
(Cite as: 81 Fed.Appx. 734, 2003 WL 22839338 (C.A.Fed.))

process. We interpret the Massachusetts long-arm statute in accordance with Massachusetts's precedent. See *Hildebrand, 279 F.3d at 1354*. The statute provides, in pertinent part:

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's

(a) transacting any business in this commonwealth

Mass. Gen. Laws ch. 223A, § 3 (2000). While the Massachusetts Supreme Judicial Court interprets the "transacting any business" portion of section 3 broadly, it has clarified that " § 3, asserts jurisdiction over the person to the constitutional limit only when some basis for jurisdiction enumerated in the statute has been established." *Good Hope Indus., Inc. v. Ryder Scott Co., 378 Mass. 1, 389 N.E.2d 76, 80 (1979)*.

[1] In September of 1997, SiGen merged with Waban Technology, Inc. ("WTI"). WTI was a Massachusetts corporation founded by Dr. Chung Chan with its principal place of business in Waban, Massachusetts. SiGen described Chan as its cofounder and the developer of the company's PIII system. SiGen advertised "that the systems built by Waban Technology were originally intended for doping semiconductor wafers, but their potential has since been recognized as a viable alternative to beam-line ion implanters for use in the Genesis Process." The Genesis Process is one of the systems accused of infringing the '564 patent. Around the time the complaint was filed, SiGen maintained its PIII equipment development group in Boston. It promoted to potential investors that the PIII equipment was an important part of the Genesis Process. In October of 1997, SiGen leased the former WTI building for an extended period. Contrary to initial assertions, it admitted purchasing subsystems and other equipment directly for its Bedford, Massachusetts, facility, which were used in the PIII equipment. In December of 1998, a periodical described SiGen's newly acquired Boston facility as the place "where the first 300-mm wafer compatible alpha-tool was designed and built." These activities, purchases and business transactions within the forum are intertwined with the accused infringing processes. In the aggregate, SiGen's contacts with the forum were sufficient to meet both the "transacting any business" requirement

of the Massachusetts long-arm statute and due process requirements for personal jurisdiction.

**2 2. SiGen contends that the district court erred as a matter of law in construing the disputed claim term "a separation" found in independent claim 1. The court construed "separation" based upon its ordinary meaning to be a "gap or intervening space." SiGen argues that this interpretation ignores intrinsic and extrinsic evidence that "a separation" requires "splitting into two parts." SiGen believes that "separate" necessarily means that the thin film and the stiffener are "split into two pieces" because the stiffener has been dissolved and no "self-supporting" membrane exists if still attached to the stiffener. Therefore, according to SiGen's logic, "a separation" must mean complete splitting or cleaving of the thin film and the substrate.

[2] We agree with the district court that the proper interpretation of "a separation" is "an intervening space or gap" between the thin film and the majority of the substrate. The specification of *737 the '564 patent describes "a separation" created during the thermal treatment "by a crystalline rearrangement effect in the wafer and a pressure effect in the microbubbles." The separation results from the thermally induced "crystalline rearrangement" and "coalescence of the bubbles." The specification does not require the "coalescence of the bubbles" to form a perfect cleavage between the top of the film and the bottom substrate. "Splitting or cleaving" the whole layer uniformly is a limitation not found in the '564 patent.

SiGen says that figure 4 depicts a complete cleavage. Drawings aid in the interpretation of claims, but a simple depiction of a single embodiment does not create such a limitation when the words of the specification and claims are broader and more descriptive. See *Autogiro Co. of Am. v. United States, 181 Ct.Cl. 55, 384 F.2d 391, 398 (1967)* ("In those instances where a visual representation can flesh out words, drawings may be used in the same manner and with the same limitations as the specification.") (citations omitted).

3. The jury determined that SiGen's Genesis Process literally infringed claim 4. SiGen argues that a new trial should be granted because of a faulty jury instruction. Because SiGen declined to file a post-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

81 Fed.Appx. 734                                                                                    Page 4
81 Fed.Appx. 734, 2003 WL 22839338 (C.A.Fed.)
**(Cite as: 81 Fed.Appx. 734, 2003 WL 22839338 (C.A.Fed.))**

verdict motion, however, it challenges the jury verdict only for legal error or abuse of discretion and not for insufficiency of the evidence. *See, e.g., Biodex Corp. v. Loredan Biomedical, Inc.,* 946 F.2d 850, 862 (Fed.Cir.1991) ("[W]e cannot review the sufficiency of the evidence after a jury verdict absent some post-verdict disposition, either by a deferred ruling or upon a post-verdict motion."). SiGen believes that the district court erred by failing to separate research and development from its commercial processes in the jury instruction. At trial SiGen requested that the court instruct the jury to consider whether three separate activities each constituted infringement: research and development, Genesis Process, and NanoCleave. The district court refused to distinguish the activities and limited the instruction to Genesis Process and NanoCleave.

**\*\*3[3]** There is no fair use or research and development exception for infringement of normal commercial processes. *SeeMadey v. Duke Univ.,* 307 F.3d 1351, 1362 (Fed.Cir.2002) ("the experimental use defense is ... limited to actions performed 'for amusement, to satisfy idle curiosity, or for strictly philosophical inquiry' ") (citation omitted). SiGen claims that it infringed the '564 patent nominally in an attempt to "design around" the claims. The district court did not err in instructing "that the same test for infringement should apply to any accused activity, regardless of whether the accused activity took place at the research and development stage or whether it took place at the manufacturing stage." Because infringement during the early stages of process development is nonetheless a violation of patent law, the district court was under no duty to distinguish research and development from later commercial processes. This jury instruction was in accordance with our precedent. *See, e.g., Hilton Davis Chem. Co. v. Warner-Jenkinson Co.,* 62 F.3d 1512, 1527 (Fed.Cir.1995) (en banc) ("[I]ntent is not an element of direct infringement, whether literal or by equivalents.... Infringement is, and should remain, a strict liability offense."). We decline to address infringement of claims 1-3, 5 and 9 because, as discussed below, the claims are invalid for nonenablement.

4. Under the proper claim construction SiGen argues that the claims are indefinite under 35 U.S.C. § 112, ¶ 2. After trial the district court granted Soitec's motion for judgment as a matter of law as to SiGen's

indefiniteness defense. Indefiniteness is a **\*738** legal determination reviewed de novo. *BJ Servs. Co. v. Halliburton Energy Servs.,* 338 F.3d 1368, 1372 (Fed.Cir.2003). "The definiteness inquiry focuses on whether those skilled in the art would understand the scope of the claim when the claim is read in light of the rest of the specification." *Id.* (citations omitted).

**[4]** SiGen contends that one skilled in the art would be unable to ascertain when "a separation" occurs sufficient to find infringement. "Definiteness problems often arise when words of degree are used in a claim. That some claim language may not be precise, however, does not automatically render a claim invalid." *Id.* at 1372 (citation omitted). Here, considering the context of the claim and the teachings of the specification, one skilled in the art would be able to determine the bounds of the claim. "A separation" must occur during the third stage of heat treatment of the wafer only after ion implantation and attachment of a stiffener. The separation must be caused by a crystalline rearrangement effect in the wafer and a pressure effect in the microbubbles. Objective evidence also suggests that SiGen's own experts were able to understand the bounds of the claims. SiGen failed to prove the claims indefinite under 35 U.S.C. § 112, ¶ 2.

5. The jury returned a verdict that claims 1-3, 5 and 9 were invalid for non-enablement under 35 U.S.C. § 112, ¶ 1. Enablement is a legal determination of whether a patent enables one skilled in the art to make and use the claimed invention. *BJ Servs. Co.,* 338 F.3d at 1371 (citations omitted). "Although enablement is a question of law, because of the factual nature of the inquiry in this case, it is amenable to resolution by the jury. And because a jury decided the issue here based on factual determinations, we look to whether a reasonable jury could have made the underlying factual findings necessary to provide substantial evidence in support of its conclusion." *Id.* at 1371-72 (citations omitted).

**\*\*4[5]** Claim 1 recites that the bombardment of the donor silicon wafer occurs with "hydrogen *or* rare earth gases." The jury apparently found that the specification failed to explain how "rare earth gases" could be used in the claimed process. The specification details precise critical temperatures for hydrogen implantation as well as other important information relating to the use of hydrogen ions in

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

81 Fed.Appx. 734                                                                                                    Page 5
81 Fed.Appx. 734, 2003 WL 22839338 (C.A.Fed.)
(Cite as: 81 Fed.Appx. 734, 2003 WL 22839338 (C.A.Fed.))

the process. Considering the unpredictability of the art, the lack of direction and guidance in the specification and the absence of working examples, the jury's finding is well supported. Soitec argues that certain articles describe the use of rare earth gases in the claimed process, and thus provide evidence of enablement. The articles cited, however, were published in 1997, while the patent was filed on September 15, 1992. The publications do not address the state of the art in 1992, and are irrelevant to whether the specification was enabling at the time the patent was filed. See *Enzo Biochem, Inc. v. Calgene, Inc.,* 188 F.3d 1362, 1371 (Fed.Cir.1999) ( "Whether claims are sufficiently enabled by a disclosure in a specification is determined as of the date that the patent application was first filed.").

"[A] patent specification must enable the full scope of a claimed invention." *AK Steel Corp. v. Sollac,* 344 F.3d 1234, 1241 (Fed.Cir.2003) (citation omitted). When a patentee chooses to claim "A or B," as Soitec has, the specification must fully enable "B" as well as "A" when the differences between "A" and "B" substantially affect the practice of the invention. Here, the jury had before it substantial evidence that hydrogen ions are significantly different from the rare earth gases in mass, bonding capability and diffusion characteristics.**739** Thus, Soitec's disclosure enabling only hydrogen was insufficient. A reasonable jury could have found that the specification failed to teach one skilled in the art how to make and use the process using "rare earth gases."

6. Soitec challenges the jury finding that SiGen's infringement was not willful. "To establish willful infringement, a plaintiff must prove by clear and convincing evidence that the defendant acted without a reasonable belief that its action avoided infringement." *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.,* 246 F.3d 1336, 1346 (Fed.Cir.2001). We review a jury's finding of willful infringement to determine if there is substantial evidence to support it. *Hoechst Celanese Corp. v. BP Chems. Ltd.,* 78 F.3d 1575, 1583 (Fed.Cir.1996).

[6] The jury had considerable evidence that SiGen's activities were geared toward designing around the claims of the '564 patent. Research and development is not an excuse for literal infringement, but it is proper for the jury to consider an accused infringer's

motivations in deciding willfulness. SiGen admittedly crossed the threshold from a clean attempt to design around the claims into activity that was infringing. While this infringement may have given SiGen a competitive advantage in early development, the jury was free to consider the degree and nature of the infringement. Along with believing that SiGen was simply attempting to design around, the jury also had a reasonable basis to find that SiGen believed its actions avoided infringement. Although later found inaccurate, SiGen secured opinions that provided an interpretation of the claims and understanding of the accused process that at least arguably avoided infringement. A reasonable jury could have found that SiGen's infringement was not willful.

C.A.Fed.,2003.
Soitec, S.A. v. Silicon Genesis Corp.
81 Fed.Appx. 734, 2003 WL 22839338 (C.A.Fed.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## CERTIFICATE OF SERVICE

I, Patricia Smink Rogowski, hereby certify that on this 7th day of August, 2008, I

electronically filed **REDACTED DEFENDANT'S REPLY BRIEF IN SUPPORT OF ITS**

**MOTION TO DISMISS, OR, IN THE ALTERNATIVE, FOR A MORE DEFINITE**

**STATEMENT** with the Court Clerk using CM/ECF which will send notification of such

filing(s) to Denise Seastone Kraft.

**VIA CM/ECF and E-MAIL**
Denise Seastone Kraft
EDWARDS ANGELL PALMER
    & DODGE LLP
919 North Market Street, 15th Floor
Wilmington, DE 19801
dkraft@eapdlaw.com

**VIA E-MAIL**
George W. Neuner
EDWARDS ANGELL PALMER
    & DODGE LLP
101 Federal Street
Boston, MA 02110
gneuner@eapdlaw.com

    */s/ Patricia Smink Rogowski*
Patricia Smink Rogowski (Bar ID No. 2632)
progowski@cblh.com

615931v1