IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

| | |
|---|---|
| S.O.I.TEC SILICON ON INSULATOR TECHNOLOGIES, S.A. and COMMISSARIAT À L'ÉNERGIE ATOMIQUE, | Civil Action No. 1:08-cv-292-SLR |
| Plaintiffs/Counterclaim-Defendants, | |
| v. | **JURY TRIAL DEMANDED** |
| MEMC ELECTRONIC MATERIALS, INC., | |
| Defendant/Counterclaim-Plaintiff, | |
| v. | |
| Soitec U.S.A., Inc., | |
| Counterclaim-Defendant. | |

## MEMC ELECTRONIC MATERIALS, INC.'S ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Defendant MEMC Electronic Materials, Inc. ("MEMC") for its Answer to the Complaint for Patent Infringement of S.O.I.TEC Silicon on Insulator Technologies, S.A. and Commissariat À L'Énergie (collectively, "Plaintiffs"), states as follows:

### GENERAL DENIAL

Unless specifically admitted below, MEMC denies each and every allegation in Plaintiffs' Complaint.

## RESPONSES TO SPECIFIC ALLEGATIONS

### Allegations Relating to the Parties

1.      MEMC lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 1 and, therefore, denies each allegation.

2.      MEMC lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 2 and, therefore, denies each allegation.

3.      MEMC lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 3 and, therefore, denies each allegation.

4.      MEMC admits that a copy of United States Reissue Patent No. 39,384, without the Certificate of Correction dated March 4, 2008, was attached to the complaint as Exhibit 1.  MEMC admits that a copy of United States Patent No. 6,809,009 was attached to the complaint as Exhibit 2.  MEMC denies that an accurate copy of U.S. Patent No. 7,067,396, as issued, is attached as Exhibit 3.  MEMC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 4 and, therefore, denies the remaining allegations.

5.      MEMC lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 5 and, therefore, denies each allegation.

6.      MEMC admits the allegations contained in paragraph 6.

2

## Allegations Relating to Jurisdiction and Venue

7.      Paragraph 7 contains a legal conclusion, to which no response is required. To the extent a response is deemed required, MEMC denies the allegations in paragraph 7.

8.      MEMC admits the allegations in paragraph 8.

9.      MEMC admits the allegations in paragraph 9.

## Background Allegations

10.      MEMC admits that United States Reissue Patent No. 39,484 issued on February 6, 2007, is titled "Process for the Production of Thin Semiconductor Material Films," is a reissue of U.S. Patent No. 5,374,564, and purports to claim priority to a French patent application filed on September 18, 1991. MEMC denies that the Bruel patent was "duly and legally reissued." MEMC denies that the Bruel patent is "valid, subsisting, and enforceable." MEMC denies the remaining allegations of paragraph 10.

11.      MEMC admits that United States Patent Nos. 6,809,009 and 7,067,396 issued on October 26, 2004 and June 27, 2006, respectively, are titled "Method of Producing a Thin Layer of Semiconductor Material," and purport to claim priority to a French patent application filed on May 15, 1996. MEMC denies that either of the Aspar patents was "duly and legally issued." MEMC denies that either of the Apsar patents is "valid, subsisting, and enforceable." MEMC denies the remaining allegations of paragraph 11.

12.      Admitted.

## Count I—Allegations of Infringement of U.S. Reissue Patent No. 39,484

13.      MEMC incorporates by reference its responses to paragraphs 1-12.

14.     MEMC denies the allegations of paragraph 14.

15.     MEMC denies the premise and the allegations of paragraph 15.

16.     MEMC denies the premise and the allegations of paragraph 16.

**Count II—Allegations of Infringement of U.S. Patent No. 6,809,009**

17.     MEMC incorporates by reference its responses to paragraphs 1-12.

18.     MEMC denies the allegations of paragraph 18.

19.     MEMC denies the premise and the allegations of paragraph 19

20.     MEMC denies the premise and the allegations of paragraph 20.

**Count III—Allegations of Infringement of U.S. Patent No. 7,067,396**

21.     MEMC incorporates by reference its responses to paragraphs 1-12.

22.     MEMC denies the allegations of paragraph 22.

23.     MEMC denies the premise and the allegations of paragraph 23

24.     MEMC denies the premise and the allegations of paragraph 24.

**ADDITIONAL AND AFFIRMATIVE DEFENSES**

A.      Plaintiffs fail to state a claim upon which relief can be granted.

B.      The claims of U.S. Reissue Patent No. 39,484 and U.S. Patent Nos. 6,809,009 and 7,067,396 (collectively "the Asserted Patents") are invalid under one or more provisions of the Patent Laws, 35 U.S.C. § 1, *et seq.*, including, but not necessarily limited to, 35 U.S.C. §§ 101, 102, 103, 112, and/or 251.

C.      MEMC does not infringe any valid claim of the Asserted Patents.

D.      The Asserted Patents are unenforceable, and plaintiffs' claims and requested relief are barred or limited, under the doctrine of intervening rights, including under 35 U.S.C. § 252.

4

E.      The Asserted Patents are unenforceable and plaintiffs' claims and requested relief are barred or limited, under the doctrine of collateral estoppel, based on, among other things, plaintiffs' past litigation concerning related U.S. Patent No. 5,374,564, captioned *Soitec S.A., and Commissariat A L'Energie Atomique v. Silicon Genesis Corporation*, 99-CV-10826-NG ("SiGen litigation").

F.      The Asserted Patents are unenforceable and plaintiffs' claims and requested relief are barred or limited, under the doctrines of estoppel, judicial estoppel, or judicial admission, based on, among other things, the positions taken by plaintiffs in the SiGen litigation.

G.      Plaintiffs are estopped by representations and concessions made to the Patent Office from claiming infringement either literally or under the doctrine of equivalents.

H.      Plaintiffs are not entitled to recover costs pursuant to 35 U.S.C. § 288.

I.      The January 9, 2007 Certificate of Correction for U.S. Patent No. 7,067,396 is invalid and void under 35 U.S.C. §§ 254 or 255.

J.      The Asserted Patents are unenforceable for the reasons set forth in MEMC's Counterclaim Counts IV-VIII and the allegations of Counts IV-VIII of MEMC's Counterclaim are incorporated herein.

### Prayer for Relief

WHEREFORE, having fully answered, MEMC requests the Court to dismiss plaintiffs' Complaint and that plaintiffs taking nothing by it, declare this an exceptional case in favor of MEMC, award MEMC its attorneys' fees and costs incurred in this case, and order such other and further relief as the Court may deem just and proper.

## COUNTERCLAIMS

Defendant and Counterclaim-Plaintiff MEMC Electronic Materials, Inc. ("MEMC") for its Counterclaims against S.O.I.TEC Silicon on Insulator Technologies, S.A. ("Soitec S.A."), Soitec U.S.A., Inc. ("Soitec U.S.A."), and Commissariat À L'Énergie ("CEA"), states as follows:

### Parties, Jurisdiction, and Venue

1.      MEMC is a corporation organized under the laws of the State of Delaware, with its principal place of business in St. Peters, Missouri.

2.      Upon information and belief, Soitec S.A. is organized as a Societé Anonyme under the laws of France and has a principle place of business in Bernin, France.  Upon information and belief, Soitec U.S.A., a wholly-owned subsidiary of Soitec S.A., is a corporation organized under the laws of the Commonwealth of Massachusetts and has a principal place of business in Peabody, Massachusetts.  Soitec S.A. and Soitec U.S.A. will be collectively referred to hereinafter as "Soitec."

3.      Upon information and belief, Commissariat À L'Énergie ("CEA") is the French Atomic Energy Commission and is located in France.

4.      As a result of the allegations made by Soitec and CEA, there has been, and is now, a substantial and continuing justiciable controversy between MEMC and Soitec and CEA as to the invalidity, non-infringement, and unenforceability of U.S. Reissue Patent No. 39,484 and U.S. Patent Nos. 6,020,252 ("the '252 patent"), 6,225,192 ("the '192 patent"), 6,809,009 ("the '009 patent"), and 7,067,396 ("the '396 patent"), and 7,498,234 ("the '234 patent") (collectively 'the Soitec Patents").

5.      CEA claims to be owner of the Soitec Patents.

6

6.    Soitec S.A. claims to be the exclusive licensee of the Soitec Patents.

7.    This Court has jurisdiction over Soitec S.A., Soitec U.S.A., CEA, and the matters alleged in these counterclaims pursuant to 28 U.S.C. §§ 1331, 1338, and 2201.

8.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b).

### Count I – Infringement of United States Patent No. 5,834,812 by Soitec

9.    MEMC incorporates by reference the allegations of Paragraphs 1-8 of its Counterclaim, as if fully set forth herein.

10.    On November 10, 1998, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 5,834,812 ("the '812 patent").  A copy of the '812 patent is attached as Exhibit A.

11.    The '812 patent is owned by MEMC.  MEMC holds all rights to sue for past, present, and future infringement of the '812 patent.

12.    On information and belief, Soitec has been and still is infringing, actively inducing infringement of, and/or knowingly contributing to the infringement of the '812 patent, by making, using, offering to sell, selling and/or importing silicon on insulator wafers and other engineered semiconductor substrates covered by claims of the '812 patent in the United States in violation of 35 U.S.C. Section 271.

13.    On information and belief, Soitec will continue to infringe the '812 patent unless enjoined by the Court.

### Count II – Declaration of Invalidity

14.    MEMC incorporates by reference the allegations of Paragraphs 1-8 of its Counterclaim, as if fully set forth herein.

15.    Each claim of the Soitec Patents are invalid under one or more provisions of the Patent Laws, 35 U.S.C. § 1, et seq., including, but not necessarily limited to, 35 U.S.C. §§ 101, 102, 103, and 112.

### Count III – Declaration of Non-Infringement

16.    MEMC incorporates by reference the allegations of Paragraphs 1-8 of its Counterclaim, as if fully set forth herein.

17.    MEMC has never directly or indirectly infringed any of the claims in any of the Soitec Patents.

### Count IV – Declaration of Unenforceability of U.S. Patent No. 6,020,252

18.    MEMC incorporates by reference the allegations of Paragraph 1-8 of its Counterclaim, as if fully set forth herein.

19.    The Soitec Patents are unenforceable, in whole or in part, due to the inequitable conduct by Soitec S.A., CEA, Michel Bruel, Bernard Aspar, Thierry Poumeyrol, their attorneys, appointed representatives and/or other individuals associated with the filing and prosecution of the patent applications discussed below (collectively, "Soitec Applicants") before the United States Patent and Trademark Office ("the PTO") during the prosecution of patent applications that issued as the Soitec Patents.

20.    Title 37 of the Code of Federal Regulations ("CFR") § 1.56 and the Manual of Patent Examination Procedure ("MPEP") § 2000.01, et seq. impose a duty of candor and good faith on each individual associated with the filing and prosecution of a patent application before the PTO, which requires that he or she disclose to the PTO all information that is material to the patentability of the application under examination.  The case law further sets forth the duty of candor and good faith required throughout patent

preparation and prosecution.  Breach of this duty of candor, good faith, and honesty with intent to deceive the PTO constitutes inequitable conduct, which renders the affected patents unenforceable.

21.     Upon information and belief, the Soitec Applicants, with the intent to deceive the PTO into issuing the Soitec Patents with claims of a scope beyond which the Soitec Applicants were entitled, exercised a pattern and practice of conduct during the prosecution of the applications that ultimately issued as the Soitec Patents that violated the duty of candor and good faith and honesty owed by patent applicants.

22.     Upon information and belief, on multiple occasions as part of the prosecution of the applications for the Soitec Patents, the Soitec Applicants, with an intent to deceive the PTO (i) failed to disclose material prior art known to the Soitec Applicants; (ii) failed to identify and disclose material information from related litigation or proceedings; (iii) failed to inform patent examiners of related applications or findings by the PTO in related applications; and (iv) made material misrepresentations of fact to the PTO.  The Soitec Applicants' repeated and intentional violations of the duty of candor, good faith and honesty, examples of which are set forth in detail below, render the Soitec Patents unenforceable.

23.     On September 15, 1992, the Soitec Applicants filed U.S. Patent Application serial no. 07/945,001 ("the '001 application"), titled "Process for the Production of Thin Semiconductor Material Films."

24.     Michel Bruel was listed as the sole inventor on the '001 application.

25.     The '001 application purported to describe and claim a process for preparing thin semiconductor films that included three stages:

9

(1) implanting ions into a silicon wafer to create a layer of gaseous microbubbles, which defined a lower and upper region of the wafer, the upper region constituting the thin film;

(2) bonding the implanted wafer to a "stiffener;" and

(3) heating the bonded wafer assembly at a temperature about the implantation temperature and sufficient to create by crystalline rearrangement effect in the wafer and a pressure effect in the microbubbles, a separation between the thin film and the remainder of the substrate.

26.    The implanted ions were identified in the '001 application as including "H+ ions, …. molecular hydrogen ions, or ions of rare gases such as helium, neon, krypton, and xenon, used either singly or in combination."

27.    On October 20, 1992, the Soitec Applicants —through attorney Jeffrey J. Sopko, an attorney with Pearne, Gordon, McCoy & Granger—submitted four references to the PTO in an information disclosure statement ("IDS"). In this submission, the Soitec Applicants admitted that one or more of these references "discloses stage 1 of the process of the present application...." No other references were disclosed by the Soitec Applicants to the PTO during the pendency of the '001 application.

28.    The '001 application issued as U.S. Patent No. 5,374,564 ("the '564 patent") on December 20, 1994.

29.    Almost two and a half years later, on May 14, 1997, the Soitec Applicants filed U.S. Patent Application serial no. 08/856,275 ("the '275 application"), titled "Method of Producing a Thin Layer of Semiconductor Material."

30.     The '275 application listed three inventors:  Michel Bruel, Bernard Aspar, and Thierry Poumeyrol.

31.     On May 13, 1997, Michel Bruel, Bernard Aspar, and Thierry Poumeyrol executed a declaration.  Among other things, the named inventors declared that they (1) were "the original, first, and joint inventors of the subject matter" claimed in the '275 application, (2) had "reviewed and understand the contents of the ['275 application's] specification, including the claims," and (3) "acknowledge the duty to disclose information known to be material to the patentability of this application as defined in Section 1.56 of Title 37 Code of Federal Regulations."

32.     The '275 application described the purported invention claimed therein as an improvement of the invention described in the '564 patent:

> This invention has been conceived in order to improve the method described in FR-A-2 681 472 [the French patent application to which the '564 patent claims priority]. After a step of ion implantation within a range of appropriate doses and before the separation step, it allows to carry out a thermal treatment of the part of the wafer corresponding to the future thin layer, in particular between 400° C and 700° C for silicon, without degrading the surface condition of the flat face of the wafer and without separation of the thin layer.

33.     Specifically, the improvement was described in the '275 application as using a lower dose of ions during the ion implantation step than that used in the '564 patent:

> According to FR-A-2 681 472 [the French patent application to which the '564 patent claims priority], the doses implanted are such that, under the effect of the thermal treatment, a layer of microcavities is obtained that allows the separation to be achieved directly.

> According to this invention, the doses implanted are insufficient to achieve a separation during the thermal treatment, the doses implanted only allow an embrittlement of the wafer at the reference plane, the separation requires an extra step of applying mechanical forces. Furthermore, the critical dose, as defined in the invention, is less than the

dose at which during the ion implantation and thermal treatment steps, there is blister formation on the flat face of the wafer.

34.     The '275 application emphasized that the "ion implantation step is carried out with an ion dose between a minimum dose and a maximum dose, the minimum dose being that from which there will be sufficient creation of microcavities to obtain the embrittlement of the wafer along the reference plane, the maximum does, or critical dose being that above which, during the thermal treatment step, there is separation of the wafer." The Soitec Applicants specifically described the critical, maximum dose for hydrogen:

> The implantation dose (number of ions received per unit surface area during the implantation period) is chosen in such a way that the dose is less than or equal to a dose, called the critical dose, such that, above this critical dose, during the subsequent thermal treatment step, there is separation of the thin layer from the rest of the wafer. In the case of implantation of hydrogen ions, this critical dose is of the order of $4.10^{16}$ $H^+/cm^2$ for an energy of 160keV.

35.     The '564 patent was not expressly identified in the '275 application.

36.     Because the '564 patent issued more than one year before the '275 application was filed, the '564 patent is prior art to the '275 application under 35 U.S.C. § 102(b).

37.     The Soitec Applicants did not disclose the '564 patent to the PTO when the '275 application was filed.

38.     The '275 application was filed with one independent claim, which read:

> 1.     A method of producing a thin layer of semiconductor material from a wafer of said material having a flat face, including an ion implantation step consisting of bombarding said flat face with ions chosen from among the ions of rare gases or of hydrogen, at a specific temperature and a specific dose in order to create, in a plane called a reference plane and situated at a depth proximate to the mean depth of penetration of the ions, microcavities, the method also including a

subsequent thermal treatment step at a temperature sufficient to achieve separation of the wafer into two parts, across the reference plane, the part situated on the side of the flat face constituting the thin layer, in which:

-the ion implantation step is carried out with an ion dose between a minimum dose and a maximum dose, the minimum dose being that from which there will be sufficient creation of microcavities to obtain the embrittlement of the wafer along the reference plane, the maximum dose, or critical dose being that above which, during the thermal treatment, there is separation of the wafer,

-a separation step of the wafer into two parts, across the reference plane, is provided after or during the thermal treatment step, this separation step comprising the application of mechanical forces between the two parts of the wafer.

39.   On November 6, 1998, after receiving a rejection from the PTO, the Soitec Applicants—through their attorney Norman P. Soloway of the Hayes, Soloway law firm—cancelled all pending claims, and added new claims, including one independent claim. The sole independent claim was drafted in Jepson format, and read:

13.    In a method of producing a thin layer of semiconductor material from a wafer of said material, wherein a semiconductor wafer having a flat face is subjected to ion implantation by bombarding said flat face with ions of a rare gas or hydrogen whereby to produce within the volume of said wafer and at a depth approximate to the penetration of the ions, a layer of microcavities separating the wafer into a lower region constituting the mass of the substrate and an upper region constituting the thin film, and the wafer is then subjected to a thermal treatment, and the thin film upper region separated from the lower region substrate mass, the improvement wherein the ion implantation step is carried out with an ion dosage level sufficient to create microcavities to embrittle said wafer along a line of implantation, but below the dosage level sufficient to cause the wafer to separate during said thermal treatment, and, during or following said thermal treatment applying a mechanical force sufficient to separate said wafer along the line of implantation into a thin top layer and lower layer comprising the remainder of the mass of the substrate.

40.    The Soitec Applicants also emphasized the difference between the claimed invention and the prior art in responding to the PTO's rejection under 35 U.S.C. § 102:

13

Turning to the art rejection, and considering first the rejection of claim 1, as anticipated by Ohori et al, claim 1 has been cancelled, and rewritten as new independent claim 13 in order to stress novel steps of Applicants' claimed invention.  More particularly, Applicants' claimed invention requires implanting ions under a controlled ion dosage sufficient so as to create microcavities within the semiconductor wafer whereby to embrittle the wafer along a line of implantation, but below the dosage level such that the wafer would be separated solely on the basis of the thermal treatment step.  In Applicants' claimed process, separation of the wafer into a top thin layer and a bulk wafer is achieved by applying mechanical force between the two parts of the wafer during or after the thermal treatment step.  This is different from any of the prior art discussed in Applicants' Specification, or the art applied by the Examiner, and provides Applicants with significant advantages over the prior art.  In particular, Applicants' use of mechanical forces to separate the two parts of the wafer permits Applicants to reduce the thermal budget of the thermal treatment and/or the dose of the implanted ions, and consequently reduce especially the amount of disturbance of electronic components on the wafer.

***

However, Ohori et al fails to disclose or suggest the criticality of controlling the ion implantation step so as to embrittle the wafer along a separation line, without degrading the wafer so that it would separate during the thermal treatment step, and the applying a mechanical force to separate the wafer as required by Applicants' claim as amended.

41.     The Soitec Applicants did not disclose the '564 patent to the PTO in connection with their November 6, 1998 arguments.

42.     In a December 8, 1998 Supplemental Amendment, the Soitec Applicants amended claim 13 to remove "then" from the phrase "and the wafer is ~~then~~ subjected to a thermal treatment," in the Jepson preamble.  The Soitec Applicants explained that the basis for this amendment was to "better define Applicants' claimed invention":

Independent claim 13 has been amended to better define Applicants' claimed invention.  In the Specification (from page 3, line 33 to page 4, line 9), it is said that the invention allows, before the separation step, to carry out a thermal treatment of the wafer.  It is a fact that, under the effect of temperature, the microcavities coalesce (see page 5, lines 24-30).  The separation in two parts of the substrate may use also mechanical

14

forces (see page 6, lines 19-24). It can happen that if a thermal treatment has been used before the separation step, the separation can be carried out just by the application of mechanical forces. In this case the temperature of the separation step can be room temperature for example (see page 5, lines 29-30).

43.     The Soitec Applicants did not disclose the '564 patent to the PTO in connection with their December 8, 1998 Supplemental Amendment.

44.     On March 16, 1999, the PTO issued a Notice of Allowability for all pending claims.

45.     On May 11, 1999, the Soitec Applicants filed a petition to remove the application from issue for consideration of a continued prosecution application, in order for the PTO to consider an IDS. The references disclosed in the IDS were the '564 patent and United States Patent No. 5,559,043. Both of these patents named applicant Michel Bruel as an inventor.

46.     The prior art '564 patent is the United States equivalent of FR-A-2 681472, discussed at length in the specification of the '275 application. This fact was not disclosed to the PTO in the Soitec Applicants' petition or IDS.

47.     The Soitec Applicants did not disclose to the PTO that the '564 patent claims, among other things, a process in which, after ion implantation, temperature alone is insufficient to remove the thin film from the wafer.

48.     The Soitec Applicants did not disclose to the PTO that the '564 patent claims, among other things, a process in which, after ion implantation and the thermal treatment steps described in the '564 patent, a mechanical force is required to remove the thin film from the wafer.

49.     The PTO granted the Soitec Applicants' May 11, 1999 petition and mailed a copy of its decision on August 24, 1999.

50.     On August 24, 1999, the Soitec Applicants' filed an Associate Power of Attorney with the PTO, requesting that Jasper W. Dockrey, of the law firm Brinks Hofer Gilson & Lione, be recognized as Associate Practitioner.

51.     On October 15, 1999, the PTO again allowed all pending claims.

52.     On January 14, 2000, the Soitec Applicants —through their attorney, Jasper Dockrey—filed another supplemental IDS and petitioned the PTO to enter 26 additional references.  Many of these references were patents or published papers of the three named inventors of the '275 application.  The Soitec Applicants' petition emphasized that "none of the references, alone or in combination, disclose or suggest the invention claimed."  The Soitec Applicants' asserted basis for the timing of their disclosure of these references was that they were discovered during litigation involving the assignee, Commissariat a l'Energie Atomique:  "The prior art references being submitted herewith include patents and publications that the Applicants' attorney became aware of in connection with litigation involving a related patent of the assignee of record."

53.     One or more of the references submitted by the Soitec Applicants after the second notice of allowance was material to patentability of the subject matter claimed in the '275 application.

54.     The Soitec Applicants did not identify the litigation or the "related patent" that was involved in the litigation, which were referenced in the January 14, 2000 IDS.

16

55.     Although not disclosed to the PTO, the litigation referenced in the Soitec Applicants' January 14, 2000 IDS was the SiGen litigation.

56.     The SiGen litigation was filed in the United States District Court for the District of Massachusetts by plaintiffs Soitec S.A. and CEA against Silicon Genesis ("SiGen") on April 16, 1999. The "related patent" involved in the SiGen litigation was the '564 patent. None of these facts were disclosed to the PTO during the prosecution of the '275 application.

57.     As of the date of the Soitec Applicants' January 14, 2000 IDS, plaintiffs' complaint and SiGen's answer and counterclaim had been filed in the SiGen litigation.

58.     The Soitec Applicants did not disclose any of this information to the PTO in their January 14, 2000 IDS.

59.     The '275 application issued on February 1, 2000 as U.S. Patent No. 6,020,252.

60.     On February 25, 2000, after the '252 patent had already issued, the Soitec Applicants—through their attorney, Mr. Dockrey—submitted another supplemental IDS, identifying additional references. The Soitec Applicants explained to the PTO that "[t]hese references came to the Applicants' attention in connection with litigation involving a related patent of the assignee of record." Again, the Soitec Applicants failed to identify the litigation or disclose any further information relating to the litigation.

61.     Upon information and belief, additional information material to the patentability of the subject matter claimed in the '275 patent was discovered or generated during the SiGen litigation before the '252 patent issued.

62.     Upon information and belief, during the prosecution of the '275 application, the Soitec Applicants violated their duty to disclose information material to the patentability of the claimed subject matter by knowingly—and with intent to deceive—withholding the following information from the PTO: (1) the fact that the '564 patent, on which the '275 application's disclosure is largely based and whose process upon which the '275 application allegedly improves, was involved in litigation; (2) the SiGen litigation, (3) the complaint from the SiGen litigation, (4) SiGen's answer and counterclaim in the SiGen litigation, (5) other material information discovered or generated during the SiGen litigation, (6) the fact that Bruel's '564 patent claims, among other things, a process in which, after ion implantation, temperature alone is insufficient to remove the thin film from the wafer, and (7) the fact that Bruel's '564 patent claims, among other things, a process in which, after ion implantation and the thermal treatment steps described in the '564 patent, a mechanical force is required to remove the thin film from the wafer—which is what the Soitec Applicants claimed in the '275 application and touted as the point of novelty.

63.     The Soitec Applicants therefore committed inequitable conduct during the prosecution of the '275 application, rendering the '252 patent unenforceable.

### Count V – Declaration of Unenforceability of U.S. Patent No. 6,225,192

64.     MEMC incorporates by reference the allegations of Paragraphs 1-8 and 18-63 of its Counterclaim, as if fully set forth herein.

65.     The '192 patent claims priority to and claims subject matter related to the '252 patent. The Soitec Applicants' inequitable conduct in obtaining the '252 patent therefore also renders the '192 patent unenforceable through infectious unenforceability.

66.     On April 26, 1999, the Soitec Applicants filed U.S. Patent Application serial no. 09/299,683 ("the '683 application"). The '683 application was a continuation of the '275 application and listed Bernard Aspar, Michel Bruel, and Thierry Poumeyrol as joint inventors.

67.     In an April 26, 1999 preliminary amendment, the Soitec Applicants—through attorney Norman P. Soloway, cancelled all the claims, and added new claims 13-33. Claim 13, the sole independent claim, read as follows:

13.     A method of producing a thin layer of semiconductor material from a wafer of the material having a face, comprising the steps of

subjecting the semiconductor wafer to implantation with a rare gas or hydrogen for producing, at a depth within the volume of the wafer, an implanted layer parallel to the face and separating the wafer into an upper region intended to constitute the thin layer and a lower region constituting a remainder part of the wafer;

subjecting the wafer to a thermal treatment so as to embrittle the wafer along the layer of implantation; and

applying, during or after the thermal treatment, a mechanical energy to the wafer sufficient to separate the upper and lower regions from each other along the embrittled layer.

68.     On May 27, 1999, the Soitec Applicants—through attorney Norman P. Soloway—submitted a supplemental declaration allegedly executed by Michel Bruel, Bernard Aspar, and Thierry Poumeyrol. Among other things, the named inventors each declared that he (1) was "the original, first, and joint inventor" of the subject matter claimed in the '683 application, (2) had "reviewed and understand the contents of the ['683 application's] specification, including the claims, as amended by [the April 26, 1999 preliminary amendment]," and (3) "acknowledge the duty to disclose information which is material to the patentability as defined in 37 CFR § 1.56."

69.     On October 28, 1999, the PTO rejected claim 13 as anticipated by the prior art and rejected claims 14-33 as obvious in light of the prior art.

70.     On April 24, 2000, the Soitec Applicants—through attorney Norman P. Soloway—submitted an IDS to the PTO, in which the Soitec Applicants disclosed 32 references. The Soitec Applicants characterized these reference as follows: "The prior art references being submitted herewith include other earlier patents and publications of one of the Applicants, as well as certain third party patents and publications recently brought to Applicants' attention in connection with litigation involving a related patent of the assignee of record."

71.     Many of the references submitted by the Soitec Applicants to the PTO on April 24, 2000, were patents or publications of one of named inventors on the '683 application.

72.     The Soitec Applicants did not identify the litigation or the "related patent," referenced in their April 24, 2000 IDS. As of April 24, 2000, many documents had been filed in the SiGen litigation, including plaintiffs' complaint, SiGen's answer and counterclaim, and SiGen's amended answer and counterclaims. In SiGen's amended answer and counterclaims, SiGen alleged that the '564 patent was invalid, not infringed, and unenforceable due to inequitable conduct based on the intentional withholding of material prior art from the PTO during prosecution of the '001 application.

73.     On April 27, 2000, the Soitec Applicants—through attorney Jasper W. Dockrey—submitted another IDS to the PTO, citing 12 additional references, some of which were publications or patents of one or more of the named inventors on the '683

application. Again, the Soitec Applicants failed to identify the SiGen litigation or produce any of the documents filed in that case.

74.     On August 3, 2000, the Soitec Applicants—through attorney Norman P. Soloway—submitted another IDS to the PTO, disclosing 42 additional references. The Soitec Applicants characterized these reference as follows: "The prior art references being submitted herewith include patents and publications that the Applicants and the Applicants' attorney became aware of in connection with litigation involving a related patent of the assignee of record." Many of these references were authored by one or more of the inventors named on the '683 application.

75.     In their August 3, 2000 IDS, the Soitec Applicants did not identify the SiGen litigation or disclose any of the following documents that had been filed in the SiGen litigation as of August 3, 2000:  plaintiffs' complaint, SiGen's answer and counterclaim, and SiGen's amended answer and counterclaims.

76.     On October 5, 2000, the Soitec Applicants—through their attorney Norman P. Soloway—submitted a supplemental IDS to the PTO disclosing 9 additional references. The Soitec Applicants described these references as follows: "The prior art references being submitted herewith include publications that the Applicants and the Applicants' attorney became aware of in connection with litigation involving a related patent of the assignee of record." The Soitec Applicants made no disclosure of the SiGen litigation or documents filed during the SiGen litigation.

77.     As of the date of the October 5, 2000 IDS, the following documents had been filed in the SiGen litigation:  plaintiffs' complaint, SiGen's answer and

counterclaim, SiGen's amended answer and counterclaims. None of this information was disclosed to the PTO in the October 5, 2000 IDS.

78.     After the Soitec Applicants filed a terminal disclaimer to overcome a double patenting rejection based on the '252 patent, the PTO issued a notice of allowance on November 6, 2000.

79.     On January 23, 2001, the Soitec Applicants—through their attorney Norman P. Soloway—filed a petition with the PTO to consider another IDS. This IDS disclosed one additional reference that "was cited in connection with litigation involving a related patent of the assignee of record." As of January 23, 2001, the following documents had been filed in the SiGen litigation:  plaintiffs' complaint, SiGen's answer and counterclaim, SiGen's amended answer and counterclaims, SiGen's *Markman* briefs, Soitec S.A.'s *Markman* briefs, the transcript of the *Markman* hearing held on December 13 and 14, 2000, SiGen's amended answer and counterclaim, Soitec S.A.'s post-*Markman* brief and exhibits, and summary judgment briefing from SiGen and plaintiffs relating to SiGen's invalidity and inequitable conduct defenses. In their January 23, 2001 IDS, the Soitec Applicants did not identify the SiGen litigation or produce any of the documents filed in the SiGen litigation.

80.     On March 19, 2001, SiGen filed a motion for summary judgment for lack of enablement. On April 4, 2001, Soitec S.A. filed an amended complaint in the SiGen litigation. On April 19, 2001 the SiGen court entered its claim construction order. In it, the court defined the term "separation," as used in the claims of the '564 patent, as "an intervening space" or "gap." Therefore, the court concluded, "'separation between the thin film and the majority of the substrate' means simply 'an intervening space or gap

22

between the thin film and the majority of the substrate.' The gap need not be sufficiently large or continuous to allow the new thin film to be removed from the wafer." The court also defined "gaseous microbubble," as that term is used in the '564 patent claims to mean "any of several types of defects in the crystalline structure of the wafer, produced when the referenced gases are implanted at the referenced temperatures." The court further found that "gaseous microbubble" "must at least include (but is not necessarily limited to) those defects produced when hydrogen gas ions are implanted at any temperature between 20° and 450° C." The Soitec Applicants did not disclose any of this information to the PTO during the prosecution of the '683 application.

81.     The '683 application issued as U.S. Patent No. 6,225,192 on May 1, 2001.

82.     Upon information and belief, additional information material to the patentability of the subject matter claimed in the '192 patent was discovered or generated during the SiGen litigation before the '192 patent issued.

83.     Upon information and belief, during the prosecution of the '683 application, the Soitec Applicants violated their duty to disclose information material to the patentability of the claimed subject matter by knowingly—and with intent to deceive—withholding the following information from the PTO: (1) the fact that the '564 patent, on which the '683 application's disclosure is largely based and whose process upon which the '683 application allegedly improves, was involved in litigation; (2) the SiGen litigation, (3) the complaint from the SiGen litigation, (4) SiGen's answer and counterclaim in the SiGen litigation, (5) briefing relating to SiGen's motion for summary judgment for lack of enablement, (6) plaintiffs' amended complaint in the SiGen litigation, (7) the April 19, 2001 claim construction order in the SiGen litigation and

related briefing, (8) other material information discovered or generated during the SiGen litigation, (9) the fact that Bruel's '564 patent claims, among other things, a process in which, after ion implantation, temperature alone is insufficient to remove the thin film from the wafer, and (10) the fact that Bruel's '564 patent claims, among other things, a process in which, after ion implantation and the thermal treatment steps described in the '564 patent, a mechanical force is required to remove the thin film from the wafer— which is what the Soitec Applicants claimed in the '683 application and touted as the point of novelty.

84.    The Soitec Applicants therefore committed inequitable conduct during the prosecution of the '683 application, rendering the '192 patent unenforceable.

### Count VI – Declaration of Unenforceability of U.S. Patent No. 6,809,009

85.    MEMC incorporates by reference the allegations of Paragraph 1-8 and 18-84, of its Counterclaim, as if fully set forth herein.

86.    The '009 patent claims priority to and claims subject matter related to the '252 and '192 patents.  The Soitec Applicants' inequitable conduct in obtaining the '252 and '192 patents therefore also renders the '009 patent unenforceable through infectious unenforceability.

87.    On February 6, 2001, the Soitec Applicants filed U.S. Patent Application serial no. 09/777,516 ("the '516 application").  The '516 application was a continuation of the '683 application and listed Bernard Aspar, Michel Bruel, and Thierry Poumeyrol as joint inventors.

88.     In a preliminary amendment accompanying the filing of the '516

application, the Soitec Applicants—through attorney Norman P. Soloway, cancelled all

the claims, and added new claims 13-20.

89.     Claim 13, the first independent claim, read as follows:

13.     A method of producing a thin film comprising:
providing a first substrate having a face surface;

introducing ions into the first substrate at the face surface, such that
microcavities are formed in the first substrate during or after introducing
the ions, wherein the microcavitites define a thin film layer extending
from the first surface to the microcavities, and wherein the microcavities
reside between solid bridges of the first substrate;

bonding a second substrate to the face surface of the first substrate; and

applying mechanical forces to fracture the solid bridges.

90.     Claim 17, the other independent claim, read as follows:

17.     A method of producing a thin film comprising:
providing a first substrate having a face surface;

introducing ions into the first substrate at the face surface and forming
microcavities in the first substrate, wherein the microcavities define a thin
film layer extending from the first surface to the microcavities, and
wherein the microcavities reside between solid bridges of the first
substrate;

bonding a second substrate to the face surface of the first substrate; and

applying mechanical forces to fracture the solid bridges.

91.     On December 18, 2002, the PTO rejected all pending claims under 35

U.S.C. § 112, ¶1, because the specification of the '516 application "does not enable any

person skilled in the art to which it pertains, or with which it is most nearly connected, to

practice the invention commensurate in scope with these claims." The PTO also rejected

the claims as anticipated by the prior art.

92.     On June 27, 2003, the Soitec Applicants—through attorney Norman P. Soloway—disputed the PTO's rejection, representing that the '516 application's specification enabled the full scope of the pending claims. The Soitec Applicants' arguments regarding enablement included the following representations:

> The applicants describe a general method for producing a thin film in a substrate that includes forming microcavities, platelets, microblisters, or bubbles residing between solid bridges in an embrittled reference plane that defines the thin film of the substrate....The terms microcavities, platelets, microblisters, or bubbles are used interchangeably and are well know to the skilled artisan.
>
> ***
>
> The applicants assert that the Examiner has failed to meet the burden of establishing a reasonable basis, since their specification contains a teaching of the manner and process of making and using their invention in terms which correspond in scope of the subject matter sought to be patented.
>
> ***
>
> As apparent from the numerous references cited by the applicants, there is ample guidance in the prior art for the formation of microcavities or bubbles in a substrate through the introduction of ions.

93.     On September 23, 2003, the PTO issued a final office action, maintaining its rejection of all pending claims under 35 U.S.C. § 112, for lack of enablement:

> There is only seen to be enablement for the species of the instant invention wherein the conditions employed at instant page 8 line 34 at less that 350°C (instant page 8, line 25), the conditions at page 9, line 11, or the conditions at instant page 9, lines 17-19, as opposed to the genus encompassed by the instant claims, in part due to the lack of description for the generically claimed invention.
>
> Applicant argues that prior art publications cited in the instant specification provide the required guidance. However, the instant specification indicates the cited publications to be deficient in disclosing the recited conditions and obtaining different results such as blistering.

94.     On February 23, 2004, the Soitec Applicants—through attorney Norman

P. Soloway—amended all pending claims to limit the claims to hydrogen implantation at

certain limited conditions.  The amendments to claim 13 of the '516 application are

illustrative:

> Claim 13 (currently amended):  A method for producing a thin film
> comprising:
>
> providing a first substrate having a face surface;
>
> introducing <u>hydrogen</u> ions into the first substrate at the face surface, such
> that microcavities are formed in the first substrate during or after
> introducing the ions, wherein the microcavities define a thin film layer
> extending from the first substrate to the microcavities, ~~and wherein~~ the
> microcavities reside between solid bridges of the first substrate, <u>and the</u>
> <u>hydrogen ions are introduced into the first substrate at a temperature and at</u>
> <u>a total amount so as not to fracture the solid bridges during energizing of</u>
> <u>the first substrate;</u>
>
> bonding a second substrate to the face surface of the first substrate; and
>
> applying mechanical forces to fracture the solid bridges.

95.     On May 10, 2004, the Soitec Applicants—through attorney Norman P.

Soloway—submitted an IDS to the PTO, in which the Soitec Applicants disclosed five

references.  The Soitec Applicants characterized these references as follows:  "These

references came to applicants' attention in connection with litigation concerning a related

U.S. Patent."

96.     The Soitec Applicants did not identify the litigation or the "related U.S.

patent," referenced in their May 10, 2004 IDS.  As of May 10, 2004, many documents

had been filed in the SiGen litigation, including:  the original and amended complaints,

SiGen's original and amended answers and counterclaims, briefing and orders relating to

SiGen's motion for summary judgment for lack of enablement, the April 19, 2001 claim

construction order and related briefing, briefing relating to SiGen's motion for summary judgment of noninfringement, trial briefs, transcripts from 18 days of jury trial proceedings, the jury verdict and final judgment of non-enablement, post-trial briefing on non-enablement, the SiGen court's order regarding post-trial briefs, the Federal Circuit's decision affirming the trial court's claim construction and affirming the invalidity judgment based on lack of enablement, and the Federal Circuit's decision denying rehearing and rehearing en banc. None of this information was disclosed to the PTO by the Soitec Applicants during the prosecution of the '516 application.

97. The Soitec Applicants also did not disclose to the PTO the existence of the reissue application, serial no. 10/449,786 ("the '786 reissue application), which the Soitec Applicants filed seeking reissue of the '564 patent after the jury verdict of non-enablement in the SiGen litigation. The '786 reissue application was filed by the Soitec Applicants—through attorney Jasper W. Dockrey—on May 30, 2003.

98. The MPEP § 2001.06(b) states that each individual associated with the filing and prosecution of a patent application before the PTO has "a duty to bring to the attention of the examiner, or other [PTO] official involved with the examination of a particular application, information within their knowledge as to other copending United States applications which are 'material to patentability' of the application in question."

99. Before the May 10, 2004 IDS was submitted by the Soitec Applicants in the prosecution of the '516 application, the Soitec Applicants had made extensive disclosures of information related to the SiGen litigation in the prosecution of the '786 reissue application. The Soitec Applicants did not disclose to the PTO the existence of

28

the '786 reissue application or any of the information disclosed to the PTO therein at any time before the '009 patent issued on October 26, 2004.

100.    On May 12, 2004, the Soitec Applicants—through attorney Norman P. Soloway—submitted another IDS to the PTO, in which the Soitec Applicants disclosed one reference, which the Soitec Applicants alleged "came to applicants' attention in connection with litigation concerning a related U.S. Patent."

101.    The Soitec Applicants did not identify the litigation or the "related U.S. patent," referenced in their May 12, 2004 IDS.  The Soitec Applicants also did not disclose to the PTO any of the documents from the SiGen litigation or the existence of the '786 reissue application or the information disclosed during the prosecution of the '786 reissue application.

102.    The '516 application issued as U.S. Patent No. 6,809,009 on October 26, 2004.

103.    Additional information material to the patentability of the subject matter claimed in the '009 patent was discovered or generated during the SiGen litigation before the '009 patent issued.  Examples of such information were disclosed to the PTO during the prosecution of the '786 reissue application.

104.    Upon information and belief, during the prosecution of the '516 application, the Soitec Applicants violated their duty to disclose information material to the patentability of the claimed subject matter by knowingly—and with intent to deceive—withholding the following information from the PTO:  (1) the fact that the '564 patent, on which the '516 application's disclosure is largely based and whose process upon which the '516 application allegedly improves, was involved in litigation; (2) the

29

SiGen litigation, (3) the original and amended complaints, (4) SiGen's original and amended answers and counterclaims, (5) briefing and orders relating to SiGen's motion for summary judgment for lack of enablement, (6) the April 19, 2001 claim construction order and related briefing, (7) briefing relating to SiGen's motion for summary judgment of noninfringement, (8) trial briefs, (9) transcripts from 18 days of jury trial proceedings, (10) jury verdict and final judgment of non-enablement, (11) post-trial briefing on non-enablement, (12) the SiGen court's order regarding post-trial briefs, (13) the Federal Circuit's decision affirming the claim construction order and affirming the invalidity judgment based on lack of enablement, (14) the Federal Circuit's decision denying rehearing and rehearing en banc, (15) the co-pending '786 reissue application, (16) information from the SiGen litigation disclosed during the prosecution of the '786 reissue application, (17) other material information discovered or generated during the SiGen litigation, (18) the fact that Bruel's '564 patent claims, among other things, a process in which, after ion implantation, temperature alone is insufficient to remove the thin film from the wafer, and (19) the fact that Bruel's '564 patent claims, among other things, a process in which, after ion implantation and the thermal treatment steps described in the '564 patent, a mechanical force is required to remove the thin film from the wafer— which is what the Soitec Applicants claimed in the '516 application and touted as the point of novelty.

105.    The Soitec Applicants therefore committed inequitable conduct during the prosecution of the '516 application, rendering the '009 patent unenforceable.

### Count VII – Declaration of Unenforceability of U.S. Patent No. 7,067,396

106.    MEMC incorporates by reference the allegations of Paragraph 1-8 and 18-105 of its Counterclaim, as if fully set forth herein.

107.    The '396 patent claims priority to and claims subject matter related to the '252, '192, and '009 patents.  The Soitec Applicants' inequitable conduct in obtaining the '252, '192, and '009 patents therefore also renders the '396 patent unenforceable through infectious unenforceability.

108.    On February 23, 2004, the Soitec Applicants filed U.S. Patent Application serial no. 10/784,601 ("the '601 application").  The '601 application was a continuation of the '516 application and listed Bernard Aspar, Michel Bruel, and Thierry Poumeyrol as joint inventors.

109.    In a preliminary amendment accompanying the filing of the '601 application on February 23, 2004, the Soitec Applicants—through attorney Norman P. Soloway, cancelled all the claims, and added new claims 13-20.  These new claims were identical to the claims previously rejected by the PTO during prosecution of the '516 application.

110.    Claim 13, the first independent claim, reads as follows:

13.    A method of producing a thin film comprising:
providing a first substrate having a face surface;

introducing ions into the first substrate at the face surface, such that microcavities are formed in the first substrate during or after introducing the ions, wherein the microcavitites define a thin film layer extending from the first surface to the microcavities, and wherein the microcavities reside between solid bridges of the first substrate;

bonding a second substrate to the face surface of the first substrate; and applying mechanical forces to fracture the solid bridges.

111.    Claim 17, the other independent claim, reads as follows:

17.    A method of producing a thin film comprising:
providing a first substrate having a face surface;

introducing ions into the first substrate at the face surface and forming
microcavities in the first substrate, wherein the microcavities define a thin
film layer extending from the first surface to the microcavities, and
wherein the microcavities reside between solid bridges of the first
substrate;

bonding a second substrate to the face surface of the first substrate; and
applying mechanical forces to fracture the solid bridges.

112.    On May 10, 2004, the Soitec Applicants—through attorney Norman P.

Soloway—submitted an IDS to the PTO, in which the Soitec Applicants disclosed five

references.  The Soitec Applicants characterized these references as follows:  "These

references came to applicants' attention in connection with litigation concerning a related

U.S. Patent."

113.    The Soitec Applicants did not identify the litigation or the "related U.S.

patent," referenced in their May 10, 2004 IDS.  As of May 10, 2004, many documents

had been filed in the SiGen litigation, including:  the original and amended complaints,

SiGen's original and amended answers and counterclaims, briefing and orders relating to

SiGen's motion for summary judgment for lack of enablement, the April 19, 2001 claim

construction order and related briefing, briefing relating to SiGen's motion for summary

judgment of noninfringement, trial briefs, transcripts from 18 days of jury trial

proceedings, jury verdict and final judgment of non-enablement, post-trial briefing on

non-enablement, the SiGen court's order regarding post-trial briefs, the Federal Circuit's

decision affirming the trial court's claim construction order and affirming the invalidity

judgment based on lack of enablement, and the Federal Circuit's decision denying

32

rehearing and rehearing en banc.  None of this information was disclosed to the PTO by the Soitec Applicants during the prosecution of the '601 application.

114.    On May 12, 2004, the Soitec Applicants—through attorney Norman P. Soloway—submitted another IDS to the PTO, in which the Soitec Applicants disclosed one reference, which the Soitec Applicants alleged "came to applicants' attention in connection with litigation concerning a related U.S. Patent."

115.    The Soitec Applicants did not identify the litigation or the "related U.S. patent," referenced in their May 12, 2004 IDS.  The Soitec Applicants also did not disclose to the PTO any of the documents from the SiGen litigation.

116.    On June 3, 2004, the Soitec Applicants—through attorney Norman P. Soloway—sent a 29 page fax to the PTO.

117.    Pages 6-19 of the June 3, 2004 fax were an incomplete copy of the specification and abstract of the pending '601 application.  Pages 20-21 of the June 3, 2004 fax were a copy of Figures 1-4.  Pages 22-24 of the June 3, 2004 fax were a copy of amendments to claims 13-20 and new claims 21-28.  Pages 25-29 of the June 3, 2004 fax was a copy of the February 23, 2004 preliminary amendment.

118.    The amendments to claim 13 at page 22 of the June 3, 2004 fax read as follows:

> Claim 13 (currently amended):  A method for producing a thin film comprising:
>
> providing a first substrate having a face surface;
>
> introducing hydrogen ions into the first substrate at the face surface, such that microcavities are formed in the first substrate during or after introducing the ions, wherein the microcavities define a thin film layer extending from the first substrate to the microcavities, ~~and wherein~~ the microcavities reside between solid bridges of the first substrate, and the

<u>hydrogen ions are introduced into the first substrate at a temperature and at a total amount so as not to fracture the solid bridges during energizing of the first substrate;</u>

bonding a second substrate to the face surface of the first substrate; and

applying mechanical forces to fracture the solid bridges.

119.   On August 24, 2004, the Soitec Applicants—through attorney Norman P. Soloway—submitted an IDS, which disclosed "additional art received in connection with the Notice of Allowance in a related application, U.S. Serial No. 09/777,516."

120.   On December 30, 2004, the Soitec Applicants—through attorney Norman P. Soloway—submitted an IDS, which disclosed a Russian publication. The Soitec Applicants argued that the publication was not prior art to the '601 application: "Based on the information available to the applicants, it is the applicants' belief that the cited reference was first published on June 27, 2000. As such, the applicants assert that the cited reference is not prior art to the applicants' patent application."

121.   In their December 30, 2004 IDS, the Soitec Applicants argued to the PTO that "the process disclosed in the cited reference supports the applicants' position that those skilled in the art had sufficient knowledge and skill as of May 1997 to practice the applicants' invention using ions other than hydrogen." The Soitec Applicants continued, "[i]n particular, the cited reference supports the applicants' position that those skilled in the art were familiar with implantation of helium ions as a means of forming bubbles in a silicon substrate." The Soitec Applicants did not disclose to the PTO any of the documents from the SiGen litigation, including those showing that the '564 patent's disclosure did not enable anything other than hydrogen implantation.

34

122.   On September 22, 2005, the PTO issued a Notice of Allowability,

allowing claims 13-28, as reflected in the Soitec Applicants' June 3, 2004 amendment:

> The following is an examiner's statement of the reasons for allowance:
> The instant claims are allowable for the reasons stated in parent
> application S.N. 09/777,516 and because the prior art taken alone or in
> combination is not seen to disclose or suggest implantation parameters
> sufficient to form the microcavities having the recited properties. Also,
> claims 23 and 27 are seen to recite a dose between $1x10^{16}$ and $4x10^{16}$
> ions/cm$^{-2}$.

123.   On October 6, 2005, the Soitec Applicants' attorney, Norman P. Soloway,

filed a "Request for Clarification of Notice of Allowability," which read:

> The Notice of Allowability mailed September 22, 2005 is at hand.  Cipher
> 2 indicates the allowability of claims 13-28, however claims 13-20 are
> pending in this application.  Furthermore, the Examiner's Statement of
> Reasons for Allowance makes specific reference to claims 23 and 27,
> which is confusing.

The PTO did not respond to the Soitec Applicants' request.

124.   On December 16, 2005, the Soitec Applicants—through attorney Norman

P. Soloway—submitted a document entitled, "Amendment Under Rule 312 and

Comments on Statement of Reasons for Allowance," which read as follows:

> Claims 13 and 17 have been amended to correct minor
> typographical errors.  No new issues have been raised which would
> require further search or consideration by the Examiner.
>
> Applicants note that the Examiner has stated that the pending
> claims are allowable, in part, in view of the reasons for allowance set forth
> in their parent application serial no. 09/777,516.  Applicants assert that
> their instant claims recite different subject matter from the claims in their
> parent application.  For example, in the instant claims, the ions introduced
> into the first substrate are not limited to a particular ionic species.
> Accordingly, Applicants assert that their instant claims are allowable over
> the prior art in view of the recited subject matter and are independently
> patentable over the claims of their parent application.

125.    The December 16, 2005 Rule 312 amendment changed the language of phrase appearing in claims 13 and 17, as follows: "wherein the microcavities define a thin film layer extending from the [[first]] face surface to the microcavities"

126.    On January 18, 2006, the PTO entered the Rule 312 amendments "as directed to matters of form not affecting the scope of the invention."

127.    The '601 application issued as U.S. Patent No. 7,067,396 on June 27, 2006, with claims 1 to 16, which corresponded to claims 13 to 28 of the '601 application. The issued claims included the amended language entered by the PTO on January 18, 2006. For example, claim 1 of the '396 patent reads as follows:

1.    A method for producing a thin film comprising:

providing a first substrate having a face surface;

introducing hydrogen ions into the first substrate at the face surface, such that microcavities are formed in the first substrate during or after introducing the ions, wherein the microcavities define a thin film layer extending from the face surface to the microcavities, the microcavities reside between solid bridges of the first substrate, and the hydrogen ions are introduced into the first substrate at a temperature and at a total amount so as not to fracture the solid bridges during energizing of the first substrate;

bonding a second substrate to the face surface of the first substrate; and

applying mechanical forces to fracture the solid bridges.

128.    On October 25, 2006, the Soitec Applicants—through attorney Norman P. Soloway—submitted a Petition for Certificate of Correction. The Soitec Applicants represented to the PTO that the "Certificate of Correction is required to correct significant printing errors." The Soitec Applicants further represented to the PTO that "[t]he above changes are being made to conform the claims to the claims as amended under Rule 312." The Soitec Applicants requested the following changes to the claims:

In the Claims:
Column 6:
Line 65, "hydrogen" should be deleted.

Column 7:
Line 2, --and wherein--should be inserted after "microcavitities,".
Lines 4-7, should be deleted after "substrate".
Line 17, --to--should be inserted before "claims".
Line 19, "hydrogen" should be deleted.
Line 22, "hydrogen" should be deleted.
Line 26, --and wherein--should be inserted after "ties,".
Lines 27-32 should be deleted after "substrate".

Column 8:
Line 3, "hydrogen" should be deleted.
Lines 4-39, Claims 9-16 should be deleted.

None of these amendments were part of the Soitec Applicants' December 16, 2005 Rule

312 amendment.

129.    One of the alleged printing errors the Soitec Applicants included in their

Petition for Certificate of Correction was as follows:

Column 5:
Line 15, "$H^+/cm^2$" should be --$H^+/cm^3$--.

The specification of the '601 application as filed included the text "$H^+/cm^2$," not

"$H^+/cm^3$." Therefore, this substantive change to the specification was not a "printing

error."

130.    On January 9, 2007 the PTO issued the Certificate of Correction.

131.    Upon information and belief, during the prosecution of the '601

application, the Soitec Applicants violated their duty to disclose information material to

the patentability of the claimed subject matter by knowingly—and with intent to

deceive—withholding the following information from the PTO:  (1) the original and

amended complaints from the SiGen litigation, (2) SiGen's original and amended

answers and counterclaims, (3) briefing and orders relating to SiGen's motion for summary judgment for lack of enablement, (4) the April 19, 2001 claim construction order and related briefing, (5) briefing relating to SiGen's motion for summary judgment of noninfringement, (6) trial briefs, (7) transcripts from 18 days of jury trial proceedings, (8) the jury verdict and final judgment of non-enablement, (9) post-trial briefing on non-enablement, (10) the SiGen court's order regarding post-trial briefs, (11) the Federal Circuit's decision affirming the trial court's claim construction order and affirming the invalidity judgment based on lack of enablement, (12) the Federal Circuit's decision denying rehearing and rehearing en banc, (13) other material information discovered or generated during the SiGen litigation, (14) the fact that Bruel's '564 patent claims, among other things, a process in which, after ion implantation, temperature alone is insufficient to remove the thin film from the wafer, and (15) the fact that Bruel's '564 patent claims, among other things, a process in which, after ion implantation and the thermal treatment steps described in the '564 patent, a mechanical force is required to remove the thin film from the wafer —which is what the Soitec Applicants claimed in the '601 application and touted as the point of novelty.

132.    Upon information and belief, during the prosecution of the '601 application, the Soitec Applicants knowingly made material misrepresentations to the PTO at least in connection with their October 25, 2006 Petition for Certificate of Correction.

133.    The Soitec Applicants therefore committed inequitable conduct during the prosecution of the '601 application, rendering the '396 patent unenforceable.

## Count VIII – Declaration of Unenforceability of U.S. Patent No. 7,498,234

134.    MEMC incorporates by reference the allegations of Paragraph 1-8 and 18-133 of it Counterclaim, as if fully set forth herein.

135.    The '234 patent claims priority to and claims subject matter related to the '252, '192, '009, and '396 patents.  The Soitec Applicants' inequitable conduct in obtaining the '252, '192, '009, and '396 patents therefore also renders the '234 patent unenforceable through infectious unenforceability.

136.    On January 9, 2006, the Soitec Applicants filed U.S. Patent Application serial no. 11/327,906 ("the '906 application").  The '906 application was a continuation of the '601 application and listed Bernard Aspar, Michel Bruel, and Thierry Poumeyrol as joint inventors.

137.    On January 30, 2006, the Soitec Applicants—through attorney Norman P. Soloway—submitted a preliminary amendment that cancelled all the claims, and added new claims 21-46.

138.    Claim 21, the first independent claim, read as follows:

21.    A method for producing a thin film comprising:
providing a first substrate having a face surface;

introducing ions into the first substrate at the face surface, such that microcavities are formed in the first substrate during or after introducing the ions, wherein the microcavitites define a thin film layer extending from the face surface to the microcavities, and wherein the microcavities reside between solid bridges of the first substrate;

bonding a second substrate to the face surface of the first substrate; and

applying mechanical force to the thin layer through the second substrate to fracture the solid bridges.

139.    Claim 31, the second independent claim, read as follows:

31.     A method for producing a thin film comprising:
providing a first substrate having a face surface;

introducing ions into the first substrate at the face surface, such that
microcavities are formed in the first substrate during or after introducing
the ions, wherein the microcavities define a thin film layer extending from
the first surface to the microcavities, wherein the microcavities reside
between solid bridges of the first substrate;

thermally treating the first substrate to coalesce the microcavities;

bonding a second substrate to the face surface of the first substrate; and

applying mechanical forces to fracture the solid bridges.

140.    Claim 35, the third independent claim, read as follows:

35.     A thin film comprising a thin layer of semiconductor
material on a substrate, wherein the layer is defined by an interface
between the thin layer and the substrate opposite from a cleaved surface,
wherein the cleaved surface comprises microcavities residing between
fractured regions of semiconductor material.

141.    Claim 41, the last independent claim, read as follows:

41.     A method for producing a thin film comprising the steps of:
implanting hydrogen ions into a semiconductor material substrate through
a face thereof so as to form a layer of microcavities with bridges
connecting a thin film layer of desired thickness to a remaining portion of
the semiconductor material substrate, the quantity of ions in the layer of
microcavities being insufficient to produce fracture of the bridges
throughout the layer of microcavities by a subsequent thermal annealing
alone;

conducting a subsequent thermal annealing of the semiconductor material
substrate at sufficiently low temperature to substantially limit diffusion of
gas from the semiconductor material substrate; and

effecting the propagation of bridge fracture to sever the thin film layer
from the remaining portion of the semiconductor material substrate
through the application of an additional mechanical force.

142.    On October 1, 2007, the PTO issued an Office Action rejecting all pending

claims of the '906 application for statutory or non-statutory double patenting.  Under 35

U.S.C. § 101, the PTO rejected claims 31-46 "as claiming the same invention as that of claims 13-20 of U.S. Patent No. 7067396, claims 13-28 of U.S. Patent 6809009 and claims 1-21 of U.S. Patent 6225192."

143.    On December 20, 2007, the Soitec Applicants—through attorney Jasper W. Dockrey—responded to the double patenting rejection.  In their arguments, the Soitec Applicants made the following representations to the PTO:

> The applicants assert their claims are not unpatentable for statutory double patenting over U.S. Pat. No. 7,067,396 ("the '396 patent").

> Independent claim 1 of the '396 patent recites, inter alia, that:

> "…the hydrogen ions are introduced into the first substrate at a temperature and at a total amount so as not to fracture the solid bridges during energizing of the first substrate…"

> Independent claim 5 of the '396 patent recites, inter alia, that:

> "…the hydrogen ions are introduced below the hydrogen diffusion temperature of the first substrate, and the total amount of hydrogen is below that necessary to fracture the solid bridges…"

> These features are not found in the applicants' rejected claims. Accordingly, the claims of the '396 patent are not identical to the instant application claims and statutory double patenting does not exist.

144.    The Soitec Applicants' December 20, 2007 characterizations of the '396 patent claims are wholly inconsistent with the representations made in the Soitec Applicants' Petition for Certificate of Correction filed during prosecution of the '601 application

145.    In response to the Soitec Applicants' December 20, 2007 representations, the PTO withdrew the statutory double patenting rejection under 35 U.S.C. § 101 in a February 11, 2008 Office Action.

146. After the Soitec Applicants submitted a terminal disclaimer to overcome a non-statutory double patenting rejection, the PTO issued a Notice of Allowance on September 15, 2008.

147. The '906 application issued as U.S. Patent No. 7,498,234 on March 3, 2009.

148. Upon information and belief, during the prosecution of the '906 application, the Soitec Applicants violated their duty to disclose information material to the patentability of the claimed subject matter by knowingly—and with intent to deceive—withholding the following information from the PTO: (1) the original and amended complaints from the SiGen litigation, (2) SiGen's original and amended answers and counterclaims, (3) briefing and orders relating to SiGen's motion for summary judgment for lack of enablement, (4) the April 19, 2001 claim construction order and related briefing, (5) briefing relating to SiGen's motion for summary judgment of noninfringement, (6) trial briefs, (7) transcripts from 18 days of jury trial proceedings, (8) the jury verdict and final judgment of non-enablement, (9) post-trial briefing on non-enablement, (10) the SiGen court's order regarding post-trial briefs, (11) the Federal Circuit's decision affirming the trial court's claim construction order and affirming the invalidity judgment based on lack of enablement, (12) the Federal Circuit's decision denying rehearing and rehearing en banc, (13) other material information discovered or generated during the SiGen litigation, (14) the fact that Bruel's '564 patent claims, among other things, a process in which, after ion implantation, temperature alone is insufficient to remove the thin film from the wafer, and (15) the fact that Bruel's '564 patent claims, among other things, a process in which, after ion implantation and the

42

thermal treatment steps described in the '564 patent, a mechanical force is required to remove the thin film from the wafer—which is what the Soitec Applicants claimed in the '906 application and touted as the point of novelty.

149.    Upon information and belief, during the prosecution of the '906 application, the Soitec Applicants knowingly made material misrepresentations to the PTO at least in connection with their December 20, 2007 response to the PTO's double patenting rejection under 35 U.S.C. § 101.

150.    The Soitec Applicants therefore committed inequitable conduct during the prosecution of the '906 application, rendering the '234 patent unenforceable.

**PRAYER FOR RELIEF**

WHEREFORE, MEMC respectfully requests that judgment be entered in its favor on its counterclaims and against Soitec and CEA:

A.      Finding that Soitec has infringed and is infringing United States Patent No. 5,834,812.

B.      Enjoining Soitec, and their agents, servants, employees, and attorneys, and all those in active participation or privity with them, from infringing United States Patent No. 5,834,812.

C.      Awarding damages to MEMC under 35 U.S.C. § 284 in an amount to be determined at trial;

D.      Awarding MEMC pre-judgment and post-judgment interest;

E.      Dismissing the Complaint with prejudice, and denying all relief requested by Soitec and CEA;

F.        Declaring that the claims of United States Reissue Patent No. 39,484, United States Patent Nos. 6,020,252, 6,225,192, 6,809,009, 7,067,396, and 7,498,234 are invalid;

G.        Declaring that MEMC has not infringed and is not infringing, directly or indirectly, any claims of United States Reissue Patent No. 39,484, United States Patent Nos. 6,020,252, 6,225,192, 6,809,009, 7,067,396, or 7,498,234;

H.        Declaring that United States Patent Nos. 6,020,252, 6,225,192, 6,809,009, 7,067,396, and 7,498,234 are unenforceable;

I.        Finding that this case is exceptional and awarding MEMC its reasonable attorney's fees and costs under 35 U.S.C. § 285; and

J.        Granting MEMC such other relief as the Court deems appropriate.

### JURY TRIAL DEMANDED

Under Federal Rule of Civil Procedure 38, MEMC demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: March 6, 2009               CONNOLLY BOVE LODGE & HUTZ LLP

By: _Patricia S. Rogowski_
Patricia S. Rogowski (I.D. #2632)
The Nemours Building
1007 North Orange Street
P.O. Box 2207
Wilmington, DE 19899
(302) 658-9141
(302) 658-5614 (Fax)
progowski@cblh.com

Of Counsel:

SENNIGER POWERS LLP
Robert M. Evans, Jr.
David W. Harlan
Marc W. Vander Tuig
B. Scott Eidson
Richard L. Brophy
100 N. Broadway, 17th Floor
St. Louis, MO 63102
(314) 345-7000
(314) 345-7600 (Fax)
revans@senniger.com
dharlan@senniger.com
mvandertuig@senniger.com
seidson@senniger.com
rbrophy@senniger.com

*Attorneys for MEMC Electronic Materials, Inc.*

## CERTIFICATE OF SERVICE

I, Patricia Smink Rogowski, hereby certify that on this 6th day of March, 2009, I

electronically filed **MEMC ELECTRONIC MATERIALS, INC.'S ANSWER,**

**AFFIRMATIVE DEFENSES AND COUNTERCLAIMS** with the Court Clerk using

CM/ECF which will send notification of such filing(s) to Denise Seastone Kraft.

**VIA CM/ECF and E-MAIL**
Denise Seastone Kraft
EDWARDS ANGELL PALMER
    & DODGE LLP
919 North Market Street, 15th Floor
Wilmington, DE 19801
dkraft@eapdlaw.com

**VIA E-MAIL AND U.S. MAIL**
George W. Neuner
EDWARDS ANGELL PALMER
    & DODGE LLP
101 Federal Street
Boston, MA 02110
gneuner@eapdlaw.com

**VIA E-MAIL AND U.S. MAIL**
Michael Brody
Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL  60601
MBrody@winston.com

  _/s/ Patricia Smink Rogowski_____
Patricia Smink Rogowski (Bar ID No. 2632)
progowski@cblh.com

615931v6