**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| S.O.I.TEC SILICON ON INSULATOR TECHNOLOGIES, S.A. and COMMISSARIAT À L'ÉNERGIE ATOMIQUE<br><br>Plaintiffs-Counterclaim Defendants,<br><br>v.<br><br>MEMC ELECTRONIC MATERIALS, INC.<br><br>Defendant-Counterclaim Plaintiff,<br><br>v.<br><br>SOITEC U.S.A., INC.,<br><br>Counterclaim Defendant. | Civil Action No.: 1:08-cv-292-SLR<br><br>JURY TRIAL DEMANDED |

**PLAINTIFFS S.O.I.TEC SILICON ON INSULATOR TECHNOLOGIES, S.A.
AND COMMISSARIAT À ÉNERGIE ATOMIQUE'S
<u>ANSWERING CLAIM CONSTRUCTION BRIEF</u>**

Dated: July 9, 2010

Denise Seastone Kraft (DE No. 2778)
John L. Reed (DE No. 3023)
**EDWARDS ANGELL PALMER & DODGE LLP**
919 North Market Street, Suite 1500
Wilmington, DE 19801
(302) 777-7770
(302) 777-7263 Fax

*Attorneys for S.O.I.TEC Silicon on Insulator
Technologies, S.A., Commissariat À L'Énergie
Atomique, and Soitec USA, Inc.*

**OF COUNSEL**:

George W. Neuner (BBO No. 369640)
Alan M. Spiro (BBO No. 475650)
Brian M. Gaff (BBO No. 642297)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA  02199
(617) 439-4444
(617) 439-4170 (fax)

Michael Brody
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois  60601
(312) 558-5600

Marcus T. Hall
Laura K. Carter
WINSTON & STRAWN LLP
101 California Street, 39th Floor
San Francisco, California  94111
(415) 591-1000

Gail Standish
Ashlea Raymond
WINSTON & STRAWN LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 615-1700

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 1

I. THE CLAIMS SHOULD NOT BE LIMITED TO PREFERRED
EMBODIMENTS DISCLOSED IN THE SPECIFICATION ......................................... 1

    A. The Bruel Patent:  Disclosure of Temperatures Of 500º C Or More
For The Third Stage Heat Treatment Does Not Limit Claim 50 .......................... 3

    B. The Bruel Patent:  The Disclosed Bonding Techniques Do Not
Limit Claim 50 .................................................................................................... 3

    C. The Aspar Patents:  The Disclosed Processing Parameters Do Not
Limit The Asserted Claims .................................................................................. 4

    D. The Aspar Patents:  The Disclosure Of Circuit Layer Transfer In
The Aspar Patents Is Not Limiting ...................................................................... 6

    E. The Aspar Patents:  The Disclosure Of A Thin Film Layer Of At
Least 1-2 μm Does Not Limit The Claims ........................................................... 9

II. MEMC NARROWS CLAIM SCOPE BASED ON A
MISINTERPRETATION OF THE EFFECT OF "COMPRISING"
LANGUAGE ........................................................................................................ 10

III. THE DEFINITIONS PROVIDED IN THE SPECIFICATIONS SHOULD
CONTROL CLAIM CONSTRUCTION ................................................................. 14

IV. PRIOR CONSTRUCTIONS OF THESE CLAIM TERMS SHOULD
CONTROL ........................................................................................................... 14

V. THIS COURT SHOULD NOT CONSTRUE TERMS WHICH ARE NOT
IN CONTROVERSY ............................................................................................ 16

VI. THE REMAINING LIMITATIONS ..................................................................... 17

VII. THE '812 LIMITATIONS ................................................................................... 19

CONCLUSION ........................................................................................................... 20

WLM 522608.1

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                          <u>PAGE(S)</u>

*Conoco, Inc. v. Energy & Envt'l. Int'l., L.C.,*
   460 F.3d 1349 (Fed. Cir. 2006) ...................................................................... 2

*Dippin' Dots, Inc. v. Mosey,*
   476 F.3d 1337 (Fed. Cir. 2007) ...................................................................... 13

*Eolas Techs. Inc. v. Microsoft Corp.,*
   399 F.3d 1325 (Fed. Cir. 2005) ...................................................................... 2

*Maytag Corp. v. Electrolux Home Prods.,*
   411 F.Supp. 2d 1008 (N.D. Iowa 2006) ......................................................... 16

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.,*
   200 F.3d 795 (Fed. Cir. 1999) ........................................................................ 16

*Voda v. Cordis Corp.,*
   536 F.3d 1311 (Fed. Cir. 2008) ...................................................................... 2

WLM 522608.1

## INTRODUCTION

The dispute over the 30 contested limitations in this case largely comes down to a relative handful of stark disagreements about what should be settled propositions of claim construction:

- For many of the disputed limitations, Soitec has proposed a construction based on the plain language of the claims, while MEMC has improperly sought to import limitations based on a preferred embodiment described in the specification.

- For many of the disputed limitations, Soitec has proposed constructions consistent with the "comprising" form of the claims at issue, while MEMC has improperly proposed constructions at odds with this language and with the prosecution history affirming that the comprising claims should be given their ordinary meaning.

- For a number of the disputed limitations, Soitec has proposed using the definitions explicit in the specification, while MEMC has improperly proposed ignoring the applicants' decision to act as their own lexicographer.

- For a number of the disputed limitations, Soitec has proposed the constructions adopted by the Federal Circuit and/or the *SiGen* district court, while MEMC has improperly proposed ignoring the doctrine of *stare decisis* and revisiting these settled conclusions of law.

- For number of the disputed limitations, Soitec has proposed avoiding constructions of undisputed terms with established meanings in the art, while MEMC has improperly insisted on construing terms in a vacuum.

We respectfully submit that the claim construction approaches advocated by MEMC have no foundation in the law. Accordingly, we respectfully request that the claim constructions proposed by Soitec be adopted by this Court.

## ARGUMENT

## I. THE CLAIMS SHOULD NOT BE LIMITED TO PREFERRED EMBODIMENTS DISCLOSED IN THE SPECIFICATION

It is not an accident that patents include both claims and a specification. The plain and unambiguous language of the claims is not limited by the specification unless the applicant has sought to act as his or her own lexicographer by defining one or more claim terms, or unless

1

applicant has clearly disclaimed subject matter that would otherwise be covered. *See, e.g.*, *Eolas Techs. Inc. v. Microsoft Corp.,* 399 F.3d 1325, 1336 (Fed. Cir. 2005) (refusing to limit claims to embodiments disclosed in specification because "absent a clear disclaimer in the specification, the embodiments in the specification do not limit broader claim language"); *Voda v. Cordis Corp.,* 536 F.3d 1311, 1320 (Fed. Cir. 2008) (while "specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor," any such disclaimer or disavowal "must be clear"); *Conoco, Inc. v. Energy & Envt'l. Int'l., L.C.,* 460 F.3d 1349, 1357-58 (Fed. Cir. 2006) (while inventor may "use the specification to intentionally disclaim or disavow the broad scope of a claim," this "intention must be clear" and "cannot draw limitations into the claim from a preferred embodiment").

Many of MEMC's proposed constructions nonetheless would improperly read features of disclosed embodiments into the claims even though no clear disclaimer of scope has been made.  MEMC tries to justify its position by pointing to language in the specification stating that a disclosed feature "is necessary" or is practiced "according to the invention."  But virtually every method or device disclosed in a specification describes something that is done or created "according to the invention" – that is why the disclosed ways of practicing the invention are said to be "embodiments" of the invention.  MEMC's suggestion that this phrase is a talisman that *per se* signals clear disclaimer has no basis in the law, and is flatly at odds with the rule that disclosed "embodiments" typically are *not* limitative.  As to the portions of the specification where a feature or step is said to be "necessary," MEMC consistently overlooks what the disclosed feature is "necessary" for.  Unvaryingly it is *not* necessary to practice the invention.

## A.   The Bruel Patent:  Disclosure Of Temperatures Of 500° C Or More For The Third Stage Heat Treatment Does Not Limit Claim 50

MEMC attempts to limit the third step of claim 50 of the '484 reissue patent ("thermally treating the assembly of said wafer and said stiffener at a temperature…adequate to create by a crystalline rearrangement effect in the wafer and a pressure effect in the microbubbles") to thermal treatments conducted at temperatures of 500° C or greater.  MEMC focuses on the language in the specification which says that it "is necessary" to heat hydrogen implanted silicon to this level.  But MEMC fails to recognize that the specification does not say that it "is necessary" to do so *to practice the invention*.  Rather, the specification notes that these temperatures are only necessary to perform the process "with adequate kinetics;" *i.e.*, quickly. The speed of the process is nowhere indicated as a defining characteristic of the invention, and the specification does not state that the invention cannot be practiced at lower temperatures over longer periods of time.  Thus, this disclosure should not act as a limitation and this limitation should be removed from the claim construction of the term.  (JA-0543, '484 reissue patent, claim 47).

## B.   The Bruel Patent:  The Disclosed Bonding Techniques Do Not Limit Claim 50

MEMC tries to read preferred embodiments into the claim for its construction of the term "intimately contacting" in the '484 reissue patent.  MEMC attempts to disguise this by portraying these embodiments as a part of the definition provided in the specification. However, this is just wrong.  The Bruel patent defines the term "intimately contacting" as follows:  "The term intimate contact is understood to mean a contact obtained by pressing the stiffener onto the wafer, e.g. by electrostatic pressure and/or by an adherent contact."  (JA-0540,

'484 reissue patent at 3:61-63).  This definition is self-contained within its paragraph, and the paragraph is provided in its entirety.

A portion of the specification which MEMC identifies as further defining "intimate contact" is found three paragraphs prior to this definition and uses the claim term as part of a broader discussion of the process, rather than defining it:

> Therefore, if it is wished to obtain a continuous semiconductor film, it is necessary to compensate the stresses appearing during the heat treatment phase. According to the invention, this compensation is brought about by the intimate contacting of the semiconductor wafer surface and a stiffener.

(*Id*. at 3:33-38).  This passage does not define what "intimate contact" consists of; it merely describes the use to which intimate contact is put in practicing the invention.  The portion of the specification which does define the meaning of intimate contact is the portion which appears at the bottom of that column and which begins with the phrase, "The term intimate contact is understood to mean . . ."

MEMC also suggests that the paragraph following the definition of "intimate contact" is part of that definition.  The syntax of the passage is to the contrary.  After defining the phrase "intimate contact," the next paragraph of the patent describes a variety of ways in which the bond formed during the "intimate contacting" step ***can*** be enhanced:

> Thus, according to the invention, said same stiffener ***can also*** be bonded either by an adhesive substance. . . or . . . by the effect of a prior preparation of at least one of the surfaces to be bonded and a thermal or electrostatic treatment . . . to assist the interatomic bonds between the stiffener and the semiconductor wafer."

(*Id*. at 3:64-4:5) (emphasis added).

### C.   The Aspar Patents:  The Disclosed Processing Parameters Do Not Limit The Asserted Claims

It is evident from the prosecution history of the Aspar patents that both the examiner and the applicant understood that the claims that were issuing were not limited to the disclosed

processing parameters.  MEMC points to the fact that the examiner rejected the claims for lack of enablement, as only the specific conditions described in the specification were shown to be effective.  MEMC also underscores the fact that the applicant amended the claims and deduces that this is an affirmation of the examiner's reason for rejection.

But MEMC ends the story there, and for good reason.  The claim rejected by the examiner called for the implantation of "ions" without further limitation into a "substrate" without further limitation, and did not include any limitations as to other quantitative processing parameters.   Applicant's amendments to the asserted claim primarily added the word "hydrogen" to modify "ions" and "clarified that the ions introduced are hydrogen ions introduced at a temperature and amount below that necessary to fracture solid bridges during energizing of the first substrate."  (JA-0153).  Moreover, the applicant, at the same time, disclosed abundant prior art concerning the implantation of a variety of ionic species into a variety of substrates and annealing those implanted materials under a variety of conditions. (PA-0058-59, ¶¶ 35-41; PA-0072-83).

This amendment did not restrict the invention to the specific conditions described in the specification.  Moreover, as the examiner made clear in his reasons for allowance:  "The attached references in combination with the instant disclosure provide sufficient guidance to enable one of ordinary skill in the art to practice the instant invention without undue experimentation."  (JA-0233).  Nothing is mentioned which suggests that allowance was due to the amended claim language or a narrowing of scope.  Rather, in both the subsequent prosecutions leading to the patents in suit, the same examiner allowed claims which were as broad as, if not broader than, the originally disallowed claims in light of the same specification

and disclosures.  In short, what the file histories show is a considered decision on the part of the examiner to allow claims that were *not* limited to the disclosed processing parameters.

MEMC has construed the following terms to include limitations restricting the invention to the specific conditions in the specification:  "microcavities," (JA-0010, '009 patent, claim 1 and JA-0929, '234 patent, claim 21); "bridges," (JA-0011, '009 patent, claim 1, JA-0268, '396 patent, claim 1, and JA-0929, '234 patent, claim 21); "energizing of the first substrate," (JA-0010, '009 patent, claim 1 and JA-0268, '396 patent, claim 1); "The hydrogen ions are introduced into the first substrate at a temperature and at a total amount so as not to fracture the solid bridges during energizing of the first substrate."  (JA-0010, '009 patent, claim 1 and JA-0268, '396 patent, claim 1); "Conducting a subsequent thermal annealing of the semiconductor material substrate at sufficiently low temperature to substantially limit diffusion of gas from the semiconductor material substrate." (JA-0929, '234 patent, claim 21); and "The quantity of ions in the layer of microcavities being insufficient to produce fracture of the bridges throughout the layer of microcavities by a subsequent thermal annealing alone."  (*Id.*).  These limitations should be discarded, as they are no more than preferred embodiments, which the prosecution history supports.

    **D.**    **The Aspar Patents: The Disclosure Of Circuit Layer Transfer In The Aspar Patents Is Not Limiting**

MEMC attempts to narrow the scope of several claim terms in the Aspar patents based on the disclosed embodiment of circuit layer transfer.  This effort is of a piece with the broader effort to limit the claims to the disclosed processing parameters, because many of them relate to the use of the invention to achieve this embodiment.  For the reasons already given, MEMC's claim construction position on this point is misguided.  Moreover, the portions of the specification on which MEMC relies underline the fact that the specification's description of the

"circuit layer transfer" embodiment was not meant to be limitative.  The specification of these

patents begins by describing the invention:

> This invention relates to a method of producing a thin layer of semiconductor material.  The thin layer produced *can possibly* be provided with electronic components.
>
> The invention permits the production of thin layers of either monocrystalline or polycrystalline or even amorphous semiconductor and, for example the production of substrates of the Silicon on Insulator type or the production of self-supporting thin layers of monocrystalline semiconductor.  Electronic circuits and/or microstructures *can be* either completely or in part created in these layers or in these substrates.

(JA-0008, '009 patent at 1:9-19) (emphasis added).  Nowhere does the patent state that circuit

layer transfer is a defining aspect of the invention.

> MEMC relies on the following paragraph for this assertion:

> This invention has been conceived in order to improve the method described in the document FR-A-2 681 472.  After a step of ion implantation within a range of appropriate doses and before the separation step, it *allows* to [sic] carry out a thermal treatment of the part of the wafer corresponding to the future thin layer, in particular between 400° C and 700° C for silicon, without degrading the surface condition of the flat face of the wafer and without separation of the thin layer."

(*Id*. at 2:33-40) (emphasis added).  The quoted passage on its face merely says that the invention

*can* be practiced in a way that "allows" this result; not that it must be.  Moreover, MEMC

conspicuously omits the last sentence of the paragraph:  "This intermediate thermal treatment

*can* form part of the operation for developing electronic components or *can* be applied for other

reasons."  (*Id*. at 2:41-43) (emphasis added).  The use of words such as "allows" and "can"

demonstrates that this is no more than an optional step to the claimed process.  (*See also* JA-

0009, '009 patent at 3:41-45 ("The method according to the invention *can* include, between the

thermal treatment step and the separation step, a step consisting of producing all or part of at

least one electronic component in the part of the wafer before forming the thin layer.") (emphasis added)).

MEMC's constructions for several of the disputed terms rely on the limitations of this *optional* step.  MEMC attempts to limit all of these terms to conditions where a heat treatment between 400° C and 700° C does not form blisters in the wafer.  MEMC reaches this conclusion by reasoning that if the invention allows for circuit layer transfer, the wafer must not blister at temperatures required for micro-electronics operations.  MEMC deduces the temperature range from a small parenthetical in the specification which notes that thermal treatment stages for micro-electronics operations are "(*typically* from 400° C to 700° C)."  (JA-0008, '009 patent at 2:12) (emphasis added).  To reach this limitation, MEMC relies on a chain of inferences which stem from this innocuous and imprecise notation.

MEMC also relies on the prosecution history of the '009 patent to suggest that the invention is limited to conditions which do not form blisters at temperatures of 400° C to 700° C.  MEMC asserts that the prosecution history of the '009 patent indicates that the claims were amended to require the wafers to be stable at these temperatures.  However, this is not what happened.  As discussed above, the claims were not amended to include such a limitation, and the examiner allowed not only those claims, but also the broader claims of the '396 and '234 patents based on the enablement provided by the newly disclosed references, not due to the change in the claim language.

Finally, MEMC seeks to limit the phrase "energizing of the first substrate" in the same way to the temperature ranges associated with the heat treatment of micro-electronics operations.  But the specification is explicit that these operations are distinct from the "thermal treatment" of the disclosure and the claims.  (*See, e.g.*, JA-0009, '009 Patent at 3:41-45 ("The

8

method according to the invention can include, between the thermal treatment step and the separation step, a step consisting of producing all or part of at least one electronic component in the part of the wafer before forming the thin layer.")).   Moreover, for all of the foregoing reasons, the thermal treatments associated with the fabrication of microcircuitry cannot be limiting, because the microcircuitry step was optional.

### E.     The Aspar Patents: The Disclosure Of A Thin Film Layer Of At Least 1-2 μm Does Not Limit The Claims

MEMC attempts to narrow the scope of the "thin film layer" in the asserted claims of the Aspar patents to a thickness of at least 1-2 μm.  MEMC needs to make several assumptions for this argument.  First, MEMC assumes that the implantation of circuits is a necessary part of the invention.  From this, MEMC deduces that the thin layer must be thick enough to accommodate these circuits.  MEMC then draws a thickness of 2 μm from a clearly marked example.  (JA-0009, '009 patent at 4:31-35 ("*If the case arises*, the thickness of the implanted semiconductor material must be such that all or part of electronic components and/or microstructures can be produced in the thin layer.  *By way of example*, the mean penetration of hydrogen ions is 2 μm at 200 keV in silicon.") (emphasis added)).   MEMC then argues that because implantation energies of only 100 and 160 keV are disclosed in the specification, their corresponding implantation depths of 1 μm and 1.6 μm should mark the minimum limits to the thickness.

MEMC's chain of reasoning fails from the outset, because the fabrication of microelectronic circuitry is not a necessary, but an explicitly optional step in the process.  The inference that the transferred layer must be at least 1-2 μm is, if anything, even weaker than other proposed limitations based on the microcircuitry example, since the very passage in which this thickness is suggested begins with the phrase, "If the case arises," and then goes on to propose that, "the thickness of the implanted semiconductor material must be such that all or

part of electronic components and/or microstructures can be produced in the thin layer."  The passage concludes with the parameters that MEMC wants to include in the claim limitations, by offering them, "by way of example."  It is hard to imagine a passage more clearly written to avoid the clear disclaimer that MEMC must show.

## II.   MEMC NARROWS CLAIM SCOPE BASED ON A MISINTERPRETATION OF THE EFFECT OF "COMPRISING" LANGUAGE

Soitec has proposed claim constructions which comport with the Federal Circuit's longstanding interpretation of the term "comprising;" that additional process steps may be practiced.  MEMC proposes that the claims should be limited to only the steps recited; i.e., proposes to transmute these claims into claims written in the "consisting of" form, because of the prosecution history of the asserted patents.  However, the portions of the prosecution history relied upon by MEMC (1) relate only to the Bruel patent; (2) actually demonstrate the claims mean what they say and should be read the same as any other claim in the "comprising" form; and (3) only relate to the first stage of the claimed processes, and thus should not be drawn to the term "comprising," as this term is in the preamble and applies to the process as a whole.

The implantation step of the original Bruel claims had called for implantation of "hydrogen or the rare gases."  The Federal Circuit held that "When a patentee chooses to claim "A or B" . . . the specification must fully enable "B" as well as "A" when the difference between "A" and "B" substantially affects the practice of the invention."  (JA-1294, ¶ 5). Accordingly, in seeking the reissue which became the '484 patent, Soitec ultimately removed references to helium and other rare gas ions from the portion of the claims regarding the first stage of the claimed processes.  Soitec did add language requiring that the "microbubbles" were "hydrogen microbubbles" in the third stage in claim 1, but this language was not included in the limitations describing the third stage of all the other independent claims of the '484 patent,

10

including claim 47 from which asserted claim 50 depends.  All of these claims were allowed.  In the prosecution history of the '009 patent, Soitec only added clarifying language to claim 1 that ions were "hydrogen ions" with respect to the implantation stage.  Thus, because prosecution history disclaimer should only apply to changes implemented to gain allowance and clearly disclaimed, any disclaimer should only apply, at the most, to the claim language describing the implantation stage.

MEMC attempts to greatly extend the significance of this prosecution history by arguing that it forecloses any additional steps involving ions other than hydrogen, despite Soitec's use of "comprising" language in framing its claims.  MEMC reaches its conclusion by conflating a situation where a gas other than hydrogen is used to satisfy the limitations of the first claimed step with the situation where a gas other than hydrogen is implanted in the wafer before or after the claimed hydrogen implantation occurs.

Although Soitec agrees that the claimed implantation step recites only hydrogen as the implant species, the comprising form of the claim opens the possibility that other implant steps may occur, a possibility which was explicitly contemplated in the specification.  (JA-0540, '484 reissue patent at 4:35-38 (". . . the principle of the method is applicable with molecules [sic] hydrogen ions or with ions of rare gases such as helium, neon, krypton and xenon, used either singly *or in combination*.") (emphasis added)).

The terms "hydrogen ion bombardment," (JA-0543, '484 reissue patent, claim 47), "introducing hydrogen ions…" (JA-0010, '009 patent, claim 1, and JA-0267, '396 patent, claim 1), and "implanting hydrogen ions" (JA-0929, '234 patent, claim 21) are the only disputed terms which appear in the first stage of the claimed processes.  Soitec's proposed claim construction ("the claimed process includes the referenced hydrogen ion [bombardment] along

with the other listed steps, but may also include additional steps before, between or after the listed steps.") does not attempt to broaden the scope of these terms, and only reflects the meaning of the term "comprising" in the claim's preamble.

The remaining terms which are disputed based on opposing interpretations of the "comprising" language are all found in the second and third stages of the asserted claims.  (e.g. "stiffener," (JA-0543, '484 reissue patent, claim 47), "gaseous hydrogen microbubbles," (*Id.*), "separation," (*Id.*), and "microcavities" (JA-0010, '009 patent, claim 1, JA-0267-68, '396 patent, claim 1, JA-0929, '234 patent, claim 21)).  For these terms, MEMC attempts to limit the source of stresses to hydrogen ions only.  As noted above, this is improper because of the possibility that added steps could contribute to the stresses.  Additionally, if only hydrogen ions can be responsible for the stress, then this would have the effect of precluding infringement even for the practice of the preferred embodiments, as the inevitable non-hydrogen ion impurities in silicon would also be partially responsible for the stresses.  It was also common at the time to "dope" or pre-implant silicon and other semiconductor wafers with other ionic species in order to enhance their electrical properties, so it was well within the contemplation of those of ordinary skill in the art that there would be implant damage with multiple causes.

MEMC argues that the Patent Office's rejection of its Protest with SiGen undermines Soitec's comprising argument.  Precisely the opposite is true.  MEMC and its licensor, SiGen, submitted remarks which were directed toward the language for the first stage in claim 1 of the '484 reissue patent ("ions being hydrogen ions").  They argued that "being" should be replaced by "consisting of" so that other ions could not satisfy the limitations of the first stage.  Not only was this argument rejected by the Patent Office, but it has no connection to the term "comprising" in the preamble to the claim.  The examiner's remarks only serve to reinforce the

point that, regardless of whether the first stage limitations can be satisfied by ions other than hydrogen – which would be hard to imagine since no other ions are recited – the claim does not preclude other implantations before or after the claimed hydrogen implantation.[1]

MEMC also erroneously relies on *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337 (Fed. Cir. 2007) to limit the effect of the term "comprising."  In *Dippin' Dots*¸ the plaintiff's patent related to a process for making ice cream in bead form.  *Id*. at 1340.  A limitation of the asserted claim specifically called for making the ice cream in bead form, and that limitation was construed to cover a process in which only beads were created, because a point of the process was to achieve a confection with pellets in the bead shape.  (PA-0023-24).  The court found that the comprising language in the preamble did not permit the claims to be broadened to cover the allegedly infringing process and found no infringement because the defendant's process produced both beads and irregularly shaped particles.  *Dippin' Dots*, 476 F.3d at 1343.

In this case, there is no dispute that an infringing process must include a step of implanting hydrogen ions.  The question is precisely, however, whether it can also include a step of implanting other ions.  It is for the purpose of permitting such variations in a claimed process that the comprising form exists.  There is no suggestion in the specification, the file history, or the history of the *SiGen* litigation, that the comprising form of these claims could be ignored.  Rather, in the *SiGen* case, the comprising form of the claim was specifically litigated and adjudicated to have its normal meaning.

---

[1]     Indeed, as discussed in Soitec's prior brief and the report of its expert, there is no limitation called for as to the type of silicon wafer into which the hydrogen would be implanted, and such wafers were typically "doped" – that is, pre-implanted with a variety of ionic species – in a manner which turned out to have significant implications for the kinetics of the Bruel process.

13

## III.   THE DEFINITIONS PROVIDED IN THE SPECIFICATION SHOULD CONTROL CLAIM CONSTRUCTION

The definitions for several of the disputed terms are explicitly provided in the specification.  As inventors are permitted to be their own lexicographers, these definitions should control construction of the limitations to which they refer.  Thus, the terms "intimately contacting," "stiffener," and "microcavities" should be construed as they are defined in the specification.

MEMC argues that the definition of "microcavities" provided by the Aspar Patents should be disregarded because that term describes the same phenomena which Bruel patent refers to as "gaseous microbubbles" and the Aspar "microcavity" limitation should therefore be similarly limited.  But the fact that a different limitation in a different patent has a different meaning is not a compelling reason for limiting a claim term which is explicitly defined in the specification, particularly because the Bruel disclosure is referenced and summarized in the Aspar disclosure.  If anything, the fact that the Aspar specification chose to provide a specific definition of the term "microcavities" suggests that any difference between that term and the term "microbubbles" from the Bruel specification was intentional and must be given effect.  Because "microcavities" is clearly defined in the Aspar patents, ("In the application, by microcavities one understands…) (JA-0009, '009 patent at 3:12), there is no reason at all to reach for the definition of "gaseous microbubbles" as construed in the unrelated Bruel patent.

## IV.   PRIOR CONSTRUCTIONS OF THESE CLAIM TERMS SHOULD CONTROL

There are several disputed terms where the *SiGen* Federal Circuit opinion and/or the *SiGen* district court's claim construction opinion either directly or de facto resolved the claim construction issues in this case.  Because claim construction is a matter of law, these issues are

stare decisis in this case, and should not be relitigated absent a compelling reason to the contrary.

The Federal Circuit has ruled that the term "temperature … adequate to create … a separation," (JA-0543, '484 reissue patent, claim 47), does not require an explicit temperature limit and is not indefinite, and Soitec respectfully submits that this Court should follow this ruling.

The Federal Circuit also has affirmed that "separation" (*Id.*) does not require "complete" cleavage and is not indefinite.  MEMC attempts to use the Court's reasoning in coming to its construction to argue against the Court's actual construction.  The construction is clear that the "separation" "<u>need not</u> result in complete cleavage," (JA-1259.004) (emphasis in original), yet MEMC persists that cleavage is necessary for the practice of the invention.  However, the Federal Circuit's decision controls, and this Court should thus reject MEMC's proposed claim construction.

The *SiGen* District Court's constructions for the terms, "process for the preparation of … comprising: first stage/second stage/third stage" (JA-0543, '484 reissue patent, claim 47), "stiffener" (*Id.*), "temperature … adequate to create … a separation" (*Id.*), "separation" (*Id.*), and "gaseous hydrogen microbubbles" (*Id.*) should similarly be adopted by this Court.

In a variant on its efforts to ignore the comprising form of these claims, MEMC argues that "gaseous hydrogen microbubbles" should be limited to the defects produced when hydrogen gas ions (and only hydrogen ions) are implanted at temperatures between 20° and 450° C.  MEMC attempts to sidestep the *SiGen* Court's explicit ruling that the term is not limited to these defects by noting that the claims were narrowed to only "hydrogen ions." However, the limitation of "only hydrogen ions" is discussed above in Section II., and the

15

*SiGen* Court's ruling on the temperature limitation is unaffected by the narrowing of the claims. The range of 20° to 450° C is still just a preferred range, and nothing in the specification disclaims higher or lower temperatures.

## V.   THIS COURT SHOULD NOT CONSTRUE TERMS WHICH ARE NOT IN CONTROVERSY

Soitec reiterates and respectfully submits that terms which are not in controversy should not be construed, as this constitutes an improper advisory opinion. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.,* 200 F.3d 795, 803 (Fed. Cir. 1999) ("only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy"); *Maytag Corp. v. Electrolux Home Prods.,* 411 F. Supp. 2d 1008, 1036 (D. Iowa 2006) (to "construe terms to a greater extent than necessary to resolve the present controversy" "would . . . constitute an impermissible advisory opinion").   MEMC attempts to sidestep this controlling case law by citing a non-controlling case which suggests that the controversy can include questions of validity as well as infringement.   However, MEMC does not even attempt to explain how its requested terms involve questions of validity.

MEMC resorts to the argument that because Soitec provided definitions for other terms which do not directly impact the infringement debate, this Court should be required to do so for all other terms which MEMC deems to be critical for the jury's understanding.   Soitec respectfully submits that this Court should not be bound by MEMC's assertion, as this Court's action is fundamentally different from Soitec's action.   Additionally, Soitec asserts that a definition was provided only in the context of claim construction, where there was a dispute over the construction of the term, i.e. "first substrate."   Thus, Soitec respectfully requests that this court not construe the terms "semiconductor material wafer" (JA-0543, '484 reissue patent, claim 47) and "ions" (JA-0010-11, '009 patent, claims 1 and 4, JA-0267-68, '396 patent, claims

16

1 and 4, and JA-0929, '234 patent, claim 21), as there is no controversy whatsoever surrounding these terms.

## VI.     THE REMAINING LIMITATIONS

There are several disputed terms where MEMC's proposed claim constructions are more confusing than the language the constructions are supposed to clarify and should therefore be rejected.

MEMC's proposed construction of the term "bonding" (JA-0010, '009 patent, claim 1 and JA-0268, '396 patent, claim 1) is a good example.  Here, a simple term is convoluted into a nearly incomprehensible barrage of limitations and verbs which describe not only the operation of bonding, but also MEMC's version of its desired effect.   ("any *sticking* operation or operation of *preparing* the surfaces and bringing them into contact that *provides* for *sufficient bonding energy* between the two substrates so that *applying* a mechanical force will *split* the thin layer from the rest of the first substrate rather than *de-bond the substrates*").   This proposed construction is very unlikely to help the finder of fact (Why is "sticking operation" clearer than the "bonding" of the claim?  If "bonding" is so unclear as to require construction, how does it help to define it as the opposite of "de-bonding"?) and adds limitations that are addressed subsequently in the claim (namely, "applying a mechanical force [that] will split the wafer").

Finally, there are several disputed terms where there is agreement about the meaning of the term and the dispute is over modifiers or examples.  These modifiers and examples either add nothing to the agreed construction or incorporate unexplained additional limitations.  For example, MEMC adds examples to its construction of the terms "stiffener" (JA-0543, '484 reissue patent, claim 47) and "second substrate" (JA-0010, '009 patent, claim 1 and JA-0268, '396 patent, claim 1).  MEMC argues that these examples must be included to guide the jury in

its enablement arguments.   But if the examples are within the scope of the agreed to construction, the testimony of the parties' experts performs the same function.  If they are not within the scope, they should not be listed.  Identifying what is and is not within the scope of the construed claims is the question of fact that is assigned to the jury.  Requesting this Court to direct a verdict on such issues as part of the claim construction process is improper.

MEMC also adds the modifier "any" to its construction of the terms "stiffener" (JA-0543, '484 reissue patent, claim 47), "first substrate," (JA-0010, '009 patent, claim 1 and JA-0268, '396 patent, claim 1), and "second substrate" (*Id*.), apparently to bolster its argument that the claim must enable all substrates.  The parties agree to what a substrate is.  If "any" simply reiterates that any substrate or stiffener is a substrate or a stiffener, it adds nothing to the agreed construction.  If it does something more, there is no basis for adding it, since the claims merely call for "a" stiffener or substrate.

Likewise, the parties agree that the limitation "pressure effect in the microbubbles" should be construed to cover at least "the pressure in the larger microbubbles caused by the heat treatment."   MEMC seeks to add the modifier "gas" to the term "pressure" in this otherwise agreed construction.[2]  Here, as in the other cases, the claim language simply calls for a "pressure effect," making no reference to any particular source for the pressure effect.  Indeed, limiting the pressure effect to a "gas" pressure effect simply adds ambiguity to the claim, since the construction begs the question of what constitutes a "gas pressure effect," and what types of "pressure effects" are excluded by adding the limitation.

---

[2]      MEMC adds a similar modifier (along with a great deal of additional verbiage) to the construction of "stiffener."

## VII.    THE '812 LIMITATIONS

There are basically two sets of limitations in dispute as to this patent.  First, there is the question of whether the claims calling for SOI wafers are limited to BESOI wafers.  MEMC argues that the claims' use of the broader term and the distinctions drawn in the specification between SOI in general and BESOI in particular should be dispositive.  The problem is that the specification of the '812 patent contains the sort of clear disclaimer of scope that is lacking from the Bruel and Aspar patents.  The opening passage of the specification is explicit that the invention relates to BESOI, not SOI in general:

> This invention generally relates to silicon on insulator ("SOI") bonded semiconductor wafers, and, more particularly to a process for stripping the outer edges of bond and etch back silicon-on-insulator ("BESOI") wafers.

(JA-1147 at 1:8-11).  This theme continues through the title ("Edge Stripped BESOI Wafer"), the abstract ("A processor for stripping the edge of a BESOI wafer . . ."), and it is consistent with the reality that the problems sought to be addressed by the invention therein are problems described as being unique to BESOI wafers.  (JA-1142, 1147 at 1:41-2:12).

The second class of disputes relates to the limitations that describe the interfaces between layers of the claimed BESOI structure.  All of the asserted claims contain two different limitations for two different types of interfaces within the BESOI structure.  The interface between the device layer and the oxide layer is claimed as a "bonded" interface – that is, the device layer of the claims has a "bonded surface" that is "parallel to and opposite" its exposed surface, and that is "bonded in its entirety to the oxide layer."  In contrast, the "oxide layer" of the claims is simply said to be "on at least one surface of the handle wafer," but there is no limitation calling for the oxide layer to be bonded to the handle wafer.

This distinction in the claims is consistent with the usage throughout the specification, which is utterly consistent in distinguishing between interfaces that are intrinsic to a substrate – such as where a layer is grown or deposited on the substrate – and interfaces that are created when two disparate surfaces are bonded to one another.  In the former case, a layer is said to be "on" a substrate.  In the latter case, a layer is said to be "bonded" to a substrate.  (*See e.g.*, JA-1147-48, '812 at 1:8-25; 1:29-31; 1:57-60; 2:42-43; 2:52-56; 2:59-64; 4:12-16 and 4:24-25; 4:42-45).

## CONCLUSION

For the foregoing reasons, Soitec respectfully requests that this Court adopt Soitec's proposed claim constructions and reject MEMC's.

Dated:  July 9, 2010                                **EDWARDS ANGELL PALMER & DODGE LLP**


                                                   */s/ Denise Seastone Kraft*
                                                   Denise Seastone Kraft (DE No. 2778)
                                                   John L. Reed (DE No. 3023)
                                                   919 North Market Street, 15th Floor
                                                   Wilmington, DE  19801
                                                   (302) 777-7770
                                                   dkraft@eapdlaw.com
                                                   jreed@eapdlaw.com
                                                   *Attorneys for S.O.I.TEC Silicon On Insulator
                                                   Technologies, S.A., Commissariat À L 'Énergie
                                                   Atomique, and Soitec USA, Inc.*

**OF COUNSEL:**

George W. Neuner (BBO No. 369640)
Alan M. Spiro (BBO No. 475650)
Brian M. Gaff (BBO No. 642297)
EDWARDS ANGELL PALMER & DODGE LLP
111 Huntington Avenue
Boston, MA  02199
(617) 439-4444
(617) 439-4170 (fax)

Michael Brody
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois  60601
(312) 558-5600

Marcus T. Hall
Laura K. Carter
WINSTON & STRAWN LLP
101 California Street, 39th Floor
San Francisco, California  94111
(415) 591-1000

Gail Standish
Ashlea Raymond
WINSTON & STRAWN LLP
333 South Grand Avenue
Los Angeles, California  90071
(213) 615-1700

21